## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN HOUSER, PH.D., FAHA<br>3500 N. Broad Street<br>Philadelphia, PA 19140,<br><br>     *Plaintiff*,<br><br>     v.<br><br>TEMPLE UNIVERSITY<br>1330 Polett Walk<br>Philadelphia, PA 19122<br><br>AND<br>ARTHUR M. FELDMAN, MD, PHD<br>3500 N. Broad Street<br>Philadelphia, PA 19140,<br><br>     *Defendants*. | Civil Action No. _____<br><br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

1.     Plaintiff, Steven Houser, Ph.D., FAHA ("Dr. Houser"), complains against Defendants, Temple University ("Temple") and Arthur M. Feldman, MD, PhD ("Feldman") (collectively sometimes hereinafter "Defendants"), for various claims including breach of contract, misappropriation of trade secrets, defamation, and intentional interference with contractual relations because Defendants have engaged in a scheme to defraud and defame Dr. Houser, capitalizing on Dr. Houser's research which was crucial to the formation of a new biopharmaceutical company.  Feldman and Temple stand to reap millions of dollars in profits off Dr. Houser's work.  To cover up their misconduct, Temple concocted pretextual "investigations" – the likes of which are not authorized by its own policies – against Dr. Houser, taking years to conduct, refusing to identify the basis of the alleged "charges" and threatening him with discipline if he did not cooperate.

2.     As a result of their wrongful conduct, Defendants have caused substantial damages to Dr. Houser, for which they are liable.

**Parties**

3.     Dr. Houser is an individual with a principal address at the above-referenced location.

4.     Temple is a state-related public research university located in Philadelphia, Pennsylvania with an address at the above-referenced location.

5.     Feldman is an adult individual with an address at the above-referenced location and Professor at Temple in the Department of Medicine and in the Center for Translational Medicine.

**Jurisdiction and Venue**

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this matter pertains to a federal question relating to misappropriation of trade secrets under 18 U.S.C. § 1831, et seq.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the Pennsylvania state law claims asserted herein.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b) as it is the judicial district in which Defendants reside and is the location where a substantial part of the events and omissions giving rise to the claims asserted herein occurred.

**Background Facts**

***Dr. Houser's Research and Reputation***

8.     Dr. Houser earned his PhD in Physiology, completed a research fellowship in the Division of Cardiology at the Lewis Katz School of Medicine at Temple University ("School of Medicine") and joined the Temple faculty as an Assistant Professor of Physiology in 1979.

9.     Since joining Temple in 1979, Dr. Houser has become an internationally respected cardiovascular researcher who has been a faculty member of the School of Medicine and Temple itself for more than forty (40) years.

2

10.     Under Dr. Houser's leadership, his research group has published approximately 240 professional articles and helped identify defective molecular and cellular processes that produce weak cardiac muscle cells that can cause poor heart function and lead to heart failure.

11.     Dr. Houser's laboratory has been continuously funded by the National Institutes of Health ("NIH") for more than 30 years, and in 2012, Dr. Houser's group was awarded a five-year, $11.6 million grant from the National Heart, Lung and Blood Institute of the NIH to study approaches to prevent or reverse damage to the heart after a heart attack.

12.     Over the course of his illustrious career, Dr. Houser rose through the ranks and was appointed as Director of the Lewis Katz School of Medicine ("School of Medicine") at Temple University Cardiovascular Research Center in 2003 (which he co-founded) and Chair of Physiology in 2005 (a position he continues to hold as of the filing of this Complaint).  Also, he serves the School of Medicine as Senior Associate Dean of Research.

13.     As a result of his efforts and those of other respected colleagues over the years, the School of Medicine has become one of the top research-oriented medical schools in the country and one of the top medical schools in Pennsylvania, and Dr. Houser was awarded an Endowed Chair ($2.5M), The Vera A Goodfriend Chair in Cardiovascular Sciences.

14.     Dr. Houser's stellar reputation as an academician and researcher has been honed over many decades and thousands of hours of detailed and quality work.

15.     Dr. Houser relies on his reputation, moreover, to help his group and Temple itself gain international attention, grants, speaking engagements and other special opportunities for him and the group that he has led for decades.

16.     Further, as a researcher, Dr. Houser places the utmost importance on academic ethics and the integrity of his research and work.  He has risen through the ranks of the major professional and service organization in his field, the American Heart Association ("AHA").  Dr.

Houser has served in numerous leadership roles in this organization, served on the Board and in 2017 served as the AHA President, the first Ph.D. basic scientist to hold this position.

### *The Employment Agreement and Temple Policies*

17.    Over the course of his decades at Temple, Dr. Houser has been a party to many agreements with Temple and has, over time, become a tenured member of Temple's faculty.

18.    Successively year after year, Dr. Houser received exceptional performance reviews from Temple (and his students and colleagues), and from 1979 through the present, Temple offered Dr. Houser continued employment, raises, bonuses and ever-increasing responsibility.

19.    Dr. Houser, in addition to his academic and research skills, has also proven himself to be an outstanding manager and administrator.

20.    Accordingly, on March 20, 2012, Dr. Houser entered into an employment agreement to serve as the Chairperson of the Department of Physiology and Director of the Cardiovascular Research Center ("2012 Agreement").  A copy of the March 20, 2012 agreement is attached hereto as Exhibit "A."

21.    The 2012 Agreement provided, among other things, that –

   a.    The term of the agreement ended on June 30, 2017;
   b.    Dr. Houser served at the "pleasure of the Dean"; and
   c.    Dr. Houser was responsible, both as Chairperson and Director, for "adhering to the policies and guidelines of the department, school, university, and accrediting bodies", "ensuring compliance with all regulations of the Center, School, university and external funding agencies, including time and effort reporting"

22.    On March 23, 2017, Dr. Houser entered into another employment agreement ("2017 Agreement") with Temple.  A copy of the March 2017 agreement is attached hereto as Exhibit "B."

23.    Through the 2017 Agreement, Temple renewed Dr. Houser's appointments as Senior Associate Dean, Research, Chair of the Department of Physiology, and Director of the

Cardiovascular Research Center in the School of Medicine from January 1, 2017 to June 30, 2022.

24.     In the 2017 Agreement, Temple states that Dr. Houser is responsible for "ensuring compliance with all regulations of the Center, School, University and external funding agencies, including time and effort reporting" and "Compliance with sponsor, University and School policies."

25.     The 2012 Agreement and 2017 Agreement are sometimes hereafter collectively referred to as the "Employment Agreements."

26.     Through the Employment Agreements, Temple placed significant responsibility and visibility in Dr. Houser.

27.     Dr. Houser, accordingly, took his responsibilities seriously and undertook a program of the highest academic, ethical and research standards.

28.     As part of Temple's policies and procedures which applied to the Employment Agreements, the Board of Trustees issued the Policy on Misconduct in Research and Creative Work, Policy No. 02.54.01 (the "Creative Work Policy") with an effective date of May 14, 2002.

29.     Through the Creative Work Policy, Temple covenanted to Dr. Houser, among others, that it was "committed to generating and disseminating knowledge and to protecting traditional principles of academic freedom." *See* Creative Work Policy at Art. I.

30.     Temple further acknowledged that it "recognizes the importance of protecting the lives and rights of all who are involved in those processes and of maintaining a relationship of trust within the broader academic, research and social communities." *Id.*

31.     Temple mandated "that each person who engages in or supervises research or creative work be responsible for conducting these activities in an ethical manner." *Id.*

32.     Temple stated that the Creative Work Policy applies to "all faculty members." *Id.* at Art. III.

33.     The Creative Work Policy provides for different procedures for tenured (Group 1) and untenured faculty (Group 2). *See id.* at Art. II. n.1.

34.     In the Creative Work Policy, the process for Group 1 (or tenured faculty) begins "[u]pon receiving information that a violation of the policy is alleged to have occurred[.]" *Id.* at Art. II.A.1.

35.     Upon receiving such information, however, Temple promised that "the Integrity Officer preliminarily will assess whether sufficient information exists to refer the matter to an Inquiry Committee." *Id.*

36.     The Creative Work Policy does not authorize the Integrity Officer to conduct an investigation as part of any preliminary assessment. *See generally* Creative Work Policy.

37.     For Group 1 personnel, Temple agreed that the Inquiry Committee "will be the Faculty Senate Personnel Committee ('Personnel Committee')." *Id.*

38.     In point of fact, under the Creative Work Policy, if the Integrity Officer "reports the matter to the Personnel Committee, the Personnel Committee will determine (1) whether there is sufficient evidence of actionable misconduct to warrant an Investigation, and (2) if so, whether in its view, formal proceedings to consider dismissal or discipline should be instituted." *Id.* at Art. II.A.2.

39.     Thereafter, the President of Temple, "after reviewing the findings and recommendation of the Personnel Committee, will decide whether to institute formal proceedings for discipline up to and including dismissal." *Id.* at Art. II.A.3.

40.     Temple guaranteed Group 1 personnel that "If the President institutes formal proceedings, the Personnel Committee will appoint an Investigation Committee (Hearing Committee) to determine whether actionable misconduct occurred and to recommend appropriate action to the President." *Id.* at Art. II.A.4.

41.     Finally, the "President or the President's Designee will decide what action(s) to take." *Id.* at Art. II.A.5.

42.     The process provided by the Policy for initiating an Inquiry is as follows: "If an allegation of misconduct proceeds to an Inquiry, the Integrity Officer promptly will (1) notify the Respondent, in writing, that an Inquiry Committee will be convened to consider an allegation of misconduct, (2) specify the nature of the allegation, (3) provide a copy of this policy to the Respondent, and (4) notify the Respondent that he or she will have the opportunity to be interviewed by and present evidence to the Inquiry Committee." *Id.* at Procedures, Art. I.B.1.

43.     Most significantly, Temple promised that "Inquiries" must "be completed within 60 and 90 days…from the date of their initiation" and "Investigations … must be completed within 120 and 180 days…from the date of their initiation." *Id.* at Policy, sec. J.

44.     According to the Creative Work Policy, "the Integrity Officer may approve an extension of these periods, in writing, if circumstances clearly warrant a longer period. The Respondent will be notified of the extension and the reason for the extension. The reason for the extension will be stated in the Inquiry Report." *Id*. at Policy, sec. F.

45.     Temple promised that all "Inquiries and Investigations will be conducted in a manner that will ensure fair treatment and confidentiality to the Respondent to the maximum extent reasonably possible without compromising public health and safety or thoroughness in carrying out the Inquiry or Investigation." *Id.* at Policy, sec. D.

46.     The Creative Work Policy requires all faculty members to cooperate with the Integrity Officer but does not require a Respondent "to provide written or oral testimony." *Id.* at Policy, sec. E.

47.     Temple further promises that "confidential treatment will be afforded to all affected, to the maximum extent reasonably possible." *Id*. at Policy, sec. F.

48.     The Creative Work Policy also defined various elements presumably to provide clarification to the process:

    a.    Allegation, according to Temple, "means any written or oral statement or other indication of possible misconduct, as defined in this policy, clearly communicated to the Integrity Officer." *Id.* at Art. III.A.

    b.    Good faith, according to Temple, "means the honest belief that misconduct may have occurred.  An allegation is not made in good faith if it is made with reckless disregard for or in willful ignorance of facts that would disprove the allegation." *Id.* at Art. III.D.

    c.    Integrity Officer, according to Temple, "means the University's chief research officer, as designated by the President." *Id.* at Art. III.I.

    d.    Misconduct, according to Temple, "means fabrication, falsification, plagiarism, or other practices that seriously deviate from those that are commonly accepted within the research and creative communities for proposing, conducting, or reporting research or other creative work." *Id.* at Art. III.L.

        i.    Temple further defined "Misconduct", in relevant part, as follows:

            1.    Abuse of confidentiality:  taking or releasing the ideas or data of others that were shared with the legitimate expectation of confidentiality; *e.g.*, stealing or disseminating ideas from others' grant proposals, award applications or manuscripts for publication when one is a reviewer for granting agencies or journals.  *Id.* at Art. III.L.1.

            2.    Dishonesty in publication:  knowingly publishing material that will mislead readers, e.g., misrepresenting date or their origin, misrepresenting research progress or adding or deleting the names of other authors without their permission. *Id.* at Art. III.L.5.

            3.    Plagiarism:  taking credit for someone else's work and ideas, stealing others' results or methods, copying the writing of others without proper acknowledgment, or otherwise taking credit for the work or ideas of others.  *Id.* at Art. III.L.9,

            4.    Property violations:  misappropriating, stealing or destroying equipment, supplies or other information including, but not limited to, data, text, works of art or authorship or databases, which either belong to others or over which others have primary usership.  *Id.* at Art. III.L.10.

49.     Thus, under the Creative Work Policy, an "Inquiry" or an "Investigation" are the fact-finding processes authorized by Temple and agreed to by the faculty.

*Temple's Intellectual Property Policies*

50.     Temple also has policies respecting "Inventions and Patents" (hereafter, "Inventions Policy").

51.     Temple's Inventions Policy, the current iteration of which was adopted by Temple's Board of Trustees in 1985, provides that the school "encourages the search for new knowledge, discoveries and inventions which will serve the public good." *See* Inventions Policy at ¶ 1.

52.     Temple has stated that this policy is intended to "provide incentive for those engaged in research and the applied arts to commercialize their inventions" and to "define the obligations of all parties involved in the invention process and to safeguard their rights and interests." *Id.* at ¶¶ 1(a) and (b).

53.     The Inventions Policy provides for the assignment of all rights and interest in any invention developed in whole or in part by any university employee with any university facilities or equipment to Temple itself. *Id.* at ¶ 2.

54.     Where an invention has been identified, Temple has, among others, the obligation to determine the owners of any such invention by reference of the matter to the president or person designated by the president to do so. *Id.* at ¶¶ 2 and 3(f)(b).

55.     Temple promised under the Inventions Policy that the "net income to the university from a royalty agreement or other agreement resulting from an invention shall be distributed as follows:  50% to the inventor(s) and 50% to the university, provided that the inventor(s)' share shall not fall below five percent (5%) of the university's gross receipts." *Id.* at ¶ 4.

### Feldman and the Misappropriation of Dr. Houser's Research

56.     Feldman was hired as Executive Dean of the School of Medicine in or around 2012 or 2013.

57.     Dr. Houser reported directly to Feldman in affairs regarding Dr. Houser's positions with Temple until Dr. Feldman was relieved of his duties by Temple as Executive Dean on or about December 21, 2015.

58.     In 2015, Dr. Houser and his lab at the School of Medicine were working on many projects related to heart failure.  As part of one of those projects, Dr. Houser and his lab conducted experiments to examine changes in cardiac structure and function after an induced "myocardial infarction," commonly known as a heart attack.

59.     As part of this project, the lab had developed a large animal (in this case, a pig) model to study heart failure after a myocardial infarction.  Large animal models, such as a pig model, are an important precursor to the eventual development of treatments and therapies for humans as they can more closely mimic and predict conditions that are likely to occur in humans.

60.     Dr. Houser's lab was using this pig model to test novel cell and drug therapies for the treatment of the failing heart.  As a result of this testing and research, Dr. Houser's lab developed a pig model that shows, among other things, what happens to the heart of a patient who has suffered a heart attack (via a blocked coronary artery), is rushed to the hospital and has their blocked artery reopened after ninety (90) minutes.  In other words, Dr. Houser's pig model establishes a model of the "gold standard" of time between when a heart attack occurs and when treatment is rendered in a typical human patient (hereafter, "Dr. Houser's Pig Model").

61.     As part of the research, Dr. Houser's team performed testing that showed that the subjects suffered heart failure with reduced ejection fraction (a decrease in percentage of blood

being pumped from the heart with each heartbeat) after inducing a myocardial infarction (heart attack) (hereafter, "Dr. Houser's Pig Data").

62.     Dr. Houser's Pig Data was part of a broader study in the Houser lab and were not published at the time.  This work was initially funded by Dr. Houser's endowed chair and later was funded by the NIH. Dr. Houser's Pig Data was not public nor was it meant to leave Dr. Houser's lab without his express permission.

63.     At or about the same time that Dr. Houser was working on research related to his Pig Model, Feldman was working on a project to see if a molecule, known as "BAG3," was altered in heart failure and if correcting the defective molecular concentration would rescue the heart function.

64.     Heart failure in humans comes in two general forms, divided by whether or not "ejection fraction" is reduced.  Ejection fraction, most simply, is the percentage of blood that is ejected from the heart with each heartbeat.

65.     Heart failure with reduced ejection fraction has multiple causes, but the most prevalent is "ischemic heart disease" or heart disease that results from a blockage of blood flow (such as from atherosclerosis), which leads to myocardial infarction (heart attack).  After a person has a myocardial infarction, they have a dead region of their heart which causes the heart to remodel and eventually its ability to pump blood is reduced (*i.e.*, the ejection fraction is decreased).  Most clinical research has involved this form of heart failure.

66.     The other major form of heart failure is heart disease in which ejection fraction is not reduced.  This type of heart failure can result from, among other causes, hypertension (high blood pressure).

67.     Upon information and belief, Feldman's work on BAG3 consisted of (1) research related to a small population of human patients suffering from heart failure, with genetic

mutations that cause reduced levels of BAG3; and (2) a mouse model that induces heart failure through hypertension, or pressure overload, in the heart, and that has reduced levels of BAG3.

68.    Upon information and belief, Feldman observed that patients with a rare hereditary form of heart failure (familial dilated cardiomyopathy), resulted from a mutation in the BAG3 gene.

69.    Upon information and belief, Feldman also observed that in a mouse model, where heart failure was induced as a result of pressure overload of the heart, BAG3 levels were reduced.  The mouse model, however, lacks broad clinical significance, as the acute nature of the pressure overload induced in the mouse in order to cause heart failure, does not occur in humans. In other words, the mouse model does not mimic what happens when a patient suffers a heart attack.  A heart attack results from ischemic heart disease, a blockage of blood flow in a coronary artery, not from an overload of pressure caused by constriction of an artery.

70.    Upon information and belief, Feldman did not have a pig model as part of his BAG3 research.  It was important for Dr. Feldman to have access to a large animal model, especially one that mimicked the conditions of a patient suffering a heart attack—ischemic heart disease (heart disease that results from a blockage of blood flow) with reduced ejection fraction (the amount of blood that leaves the heart each time it contracts).  Such a model would have broad clinical significance as it would allow for the testing of potential treatments and therapies for human patients who have suffered a heart attack, the leading cause of ischemic heart failure in humans.

71.    Upon information and belief, having such a model also was important to secure investment and other financial support for a commercial venture based upon this invention.

72.    Thus, using data and testing from a large animal model, such as Dr. Houser's Pig Model, was an essential part of the inventive and commercialization processes to complete Dr. Feldman's research.  If Dr. Houser's Pig Model, which mimics the 90-minute gold standard of

the time between the occlusion event (blocked artery) and reperfusion (what occurs when a patient suffers a heart attack, is rushed to the hospital, and the blocked artery is reopened), also showed reduced levels of BAG3 in the heart tissue, the model could be used to test the potential efficacy of gene therapies that would reintroduce BAG3 to the damaged tissue in the hopes of recovering normal heart function, including improving the heart's ejection fraction (ability to pump blood).

73.      At the time, Dr. Feldman and Dr. Houser were generally aware of each other's work; however, Dr. Houser was not aware that Dr. Feldman needed access to Dr. Houser's Pig Model for any future commercial endeavors.  As Dr. Houser's supervisor, however, Dr. Feldman was aware of the details of Dr. Houser's research and of the potential value of Dr. Houser's Pig Model.

74.      Upon information and belief, with this knowledge, Dr. Feldman seized on the opportunity to secure Dr. Houser's Pig Model without investing the time, money and research necessary to create one for himself.  Thus, Dr. Feldman embarked on a covert effort to improperly secure access to this pivotal missing link for his research, without having to share the credit (or potential financial gains) from this invention with Dr. Houser.

75.      Upon information and belief, in or about 2014 or 2015, Dr. Feldman, while he was Dr. Houser's supervisor and Executive Dean of the School of Medicine, approached one of Dr. Houser's graduate students, Thomas Sharp, and asked for Dr. Houser's Pig Data that Dr. Houser had developed in his lab, as well as for samples of tissue from pigs that had undergone the 90-minute occlusion to induce a heart attack and control samples ("Dr. Houser's Pig Model Tissue Samples").

76.      Upon information and belief, Dr. Feldman told Sharp that (1) Dr. Houser had given his permission for Sharp to provide Dr. Houser's Pig Data and Dr. Houser's Pig Model Tissue Samples to Dr. Feldman; (2) Dr. Houser would be able to examine the paper which Dr.

Feldman was working on before submission; and (3) Dr. Houser would be identified as a co-author on the paper.  The first of these statements is categorically false.  Upon information and belief, the remaining two statements were also false when made.

77.     In fact, Dr. Houser had no knowledge of Dr. Feldman's request to Sharp, nor did he give Dr. Feldman permission to take, use, publish or otherwise claim as his own Dr. Houser's Pig Data, Dr. Houser's Pig Model Tissue Samples or any data derived from Dr. Houser's Pig Model Tissue Samples.  Indeed, Dr. Feldman never made any such requests for permission to Dr. Houser.

78.     Unbeknownst to Dr. Houser, Sharp (who, upon information and belief, believed he was acting with Dr. Houser's knowledge and blessing) gave Dr. Houser's Pig Data and Dr. Houser's Pig Model Tissue Samples to Dr. Feldman (hereafter, Dr. Houser's Pig Data and Dr. Houser's Pig Model Tissue Samples will be referred to collectively as the "Stolen IP").

79.     Unbeknownst to Dr. Houser, Dr. Feldman published a paper which contained the Stolen IP in or around 2015 (hereafter, the "Feldman Paper").  A copy of the Feldman Paper is attached hereto as Exhibit "C."

80.     Dr. Houser, however, was never provided with a copy of the Feldman Paper at any time prior to its submission (and only learned of it until years after it was first published).

81.     Dr. Houser was not listed as a co-author on the Feldman Paper or any other paper, article or any other document that used the Stolen IP, Dr. Houser's Pig Data or any information derived from Dr. Houser's Pig Model Tissue Samples.

82.     Further, while Dr. Feldman intentionally omitted Dr. Houser as a co-author on the Feldman Paper, he listed Sharp, Dr. Houser's graduate student, as a co-author.  In such situations, it is customary for the head of lab (Dr. Houser, in this case) to be listed, and the head of the lab communicate to the other lab director (in this case, Dr. Feldman), who had performed sufficient work to be listed as a co-author.  That Dr. Houser was never contacted by Dr. Feldman

about either the Stolen IP or the Feldman Paper, but his graduate student was (and even listed as a co-author), underscores that Dr. Feldman intentionally excluded Dr. Houser from the entire process.  Upon information and belief, Dr. Feldman also never informed Sharp that Dr. Houser was not being listed as a co-author and Sharp also did not learn of this until years after the Feldman Paper was published.

83.     Sometime in 2017, Dr. Houser learned from Sharp, that at some point in either 2014 or 2015, Dr. Feldman had requested the Stolen IP, told Sharp that Dr. Houser had granted permission to Dr. Feldman to use the Stolen IP and stated that he would give Dr. Houser co-author credit on a paper which Feldman would publish.

84.     At or about the same time, Dr. Houser also learned of the Feldman Paper published by Dr. Feldman, which relied, critically, on Dr. Houser's Pig Data as well as data derived from Dr. Houser's Pig Model Tissue and passed off the research, data and model as if it were Dr. Feldman's own research, model and data and not that of Dr. Houser.

85.     Dr. Feldman used the Stolen IP in the Feldman Paper.  Specifically, in the paper, Dr. Feldman published Dr. Houser's Pig Data to show that the subjects suffered heart failure with reduced ejection fraction (the decrease in blood flow being pumped through the heart that occurs during a heart attack), and the results of protein testing done on Dr. Houser's Pig Model Tissue that showed reduced levels of BAG3 in the heart tissue from the pig where a heart attack was induced.

86.     The Stolen IP provided necessary clinical information needed by Dr. Feldman to begin to market BAG3 as a potential therapeutic target for patients who suffer from a heart attack, the leading cause of ischemic heart failure (heart failure caused by a blockage of blood flow through the heart).

87.     The Feldman Paper focused on the available data and evidence supporting the theory that BAG3 may be a potential target for new therapies in patients with heart failure.

88.     In 2017 when he learned of Dr. Feldman's misconduct, Dr. Houser knew that he, as the author/creator of the Stolen IP, had not given Feldman permission to use the Stolen IP or permission to pass off the Stolen IP as Feldman's own work.

89.     Dr. Houser also knew that he, as the author/creator of the Stolen IP, had not been approached or contacted by Dr. Feldman or anyone on his behalf to use the Stolen IP in the Feldman Paper or otherwise.

90.     Dr. Feldman's conduct constituted misconduct under Temple's own Creative Work Policy, including dishonesty in publication, plagiarism and property violation.  *See* Art. III.L(5), (9) and (10).

91.     In accordance with Temple's Creative Work Policy, in or around February 2017, Dr. Houser made a good faith allegation of misconduct by Dr. Feldman to Dr. Susan Wiegers who was at that time the Senior Associate Dean of Faculty Affairs at the School of Medicine.

92.     Upon information and belief, Dr. Wiegers turned over Dr. Houser's report to the University's Integrity Officer and Vice President of Research ("OVPR") at Temple, Michele Masucci ("Masucci").

93.     Dr. Houser was never interviewed over the matter by the OVPR.

94.     Dr. Houser was never notified whether there was an Inquiry or Investigation, as those concepts are defined in Temple's policies, over Dr. Feldman's conduct.

95.     Instead, approximately one week after Dr. Houser's report, Dr. Wiegers told Dr. Houser that the OVPR would like him to accept an "apology" from Dr. Feldman.

96.     Dr. Feldman offered an "apology" to Dr. Houser but did not return any part of the Stolen IP, and the Feldman Paper was not corrected to reflect Dr. Houser as an actual author/creator of the lab data upon which the paper (and Dr. Feldman) so critically relied.

97.     To this day, Dr. Houser has not given Dr. Feldman any permission to use, publish or otherwise claim the Stolen IP as Dr. Feldman's own in any forum or publications.

16

98.     In December of 2015, Dr. Feldman was relieved by Temple of his position as Executive Dean but remained on staff at Temple and the School of Medicine.

99.     Dr. Houser no longer reported directly to Dr. Feldman after that point.

100.    Despite being colleagues at Temple, Dr. Houser understands that Dr. Feldman dislikes Dr. Houser, and upon information and belief, Dr. Feldman stands to lose considerable credibility and financial gain if his improper actions regarding Dr. Houser's Stolen IP come to light.

### The So-Called Inquiry Or Investigation

101.    In October 2018, Dr. Houser (and many other scientists and academics across the United States) was notified that Harvard University ("Harvard") was recommending the retraction of approximately 30 academic papers which were authored, co-authored or collaborated on by a now disgraced and former Harvard professor, Piero Anversa ("Anversa"), and/or his group (that is, Anversa, plus a number of other faculty who joined Harvard from New York Medical College when Anversa did).

102.    As a prominent academic and scientist, Anversa (and his group) had collaborated with a large number of people and published papers with many more.

103.    Harvard, however, focused its investigation on papers published by Anversa and his group while they were at Harvard.

104.    Dr. Houser had one research paper that was named in the Harvard investigation; however, Anversa was **neither** an author **nor** a co-author on that paper.

105.    Houser and Anversa have no co-authored papers during Anversa's tenure at Harvard.

106.    The research paper, entitled *"Increasing Cardiac Contractility After Myocardial Infarction Exacerbates Cardiac Injury and Pump Dysfunction."* Authored and co-authored by: Hongyu Zhang, Xiongwen Chen, Erhe Gao, Scott M. MacDonnell, Wei Wang, Mikhail

Kolpakov, Hiroyuki Nakayama, Xiaoying Zhang, Naser Jaleel, David M. Harris, Yingxin Li, Mingxin Tang, Remus Berretta, Annarosa Leri, Jan Kajstura, Abdelkarirn Sabri, Walter J. Koch, Jeffery D. Molkentin, Steven R. Houser.: *Circ. Res.* 2010;107: 800-809. (hereafter, the "2010 Paper"), was published by AHA after peer review.

107.    Peer review is a critical component of the academic verification and vetting process for research papers.  In peer review, the authors send the paper to a journal.  The journal then sends the paper to three experts in the particular field at issue.  The authors do not know (and they do not choose) the reviewers, and the reviewers remain anonymous to the authors through the peer review process.  The three selected experts critique the paper (nothing is off limits in the review process), and for good journals about 80% of all submissions are rejected based on peer review.  If the paper is deemed suitable for publication, the authors are given the opportunity to answer questions, provide more data, and revise the paper as needed.  The peer review process can go back and forth a number of times before the paper is finally accepted for publication.

108.    A leading hypothesis Anversa was known for was the idea that a "stem" cell exists in the heart which could regenerate new cardiac muscle cells called "myocytes."

109.    The 2010 Paper, however, did not focus on this theory and instead concerned myocyte (or muscle cell) death from too much calcium.

110.    Anversa was neither a collaborator or co-author on the 2010 Paper.

111.    Instead, Harvard expressed concern that others at Harvard and members of Anversa's "group" – but not Houser – might have created (or helped to create) a fabricated supplemental figure included in the 2010 Paper.

112.    Upon learning of the potentially-fabricated figure, Dr. Houser, along with his primary collaborator Jeffrey Molkentin, PhD, from Cincinnati Children's Hospital, requested

that the publisher, AHA, allow them the opportunity to correct the figure, which was not central to the conclusions of the paper.

113.    AHA agreed to permit the corrected figure, and Drs. Houser and Molkentin later provided data to support the original paper and a ***new*** figure to AHA for correction of the 2010 Paper.  AHA accepted the correction and the Notice of Concern, issued while the suspect figure remained uncorrected, was removed.  The 2010 Paper otherwise had become and remains accepted and competent scientific research in the field.

114.    Moreover, for any paper where Anversa is identified as a senior author while at Harvard, there is no data from Dr. Houser's lab at the School of Medicine.

115.    Nevertheless, not long after Harvard's announcement about Anversa, from around October 2018 and through September 2019, Masucci spoke multiple times to Dr. Houser, stating that she would need to begin an "inquiry" – presumably in accordance with the Creative Work Policy – related to the 2010 Paper as a result of Harvard's call for retraction of papers involving Anversa or his group.  Harvard made no claims about any individuals other than Anversa and other Harvard faculty in his research group.

116.    However, the real reasons for the Inquiry were not disclosed to Dr. Houser.

117.    Masucci told Dr. Houser, moreover, that due to her friendship with him, she had a conflict of interest in any inquiry or investigation respecting Dr. Houser, and therefore Michael Henderson, an attorney in the OVPR office, would be in charge of the process.  For all purposes related to this alleged Inquiry/Investigation, it appeared to Dr. Houser that Henderson was merely following Masucci's instructions.

118.    Henderson left Temple about a year ago, and for all relevant times hereafter, Masucci has taken over the Inquiry/Investigation at issue, despite her claims of an alleged conflict of interest.

119.    In the midst of the discussions between Masucci and Dr. Houser, however, Dr. Houser received an email providing him with the time and place at which he had to meet with attorneys from Wilmer Hale, an outside law firm presumably retained by Temple to conduct an investigation into the Anversa matter, and to be prepared to discuss the 2010 Paper with the attorneys.

120.    On October 10, 2019, Dr. Houser met with three attorneys from Wilmer Hale and was questioned for approximately five hours.

121.    The first question from the attorneys handling the Inquiry/Investigation concerned the reason why Anversa was not identified as a co-author on the 2010 Paper.

122.    Dr. Houser explained that the reason he was not so identified was that he did not do anything on or relating to the 2010 Paper.

123.    Though the email Dr. Houser received stated that he should be prepared to discuss the 2010 Paper, most of the interrogation focused on other matters not mentioned to Dr. Houser before, including a paper published in 2007 from Dr. Houser's lab in which Anversa was identified as a collaborator (hereafter, the "2007 Paper").

124.    In 2007, Anversa was a faculty member at New York Medical College and not Harvard.

125.    To Dr. Houser's knowledge at the time of his interrogation by Temple's outside lawyers engaged to conduct an investigation, there had been no claim of fraud, fabrication, plagiarism, or academic misconduct of any kind leveled against the 2007 Paper.

126.    At the 2019 interrogation, Dr. Houser had no counsel or representative present with him nor was he advised at any point before, during or after the interrogation of any basis for any Inquiry or Investigation by Temple.

127.     There is no authorization under the Creative Work Policy for the Integrity Officer or Temple or anyone acting on their behalf to require an interrogation or document production pursuant to a "preliminary assessment." *See generally* Creative Work Policy.

128.     Dr. Houser nevertheless answered all questions posed by the Wilmer Hale attorneys, despite having no obligation to do so.

129.     After Harvard's listing of retraction requests in October 2018 were made public, Dr. Houser was informed by certain colleagues that Dr. Feldman had told them that Dr. Houser was under investigation by Harvard and the National Institutes of Health ("NIH").

130.     Dr. Houser, in fact, informed Masucci that Dr. Feldman was making these untrue statements about him to other faculty members.

131.     In point of fact, Dr. Houser was asked on separate occasions by Dr. John Daly (now interim Dean of the School of Medicine) and Patrick O'Connor (at the time the Chairman of the Temple Board) to explain the so-called "Harvard Investigation."

132.     As an aside, Dr. Houser also informed the Wilmer Hale interrogators that Dr. John Daly and Patrick O'Connor had approached him to inquire about rumors they heard which were the same as those being disseminated by Dr. Feldman.

133.     The statements that Dr. Houser was being investigated by Harvard and/or NIH are categorically false.

134.     The same statements were intended to defame Dr. Houser and harm his reputation and personal and professional standing in his profession.

135.     To Dr. Houser's knowledge, Temple has not initiated any inquiry or investigation into Dr. Feldman's defamatory statements against him.

136.     On October 10, 2019, in the midst of this non-specific "Inquiry/Investigation", Dr. Houser contacted Masucci to ask whether the Stolen IP which Dr. Feldman wrongfully claimed as his own was used in any patent filings.

21

137.    By that time, Dr. Houser knew that Dr. Feldman had used the Stolen IP without Dr. Houser's permission in the Feldman Paper and wondered if the Stolen IP might also be part of a patent filing.

138.    In response to Dr. Houser's questions, Masucci stated that she did not know the answer but noted that "it is a fair question."  Masucci next stated that "I would like to move through our current process and then take a step back to assess how best to address many interrelated matters."

139.    In January 2020, Dr. Houser, frustrated with the lack of information and responsiveness to his questions about the Stolen IP and Dr. Feldman's defamatory statements about him, met with counsel for Temple, Michael Gebhardt, to discuss the lies Dr. Feldman had been spreading about Dr. Houser, as well as Dr. Houser's concerns regarding Dr. Feldman's use of the Stolen IP.

140.    Thus, Temple, at the highest levels, was aware of Dr. Houser's concerns and the reports of Dr. Feldman's conduct.

141.    To date, however, neither Masucci nor Temple ever responded to Dr. Houser's inquiries about these matters in any substantive way.

142.    In the meantime, Dr. Houser's direct reports and other colleagues of his in the School of Medicine were being interviewed by either Temple or its counsel, Wilmer Hale, in connection with the unspecified claims against him.

143.    In point of fact, on August 31, 2020, Masucci requested that a co-worker of Dr. Houser "gather[] information related to the collaboration between the laboratory of Dr. Steven Houser and Dr. Piero Anversa" and demanded that Dr. Houser's colleague "collect your laboratory notebooks."  Masucci told Dr. Houser's co-worker that "Dr. Houser is aware that we have requested the preservation of documents related to this matter; however, we request that

you keep this matter confidential and ask that you do not discuss our request or share this message with your colleagues," which obviously included Dr. Houser.

144.    Dr. Houser was unaware of Masucci's request sent to his colleague when the request was made.

145.    Further, Masucci was told by Dr. Houser's co-worker who was the target of Masucci's document demands that when the notes were delivered to her office, the notes at issue were really Dr. Houser's property and they were stored in his private storage areas.  Dr. Houser's co-worker expressed concern about continuing to act upon Masucci's requests.

146.    Masucci responded that "we will take care of it from here."

147.    Masucci also made a request for lab notebooks of a former trainee in Dr. Houser's lab from another co-worker, again all without Dr. Houser's knowledge or consent.

148.    Dr. Houser, not initially knowing about Temple's secretive efforts to collect his lab work products, reported a theft of property from his lab to the police.

149.    To date, there exists a gap in Dr. Houser's lab notes and data from 2003-2013, as a result of documents demanded by and apparently given to Masucci as part of the Inquiry/Investigation against Dr. Houser.

150.    After October 2019 and through August, 2020, Dr. Houser made several requests, at least once through his own legal counsel, for Masucci and/or Temple to identify the specific issues for the "Inquiry" or "Investigation" that they were pursuing against him.

151.    Finally, on September 25, 2020, Masucci sent Dr. Houser an email in which she, for the first time, attempted to classify the nearly year-long inquiry as a "preliminary assessment."

152.    Masucci said that "scope of the preliminary assessment from the outset involved your publications and research performed in collaboration with Dr. Anversa."  Masucci also

stated that the "preliminary assessment continues to focus on issues related to [certain publications relating to Anversa] and research performed in collaboration with Dr. Anversa."

153.    Masucci then stated:

> Notwithstanding our efforts, we have not been able to review certain potentially relevant sources of information with respect to the collaboration.  Thus, we are continuing to identify additional relevant sources of information to aid our assessment.  Our expectation is that counsel will be prepared to sit with you for a final interview within the next 45 days, after which we will conclude the preliminary assessment.

154.    Masucci's statement was false to the extent it tried to paint the ongoing "Inquiry" as a "preliminary assessment."

155.    Nothing in the Creative Work Policy permits such a wide-ranging investigation to constitute a "preliminary assessment."  *See generally* Creative Work Policy.

156.    In fact, Masucci was conducting an "Inquiry" or "Investigation," which is not authorized by the Creative Work Policy to be conducted in the manner it has proceeded against Dr. Houser.

157.    Dr. Houser provided a detailed written response, repudiating Masucci's mislabeling of Temple's actions and giving an answer to every allegation raised by Masucci.

158.    In turn, Masucci responded stating that "this matter is not an 'inquiry' into misconduct, but rather is a 'preliminary assessment' under our policy on misconduct in research."  Masucci next informed Dr. Houser that because Temple deems the process a "preliminary assessment," Dr. Houser's request "to be apprised of the nature of an allegation against you is applicable to an Inquiry under our policy," not a preliminary assessment.  Further, "[i]f this matter moves to an Inquiry, we would then share the specific allegations regarding potential research misconduct that would warrant that next step."

159.    Further, Masucci stated that "at this stage, there is no allegation of research misconduct – only an assessment being undertaken to determine if anything rises to that level."

160.    Masucci then demanded to know whether Dr. Houser would – again – be "willing to meet with the team" to interrogate him once more.

161.    The Creative Work Policy does not require any faculty member or employee to submit to interrogation or document demands under any alleged "preliminary assessment." *See generally* Creative Work Policy.

162.    Also by email dated September 25, 2020, Masucci sent Dr. Houser correspondence stating that Temple had been notified by the Office of Research Integrity of the Office of the Assistant Secretary for Health – U.S. Department of Health and Human Services (hereafter, "ORI") "that you have been named in a complaint regarding allegations of possible research misconduct stemming from but not limited to 'Clare Francis' complaints that were received by ORI, including but not limited to those noted here: https://pubpeer.com/search?q=steven+houser [hereafter, the "PubPeer Claims"]."

163.    Masucci warned Dr. Houser "not to discuss the matter with colleagues" and to preserve and maintain "any and all records regarding your research[.]"

164.    "Clare Francis" is a pseudonym used to describe unverified and anonymous complaints or allegations by unspecified individuals regarding claimed cases of plagiarism or fabricated or duplicated figures appearing in scientific journals and papers.  It is an academic pseudonym for an internet "troll."

165.    PubPeer's own disclaimer states that "The success of the site is due to the expertise and diligence of our users, who create all of its content.  Nevertheless, comments should always be considered as sources of potentially useful information whose veracity readers must evaluate for themselves."

166.    PubPeer also states that it "does not review comments scientifically and provides no warranty as to their veracity."

167.    Thus, PubPeer is an anonymous, open forum where reviewers criticize publications without peer review, fact checking or substantiation.

168.    Thereafter, Dr. Houser heard nothing more from Temple or Masucci on the PubPeer Claims until January 2021.

169.    By email dated December 11, 2020, Masucci again notified Dr. Houser that Temple's outside interrogators, Wilmer Hale, were "prepared to sit with you for a final decision to further inform the conclusion of their assessment."

170.    Dr. Houser, not being given adequate or proper explanations of the basis or claims for the Inquiry/Investigation, did not agree to Masucci's invitation to be interrogated – again – as there exists no basis under the Creative Work Policy for the procedure presented.

171.    To date, Dr. Houser has not been given any further information on the Inquiry/Investigation that presumably related to the 2010 Paper, as detailed above.

172.    By letter dated January 11, 2021, Masucci wrote in follow up to her prior "notice" of the PubPeer Claims and listed 9 different papers – one of which, published in various academic journals on a variety of topics, which were identified at PubPeer (hereafter, the "PubPeer Demand Letter").

173.    Masucci's PubPeer Demand Letter does not identify any basis for any allegations other than the reference to PubPeer.

174.    In point of fact, cross-referencing the list of 9 articles identified by Masucci in her PubPeer Demand Letter on PubPeer's own site confirms that comments on most of the claimed, anonymous criticisms appeared ***more than 6 months ago*** and one alleged comment specifically contains an Errata entry from one of the authors showing that the article was ***corrected*** long before Masucci's baseless PubPeer Demand Letter.

175.    None of the PubPeer Claims, however, contain "strong evidence," as PubPeer requires, to support any of the allegations Temple now asserts.

176.   Moreover, Masucci did not explain how or why these papers, which have been identified on PubPeer for months and corrected in one case, are now being raised against Dr. Houser.

177.   Nevertheless, in her PubPeer Demand Letter Masucci demanded that Dr. Houser preserve documents and warned any failure to do so might constitute misconduct.

178.   The PubPeer Demand Letter, however, did not mention the status of documents Masucci previously demanded and received from Dr. Houser's lab without his knowledge or permission.

179.   Masucci also notified Dr. Houser that "Temple University will identify a time to hold an initial discussion of the specific allegations once the records you provide have been reviewed."

180.   The PubPeer Demand Letter, unlike the other "Anversa Inquiry/Investigation," purported to notify Dr. Houser that after an unspecified "preliminary assessment," Temple "has initiated an inquiry" under Temple's Creative Work Policy and federal regulations.

181.   Notably, Temple did not appear to conduct any "preliminary assessment" investigation as it did with the Anversa Inquiry/Investigation.   Further, Masucci made no reference in the PubPeer Demand Letter to any apparent conflict of interest that she might have had with Dr. Houser.   Thus, whatever conflict of interest she referenced relating to the Anversa Inquiry/Investigation, Masucci seemed to have resolved it with this second Inquiry.

182.   Further, Temple did not identify any outside counsel that assisted it with the unspecified "preliminary assessment."

183.   By email dated January 13, 2021, Masucci notified Dr. Houser that since he did not state that he wanted to meet again with Masucci's "team" respecting the Anversa matter, "I want to let you know that we are moving forward without your further input related to the preliminary assessment."

184.    The Anversa Inquiry/Investigation has been ongoing since September 2019 and continues to this day.

185.    Over that time, Temple's purported "preliminary assessment" has involved the interrogation of Dr. Houser for over 5 hours, demanding voluminous documents and related information – without his knowledge or consent – from his lab colleagues, collecting certain documents and information, demanding additional interrogations with Temple's interrogation team, Wilmer Hale, and ignoring Dr. Houser's every request for clarity, information and the basis and foundation for Temple's actions.

186.    Contrary to Temple's express Creative Work Policy, this "Inquiry" or "Investigation" or whatever it the process is called by Temple, the Anversa Inquiry/Investigation has not been completed within 60 or 90 days or 120 or 180 days from its inception. *See* Creative Work Policy at Policy, sec. J.

187.    In contravention of Temple's own Creative Work Policy, at no time up to and including the filing of this Complaint was Dr. Houser ever formally notified by Temple or its Integrity Officer (1) in writing, that an Inquiry Committee was to be convened to consider an allegation of misconduct, (2) informed of the nature of the allegation, (3) provided a copy of the Creative Work Policy, or (4) notified that he will have the opportunity to be interviewed by and present evidence to the Inquiry Committee. *See* Creative Work Policy at Procedures, Art. I.B.1.

188.    The frivolous Anversa Inquiry/Investigation has badly damaged Dr. Houser's reputation and continues to badly damage his reputation and position of authority at the School of Medicine and in the greater academic community.

189.    As a direct result of Temple's illegal actions, Dr. Houser has not taken on any new leadership roles in any professional organizations because the ongoing investigation would have a negative impact on the organizations he would be representing.

190.    Temple's conduct, moreover, comes at a time when Dr. Houser is planning for his career after Temple.

191.    Temple's unfounded and undefined Anversa Inquiry/Investigation continues to negatively impact all plans Dr. Houser has for his career after leaving Temple.

192.    Contrary to Masucci's statements, there is no authority under the Creative Work Policy for a preliminary assessment to include full-scale investigations, respondent interviews, demands for documents, and outsourcing the investigatory process.

193.    By letter dated January 22, 2021, Dr. Houser, through his counsel, responded to each purported allegation in the PubPeer Demand Letter, denouncing, among other things, Temple's continued failure to identify the specific basis on which Temple was pursuing documents and information against Dr. Houser.

194.    Dr. Houser specifically demanded to know whether Temple was acting pursuant to an Inquiry or Investigation under the Creative Work Policy.

195.    Dr. Houser also demanded to know whether any allegation existed outside of the PubPeer Claims.

196.    Further, Dr. Houser specifically detailed his role, such as it was, in each of the 9 papers identified by Temple, noting that for 5 of the papers, Dr. Houser merely ***edited*** the text of certain sections for a non-native English speaking author.  Dr. Houser provided no data from his laboratory, analyzed no data for the paper, and did not design or oversee any of the experiments described in them.

197.    Respecting one paper – the one that PubPeer shows was corrected – Dr. Houser explained that the figure shown in the paper had a duplication due to a clerical error.  The error was corrected (as confirmed on PubPeer), had no impact on the methodology or conclusion of the paper, and was otherwise a non-event.

198.    One of the papers, in fact, was completely appropriate and the PubPeer "allegation" lacked any "strong evidence" of any problem, dishonesty or mistakes.

199.    Another paper, relating to mouse RNA, was wrongly trolled by a commenter on PubPeer as involving human RNA.

200.    Dr. Houser also repudiated the "allegation" relating to a final paper identified by Temple, noting that he had nothing to do with any of the experiments in the study.

201.    In response, Temple merely acknowledged receipt of Dr. Houser's refutations and stated that it "will respond in due course."

202.    To this day, the PubPeer Claims and Anversa Inquiries/Investigations continue without providing any substantive basis for either or any authority under Temple's Creative Work Policy for Temple's actions against Dr. Houser.

203.    In the meantime, Temple has not responded in any substantive manner respecting Dr. Feldman's use of the Stolen IP and his defamatory statements about Houser.

204.    For the reasons that follow, however, Temple and Dr. Feldman are in business together, standing to potentially reap millions of dollars in revenue, while using Dr. Houser's Stolen IP.

### *Temple and Feldman Improperly Rely Upon Dr. Houser's Research in Patent Applications and Fail to Name Him as a Co-Inventor*

205.    More recently, Dr. Houser learned that not only did Dr. Feldman take the Stolen IP and pass it off as his own in a publication, but also Temple and Dr. Feldman compounded the injury to Dr. Houser by including Dr. Houser's Stolen IP in several patent applications in the United States and other countries.  The patent applications filed by Temple appear to be for a groundbreaking innovation (if successful) in the treatment of heart failure.

206.    These applications name Dr. Feldman as the lead inventor and omit Dr. Houser altogether as a co-inventor.

207.    Specifically and unbeknownst to Dr. Houser until recently, Dr. Feldman included Dr. Houser's Stolen IP in the patent application for methods of treating patients with heart failure and a reduced level of BAG3, U.S. Patent Application No. 15/115,807, titled "BAG3 As a Target for Therapy of Hearth Failure," (the "'807 Application"), attached hereto as Exhibit "D."

208.    More specifically, Dr. Houser's Stolen IP appears in Figures 7A-7E in the published patent application and is specifically discussed in paragraph [0254].

209.    Dr. Houser's Pig Data appears in Figures 7A-7D, which includes functional measurements of the heart (including ejection fraction) of a pig where myocardial infarction (heart attack) was induced compared to a control (where myocardial infarction was not induced).

210.    Figures 7E and 7F include the protein measurements Feldman conducted on Dr. Houser's Pig Model Tissue Samples that show reduced levels of BAG3 in the pig where myocardial infarction was induced compared to a control.

211.    Notably, the data included in the '807 Application, is identical to that used by Dr. Feldman in the Feldman Paper and includes Dr. Houser's Pig Data as well as the BAG3 protein level measurements Feldman derived from Dr. Houser's Pig Model Tissue Samples.

212.    Not only was Dr. Houser's Stolen IP used and published again without his knowledge and permission, he was also not named – as he should have been – as a co-inventor on the '807 Application.

213.    Instead, the '807 Application only lists Dr. Feldman, Douglas Tilley, Weizhong Zhu, Kamel Khalili, and Walter Koch as the named inventors, with Temple University as applicant and assignee.

214.    The '807 Application includes broad claims directed to methods of treating patients suffering from heart failure with reduced ejection fraction that also express a decreased level of BAG3 protein.

215. As described above, Dr. Houser's Stolen IP is the animal model that established the clinical legitimacy and significance of BAG3 as a potential therapeutic target for patients suffering from ischemic heart failure.

216. A decreased level of expression of BAG3 is a critical clinical element of the pending claims.

217. Without Dr. Houser's Stolen IP, Dr. Feldman would not have the necessary support for the '807 Application's broad claims given that only a small subset of the population of relevant patients suffer from heart failure caused by Dr. Feldman's discovered genetic mutation, and the mouse model included in the specification does not (and cannot) mimic what occurs when a patient suffers a heart attack.

218. Dr. Houser was unaware of the filing of the '807 Application, including the use of his Stolen IP, at the time it was filed and never gave permission for the use of the Stolen IP or any of his research and data to be used in the '807 Application.

219. Dr. Houser only became aware that his research was included in the '807 Application on November 17, 2020, when a colleague assisted him in searching for patent filings.

220. Dr. Houser's Stolen IP is an essential piece of the claimed invention for at least two reasons: (1) it is a large animal model of heart failure with reduced ejection fraction that closely mimics what happens in human patients that suffer a heart attack, the most common form of ischemic heart failure, and (2) it confirms that in such situations, the BAG3 level is decreased.

221. Without Dr. Houser's Stolen IP, the pending claims towards methods of treatment for patients with heart failure with reduced ejection fraction and a decreased level of BAG3, lack sufficient support to be valid.

222.    Without Dr. Houser as a named inventor on the pending application, the claims are invalid as patent examiners are instructed to reject applications with incorrect inventorship under MPEP § 2157.

223.    Further, on information and belief, Dr. Houser was intentionally omitted as an inventor on the pending application with intent to deceive the US Patent Office, thus rendering any patent that issues unenforceable due to inequitable conduct.

224.    Despite the fact that Dr. Houser's Stolen IP is essential to the validity of the pending claims (which undoubtedly was the reason for its misappropriation and inclusion in the application), inventorship of the '807 Application has never been corrected.

225.    A notice of allowance for the '807 Application, with incorrect inventorship, was issued on September 8, 2020.

226.    The '807 Application, however, remains unissued.  The US Patent Office, on December 1, 2020, determined that the application was expressly abandoned for failure to comply with the requirements of 35 U.S.C. 371(c)(4).  Applicant filed a Petition for Review on December 3, 2020, requesting that the Patent Office's determination that the application was expressly abandoned be reconsidered.  That request remains pending.

227.    In addition to using Dr. Houser's Stolen IP as part of the invention forming the basis of the '807 Application, upon information and belief, Temple and Feldman also filed companion patent applications on the invention claimed in the '807 Application in the European Patent Office (EP 3099333), Japan (Application No. 20165493334), and Canada (Application No. 2975258).

***Dr. Houser Has Been Injured Economically by not Being Named a Co-Inventor***

228.    As part of Temple's policies, academic inventors of certain technologies or applications agree that Temple owns the intellectual property as a "work for hire" but that the individual inventors can benefit financially if the invention is monetized. This monetization usually occurs when a company licenses (typically exclusively) the invention in question from Temple.

229.    Under Temple's Inventions Policy, fifty percent 50% of the net income from each invention is distributed among the named inventors.  Typically, the named inventors come to agreement among themselves as to the distribution of the inventors' share of the net income.

230.    By omitting Dr. Houser as a named inventor on the '807 Application, Dr. Houser is excluded from sharing in any proceeds that result from the monetization of the claimed invention.

231.    Due to the importance of Dr. Houser's contribution to the invention claimed in the '807 Application, upon information and belief, he likely would have received a significant portion of the inventors' share of the net income from the invention.

232.    Upon information and belief, Dr. Feldman's company, Renovacor, Inc. ("Renovacor") has licensed the invention claimed in the '807 Application from Temple.  Upon information and belief, Temple has received or will receive licensing royalties, including perhaps at least a portion of the investment that Renovacor received from Broadview Ventures and/or is entitled to receive a percentage of any future sales of Renovacor products that commercialize the invention claimed in the '807 Application.

233.    Upon information and belief, without the Stolen IP which made the invention possible and enhanced its commercial viability, Renovacor would not have received investment (or any promised investment or capital) from Broadview Ventures.

234.     Given the nature of the invention, upon information and belief Renovacor, Temple, Feldman and the other inventors have and/or will derive substantial income from the invention claimed in the '807 Application.

235.     As an omitted co-inventor, Dr. Houser has thus been deprived of the opportunity to earn his rightful share of this revenue.

### *Temple's Inquiries/Investigations Are Mere Pretext to Deprive, Threaten and Intimidate Dr. Houser into Allowing Temple to Take the Stolen IP for Its and Dr. Feldman's Benefit*

236.     Upon information and belief, Temple's Inquiries/Investigations constitute a mere pretext to malign, harass, threaten and intimidate Dr. Houser into dropping pursuit of his rights under Temple's applicable policies and procedures to clear his name and into dropping his pursuit of his rights to the Stolen IP, Dr. Feldman's defamatory statements about Dr. Houser, and his rights to financial remuneration concerning Renovacor and the related patent filings.

237.     Upon information and belief, Temple's Inquiries/Investigations into Dr. Houser are being pursued in bad faith and are not being conducted in accordance with the applicable Temple policies and procedures.

238.     Upon information and belief, Temple's refusals to pursue any Inquiries/Investigations into any of the complaints made by Dr. Houser against Dr. Feldman and the direct statement that Masucci wanted to conclude the inquiries/investigations into Dr. Houser before looking into any of his allegations respecting Dr. Feldman constitute harassment and intimidation and an improper method of forcing Dr. Houser to accept Dr. Feldman's misconduct and the economic relationship between Renovacor and Temple.

239.     Defendants' conduct as described herein is illegal and unlawful, for which they are liable to Dr. Houser.

## COUNT I – BREACH OF CONTRACT

240.     Dr. Houser incorporates herein by reference each of the foregoing allegations.

241.     Temple and Dr. Houser are parties to the 2012 Agreement and 2017 Agreement, which, among other things, incorporate the Creative Work Policy and Inventions Policy.

242.     The Creative Work Policy and Inventions Policy are binding and enforceable agreements between Temple and Dr. Houser.

243.     As stated above, Temple, through its improper (and/or unauthorized or baseless) Inquiries/Investigations and failures to act upon Dr. Houser's complaints about the Stolen IP and defamatory statements disseminated by Dr. Feldman, failed to honor the terms of the various agreements between Temple and Dr. Houser.

244.     Dr. Houser has suffered and will continue to suffer damages as a result of Temple's failures.

245.     As stated above, Temple's failures constitute breaches of the applicable agreements, for which it is liable to Dr. Houser.

246.     Dr. Houser, to the extent applicable, satisfied all conditions precedent under the agreements entitling him to pursue these claims against Temple.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Temple in an amount in excess of $150,000 and grant him such other relief deemed appropriate under the circumstances.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS
## (FEDERAL DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1831, ET SEQ.)

247.     Dr. Houser incorporates herein by reference each of the foregoing allegations.

248.     Dr. Houser has equitable title to and/or a license in the Stolen IP.

249.     As described above, Defendants were fully familiar with Dr. Houser's Stolen IP.

250.     As described above, Dr. Feldman, under fraudulent circumstances, acquired Dr. Houser's Stolen IP for use in the Feldman Paper and later in the various patent filings.

251.    Dr. Houser never agreed to allow any Defendant to disclose or use the Stolen IP for any purpose.

252.    Dr. Houser had taken reasonable efforts to maintain the secrecy of the Stolen IP, including, but not limited to, sharing the information on a limited, need-to-know basis and not disclosing it to any third-parties without appropriate precautions.

253.    Dr. Houser's Stolen IP obviously have significant economic and commercial value, representing an investment of many years and millions of dollars, and are not generally known or readily ascertainable by others.

254.    Dr. Feldman and later Temple relied upon and used Dr. Houser's Stolen IP without Dr. Houser's permission when, for Dr. Feldman's purpose, publishing the Feldman Paper and when drafting the '807 Application for the sole benefit of Defendants.

255.    Upon information and belief, Defendants are continuing to rely upon and use the Stolen IP in further development and prosecution of the '807 Application.

256.    Upon information and belief, Defendants' misappropriation of Dr. Houser's Stolen IP saved them considerable time and monetary investment in the development and prosecution of the '807 Application.

257.    Defendants' improper activities, described above, were a knowing, willful, malicious and deliberate disregard of Dr. Houser's rights and interests.  Such conduct warrants an award of exemplary damages in an amount up to two times the damages awarded and an award of reasonable attorneys' fees to Dr. Houser.

258.    Dr. Houser has suffered and will continue to suffer material damage as a result of this misuse of the Stolen IP.

259.    Defendants are therefore liable to Dr. Houser for such damages.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Defendants in an amount in excess of $150,000, grant Dr. Houser an award of reasonable

attorneys' fees and exemplary damages as provided for under 18 U.S.C. § 1831, et seq., that the

Court enter an injunction against Defendants, directing and ordering the following:

> (a)     Direct Temple to immediately correct the patent application (and the foreign counterparts) to add Dr. Houser as a co-inventor;
>
> (b)     Direct Dr. Feldman to immediately issue a retraction and correction of the Feldman Paper to recognize Dr. Houser as author/creator/inventor of the Stolen IP; and
>
> (c)     Direct Dr. Feldman and Temple to immediately amend all agreements relating to Renovacor and any aspect of the Stolen IP to add Dr. Houser as a party or recipient of monetary or other compensation for use and inclusion of the Stolen IP.  To the extent there exists any dispute about the percentage interest attributable to Dr. Houser, such dispute shall be presented to the Court if the parties cannot successfully negotiate it amongst themselves;

and grant him such other relief deemed appropriate under the circumstances.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS
## (PENNSYLVANIA UNIFORM TRADE SECRETS ACT, 12 PA.C.S. § 5301, ET SEQ.)

260.    Dr. Houser incorporates herein by reference each of the foregoing allegations.

261.    Dr. Houser enjoyed a valid property interest in the Stolen IP, including but not

limited to lawful possession of the Stolen IP and the right to enjoy the value of the secrecy of the

Stolen IP.

262.    As described above, Defendants were fully familiar with Dr. Houser's Stolen IP.

263.    As described above, Dr. Feldman, under fraudulent circumstances, acquired Dr.

Houser's Stolen IP for use in the Feldman Paper and later in the various patent filings.

264.    Dr. Houser never agreed to allow any Defendant to disclose or use the Stolen IP

for any purpose.

265.    Dr. Houser had taken reasonable efforts to maintain the secrecy of the Stolen IP,

including, but not limited to, sharing the information on a limited, need-to-know basis and not

disclosing it to any third-parties without appropriate precautions.

266.    Dr. Houser's Stolen IP obviously have significant economic and commercial value, representing an investment of many years and millions of dollars, and are not generally known or readily ascertainable by others.

267.    Dr. Feldman and later Temple relied upon and used Dr. Houser's Stolen IP without Dr. Houser's permission when, for Dr. Feldman's purpose, publishing the Feldman Paper and when drafting the '807 Application for the sole benefit of Defendants.

268.    Upon information and belief, Defendants are continuing to rely upon and use the Stolen IP in further development and prosecution of the '807 Application.

269.    Upon information and belief, Defendants' misappropriation of Dr. Houser's Stolen IP saved them considerable time and monetary investment in the development and prosecution of the '807 Application.

270.    Defendants' improper activities, described above, were a knowing, willful, malicious and deliberate disregard of Dr. Houser's rights and interests.  Such conduct warrants an award of exemplary damages in an amount up to two times the damages awarded and an award of reasonable attorneys' fees to Dr. Houser.

271.    Dr. Houser has suffered and will continue to suffer material damage as a result of this misuse of the Stolen IP.

272.    Defendants are therefore liable to Dr. Houser for such damages.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Defendants in an amount in excess of $150,000, grant Dr. Houser an award of reasonable attorneys' fees and exemplary damages as provided for under 12 PA.C.S. § 5301, et seq., that the Court enter an injunction against Defendants, directing and ordering the following:

    (a)    Direct Temple to immediately correct the patent application (and the foreign counterparts) to add Dr. Houser as a co-inventor;

    (b)    Direct Dr. Feldman to immediately issue a retraction and correction of the Feldman Paper to recognize Dr. Houser as author/creator/inventor of the Stolen IP; and

(c)   Direct Dr. Feldman and Temple to immediately amend all agreements relating to Renovacor and any aspect of the Stolen IP to add Dr. Houser as a party or recipient of monetary or other compensation for use and inclusion of the Stolen IP.  To the extent there exists any dispute about the percentage interest attributable to Dr. Houser, such dispute shall be presented to the Court if the parties cannot successfully negotiate it amongst themselves; and

(d)   Grant him such other relief deemed appropriate under the circumstances.

## <u>COUNT IV – MISAPPROPRIATION OF TRADE SECRETS</u><br><u>(PENNSYVLANIA LAW – COMMON LAW)</u>

273.    Dr. Houser incorporates herein by reference each of the foregoing allegations.

274.    To the extent Dr. Houser is not entitled to recover against Defendants under applicable statutory misappropriation, Dr. Houser is alternatively and nevertheless entitled to recover against Defendants under a common law theory of misappropriation of trade secrets.

275.    As described above, Defendants were fully familiar with Dr. Houser's Stolen IP.

276.    Further as described above, Defendants owed fiduciary duties to Dr. Houser and the protection and non-disclosure of the Stolen IP.

277.    As described above, Dr. Feldman, under fraudulent circumstances, acquired Dr. Houser's Stolen IP for use in the Feldman Paper and later in the various patent filings.

278.    Dr. Houser never agreed to allow any Defendant to disclose or use the Stolen IP for any purpose.

279.    Dr. Houser had taken reasonable efforts to maintain the secrecy of the Stolen IP, including, but not limited to, sharing the information on a limited, need-to-know basis and not disclosing it to any third-parties without appropriate precautions.

280.    Dr. Houser's Stolen IP obviously have significant economic and commercial value, representing an investment of many years and millions of dollars, and are not generally known or readily ascertainable by others.

281.    Dr. Feldman and later Temple relied upon and used Dr. Houser's Stolen IP without Dr. Houser's permission when, for Dr. Feldman's purpose, publishing the Feldman Paper and when drafting the '807 Application for the sole benefit of Defendants.

282.    Upon information and belief, Defendants are continuing to rely upon and use the Stolen IP in further development and prosecution of the '807 Application.

283.    Upon information and belief, Defendants' misappropriation of Dr. Houser's Stolen IP saved them considerable time and monetary investment in the development and prosecution of the '807 Application.

284.    Defendants' improper activities, described above, were a knowing, willful, malicious and deliberate disregard of Dr. Houser's rights and interests.  Such conduct warrants an award of punitive damages.

285.    Dr. Houser has suffered and will continue to suffer material damage as a result of this misuse of the Stolen IP.

286.    Defendants are therefore liable to Dr. Houser for such damages.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Defendants in an amount in excess of $150,000, that the Court enter an injunction against Defendants, directing and ordering the following:

(a)    Direct Temple to immediately correct the patent application (and the foreign counterparts) to add Dr. Houser as a co-inventor;

(b)    Direct Dr. Feldman to immediately issue a retraction and correction of the Feldman Paper to recognize Dr. Houser as author/creator/inventor of the Stolen IP; and

(c)    Direct Dr. Feldman and Temple to immediately amend all agreements relating to Renovacor and any aspect of the Stolen IP to add Dr. Houser as a party or recipient of monetary or other compensation for use and inclusion of the Stolen IP.  To the extent there exists any dispute about the percentage interest attributable to Dr. Houser, such dispute shall be presented to the Court if the parties cannot successfully negotiate it amongst themselves; and

(d)    Grant him such other relief deemed appropriate under the circumstances.

## COUNT V – SPECIFIC INJUNCTIVE RELIEF

287.   Dr. Houser incorporates herein by reference each of the foregoing allegations.

288.   While Dr. Houser believes he may have certain legal remedies at law, as stated herein above and after, Dr. Houser avers that he also is entitled to the imposition of the following injunctive relief for which he has no adequate remedy of law due to Defendants' acts or omissions as averred herein.

289.   Dr. Houser is and has been an employee of Temple and, for a time, a subordinate of Dr. Feldman.

290.   As an employee at Temple, Dr. Houser has various rights, agreed to expressly by Temple, to the recognition and protection of intellectual property created by Dr. Houser through his efforts at Temple, the prompt and orderly inquiry or investigation into issues of misconduct, plagiarism or other academic dishonesty, to the fair treatment of his rights and interests, and to certain monetary arrangements for any works or intellectual property created by or through his efforts.

291.   Dr. Houser has made demands to Defendants to, on the one hand, account for the Stolen IP and, on the other hand, to cease the Anversa and PubPeer Demand investigations and to commence an investigation into Dr. Feldman's defamatory statements and other misconduct as described above.

292.   In response to these demands, Defendants have unjustifiably refused to return the Stolen IP, recognize Dr. Houser's interests in the Stolen IP, and as to Temple, it has unjustifiably refused to cease the baseless inquiries/investigations against Dr. Houser, provide Dr. Houser with the appropriate information and access under Temple's own policies, initiate any inquiry/investigation into Dr. Houser's complaints about the Stolen IP, his rights thereunder, or Dr. Feldman's defamatory statements about Dr. Houser.

293.    Further, Defendants' actions violate the aforementioned agreements and related statutory and common laws respecting Dr. Houser's various rights, as described above.

294.    Dr. Houser will suffer immediate and irreparable harm in the deprivation of his rights, as described above, if he is not granted the injunctive relief requested herein.

295.    Dr. Houser does not have an adequate remedy at law for the injuries he has and will continue to suffer as a result of Defendants' continued violation of his rights as stated above.

296.    Greater injury will result from refusing the relief requested herein than from granting it, as Dr. Houser will continue to be deprived of important rights if the relief is denied, but Defendants will be able to function normally if the relief is granted.

297.    The injunctive relief will restore Dr. Houser to the position he was in prior to Defendants' wrongful conduct.

298.    Dr. Houser is likely to prevail on the merits of his claims.

299.    The relief requested herein is reasonably suited to abate the offending activity, as it directly requires Defendants to cease from continuing the offending activities, and prevents Defendants from causing harm to Dr. Houser and his rights.

300.    The injunction will not adversely affect the public interest.

WHEREFORE, Dr. Houser respectfully requests that the Court enter an injunction against Defendants, directing and ordering the following:

(a)    Direct Temple to immediately correct the patent application (and the foreign counterparts) to add Dr. Houser as a co-inventor;

(b)    Direct Dr. Feldman to immediately issue a retraction and correction of the Feldman Paper to recognize Dr. Houser as author/creator/inventor of the Stolen IP;

(c)    Direct Dr. Feldman and Temple to immediately amend all agreements relating to Renovacor and any aspect of the Stolen IP to add Dr. Houser as a party or recipient of monetary or other compensation for use and inclusion of the Stolen IP.  To the extent there exists any dispute about the percentage interest attributable to Dr. Houser, such dispute shall be presented to the Court if the parties cannot successfully negotiate it amongst themselves;

(d)     Direct Dr. Feldman to immediately cease and forever desist in defaming or libeling or communicating anything derogatory, defamatory, or intending to malign or criticize Dr. Houser's character or reputation.  To the extent that Dr. Feldman has printed any such statements, he shall immediately delete, retract and destroy any such writings and confirm in a Declaration or Affidavit to this Court all the places such statements were published and precisely how such communications were retracted and destroyed or deleted;

(e)     Direct Temple to immediately cease all "preliminary assessments," "inquiries," or "investigations" into or against Dr. Houser and to the extent any such events are in progress or contemplated, Temple shall immediately provide Dr. Houser all claims against or concerning him, in detail and with specificity as to the nature of the claims, the topics or subjects at issue and Temple's efforts to the present to assess, inquire or investigate such matters; and

(f)     Such further relief as this Court may deem just and proper under the circumstances shall be afforded.

## COUNT VI – CONSTRUCTIVE TRUST

301.    Dr. Houser incorporates herein by reference each of the foregoing allegations.

302.    To the extent that the injunctive relief sought by Dr. Houser is denied, Dr. Houser is entitled to the imposition of a constructive trust against Defendants for the preservation of the Stolen IP and any monies received as a result of any efforts which used or incorporated the Stolen IP until this matter has ended.

303.    Dr. Houser has a legal, tangible and personal interest in the Stolen IP and any monies derived from their use or incorporation into any other property, concept, business or idea, and he is entitled to compensation for his interest therein.

304.    Defendants have an adverse interest to Dr. Houser with regard to such funds.

305.    An actual controversy exists between the parties concerning their respective interests in the Stolen IP.

306.    By virtue of Defendants' acts and omissions, they are in possession and total control of any monies received relating to the use or incorporation of the Stolen IP and the Stolen IP itself on a daily basis.

307.    Defendants will be in possession and control of all such items in the future and during the pendency of this lawsuit.

308.    The retention of such funds and property constitutes an unjust enrichment to Defendants.

309.    Dr. Houser is entitled to the imposition of a constructive trust over these assets to protect their interest during the pendency of this litigation.

310.    Dr. Houser is entitled to the imposition of a constructive trust over the assets described above to protect his interests.

311.    If a constructive trust is not imposed by this Court, Defendants may distribute and dissipate such funds or property to the continued detriment of Dr. Houser.

WHEREFORE, Dr. Houser respectfully requests that this Court:

(a)    Order the imposition of a constructive trust as to all the assets of Defendants that relate, in any way, to the Stolen IP during the pendency of this litigation;

(b)    Enter judgment declaring that Dr. Houser has a protectable and enforceable interest in such property;

(c)    Enjoin Defendants from using or distributing any funds derived from any part or portion of the Stolen IP or the '807 Application during the pendency of this litigation without further order and permission of this Court;

(d)    Award Dr. Houser his costs of litigation, incurred as a result of this action; and

(e)    Grant such other further relief as this Court deems appropriate.

## COUNT VII – ACCOUNTING

312.    Dr. Houser incorporates herein by reference each of the foregoing allegations.

313.    To the extent that the injunctive relief sought by Dr. Houser is denied, Dr. Houser is entitled to an accounting of the financial records of Temple to determine his interest in and any pecuniary remuneration to which he might be entitled as a result of the Stolen IP.

314.    Dr. Houser is an owner or inventor of the Stolen IP.

315.     As described above, Defendants, through Dr. Feldman, misappropriated the Stolen IP, under fraudulent circumstances, and have denied Dr. Houser's rights, interests, and contributions.

316.     Dr. Houser has made repeated demands to Temple asking for an inquiry or investigation into the Stolen IP to no avail.

317.     Under the applicable Temple policies, Dr. Houser has a right to ownership, authorship or inventor's credits for the Stolen IP as well as rights for certain monetary remuneration.

318.     Temple's failures and refusals to investigate the Stolen IP claims, recognize Dr. Houser's rights and arrange for his financial interest in such rights constitute a material breach of the terms of the agreements between Temple and Dr. Houser.

WHEREFORE, Dr. Houser respectfully requests that this Court enter an order allowing Dr. Houser full, complete and unfettered access to the financial records of Temple as they pertain to Renovacor, Dr. Feldman and the Stolen IP to conduct an accounting of such records and his interests in accordance with his contractual rights; and grant such other further relief as this Court deems appropriate.

## **COUNT VIII - UNJUST ENRICHMENT**

319.     Dr. Houser incorporates herein by reference each of the foregoing allegations.

320.     If and to the extent that the express agreements between Temple and Dr. Houser (and agreements to which Dr. Feldman might also be a party) are either found not to be valid and enforceable or applicable to the unlawful taking of the Stolen IP, then Dr. Houser is nevertheless entitled to recover damages from Defendants under the theory of unjust enrichment.

321.     As described above, Dr. Houser, through the Stolen IP, conferred benefits on Defendants.

322.    As described above, Defendants appreciated, acknowledged and retained the benefits conferred on them by the Stolen IP.

323.    The acceptance and retention by Defendants of all of the benefits conferred on them by Dr. Houser, under the circumstances, would be inequitable in the absence of full payment to Dr. Houser for the value of all of the benefits conferred.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Defendants in an amount in excess of $150,000 and grant him such other relief deemed appropriate under the circumstances.

## COUNT IX - CONVERSION

324.    Dr. Houser incorporates herein by reference each of the foregoing allegations.

325.    Pursuant to the agreements between Temple and Dr. Houser, Temple and Dr. Feldman were required to recognize and provide for Dr. Houser's financial and proprietary interests in the Stolen IP, and to the extent money has been paid, Temple and Dr. Feldman were required to pay Dr. Houser.

326.    Further, as described above, Dr. Houser had an express, recognized ownership, creator, or inventor's interest in the Stolen IP; Dr. Feldman had none.

327.    As described above, Dr. Feldman and Temple have exercised complete ownership and control over the Stolen IP, which was secured under fraudulent circumstances, and which was not authorized or agreed to by Dr. Houser.

328.    Dr. Houser's rights in the Stolen IP have been violated, and Defendants' acts or omissions, as described above, constitute conversion of monies and property rights rightfully due and owing to Dr. Houser, for which they are liable to Dr. Houser.

329.    Defendants' conduct was outrageous, wanton and willful.

330.    Punitive damages are warranted to punish Defendants and deter them from engaging in such conduct in the future.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Defendants in an amount in excess of $150,000 in compensatory damages, award him punitive damages against Defendants, that the Court enter an injunction against Defendants, directing and ordering the following:

(a)     Direct Temple to immediately correct the patent application (and the foreign counterparts) to add Dr. Houser as a co-inventor;

(b)     Direct Dr. Feldman to immediately issue a retraction and correction of the Feldman Paper to recognize Dr. Houser as author/creator/inventor of the Stolen IP; and

(c)     Direct Dr. Feldman and Temple to immediately amend all agreements relating to Renovacor and any aspect of the Stolen IP to add Dr. Houser as a party or recipient of monetary or other compensation for use and inclusion of the Stolen IP.  To the extent there exists any dispute about the percentage interest attributable to Dr. Houser, such dispute shall be presented to the Court if the parties cannot successfully negotiate it amongst themselves; and

(d)     Grant him such other relief deemed appropriate under the circumstances.

## COUNT X - CIVIL CONSPIRACY

331.     Dr. Houser incorporates herein by reference each of the foregoing allegations.

332.     As described above, Defendants acted in concert with one another to deprive Dr. Houser of his ownership and monetary rights to the Stolen IP, so that Defendants could use the Stolen IP to earn significant monies (and thereby increase their own respective shares and prestige)

333.     For Dr. Feldman's part, he defamed Dr. Houser, secured the Stolen IP under fraudulent circumstances, and otherwise passed off the work of others as his own for his own personal benefit.

334.     For Temple's part, it conducted various, baseless investigations – designated from a "preliminary assessment" to an "inquiry" – all in an effort to discredit and threaten Dr. Houser into inaction.

335.    Further, Temple threatened Dr. Houser that his complaints about Dr. Feldman would have to wait until Temple finished its investigations into Dr. Houser, thereby creating the impression that Dr. Houser's cooperation in unfounded investigations and keeping his mouth shut over Dr. Feldman's misconduct would be in his best interest as opposed to getting at the truth of the matters.

336.    As described above, it is clear that Temple and Dr. Feldman, through the alleged "apology" over the Stolen IP and the filing and prosecution of the '807 Application and the contract with Renovacor, have agreed and committed another overt act to purse the common plan or design of freezing out Dr. Houser and enriching themselves.

337.    As described above, Defendants' acts and omissions were committed with malice and an intent to injure or harm Dr. Houser or his interests.

338.    As described above, Defendants' acts and omissions were committed without justification.

339.    Defendants' acts or omissions, as described above, were outrageous, wanton and willful.

340.    Punitive damages are warranted to punish Defendants and deter them from engaging in such conduct in the future.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Defendants in an amount in excess of $150,000 in compensatory damages, award him punitive damages against Defendants, that the Court enter an injunction against Defendants, directing and ordering the following:

    (a)    Direct Temple to immediately correct the patent application (and the foreign counterparts) to add Dr. Houser as a co-inventor;

    (b)    Direct Dr. Feldman to immediately issue a retraction and correction of the Feldman Paper to recognize Dr. Houser as author/creator/inventor of the Stolen IP; and

    (c)    Direct Dr. Feldman and Temple to immediately amend all agreements relating to Renovacor and any aspect of the Stolen IP

49

to add Dr. Houser as a party or recipient of monetary or other compensation for use and inclusion of the Stolen IP.  To the extent there exists any dispute about the percentage interest attributable to Dr. Houser, such dispute shall be presented to the Court if the parties cannot successfully negotiate it amongst themselves; and

(d)   Grant him such other relief deemed appropriate under the circumstances.

## COUNT XI – DEFAMATION (AGAINST DR. FELDMAN ONLY)

341.   Dr. Houser incorporates herein by reference each of the foregoing allegations.

342.   As described above, Dr. Feldman made communications to various colleagues of Dr. Houser, including, but not limited, Patrick O'Connor, and others, which communications were defamatory in character.

343.   The communications made by Dr. Feldman were defamatory in that they tended to harm Dr. Houser's reputation so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

344.   In an academic society of the like Dr. Houser has spent his entire professional career working and thriving in, these defamatory statements were especially harmful and damaging.

345.   As described above, Dr. Houser (and indeed Temple itself) relied on Dr. Houser's research and reputation to secure grants, projects, and other opportunities designed to increase the notoriety of Temple and the School of Medicine or provide for funds or access to prestigious appointments, programs or research.

346.   As described above, Dr. Feldman made the communications to apply to Dr. Houser and to imbue the understanding in the recipient that Dr. Feldman either committed an act or omission questioning his character, ethics or credibility and otherwise maligning Dr. Houser's professional and personal reputations.

347.   Dr. Feldman's communications were published to third-parties and he had no privilege or justification in making such communications.

348.    Dr. Feldman's conduct was outrageous, wanton and willful.

349.    Punitive damages are warranted to punish Dr. Feldman and deter him from engaging in such conduct in the future.

WHEREFORE, Dr. Houser requests that the Court enter judgment in his favor and against Dr. Feldman in an amount in excess of $150,000 in compensatory damages, award him punitive damages against Dr. Feldman and grant him such other relief deemed appropriate under the circumstances.

**WISLER PEARLSTINE, LLP**

Date: February 12, 2021                        By:  /s/ David M. Burkholder
                                               David M. Burkholder, Esquire
                                               Alex B. Heller, Esquire
                                               460 Norristown Road, Suite 110
                                               Blue Bell, PA 19422
                                               dburkholder@wispearl.com
                                               aheller@wispearl.com
                                               *Attorneys for Plaintiff*