# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN HOUSER,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 21-0676** |
| | : | |
| **ARTHUR FELDMAN AND TEMPLE** | : | |
| **UNIVERSITY,** | : | |
| **Defendants.** | : | |

## OPINION

Once colleagues, now adversaries, this litigation stems from Defendant Dr. Arthur Feldman's allegedly unauthorized use of Plaintiff Dr. Steven Houser's trade secrets for his own work and the involvement in Feldman's alleged acts by the two doctor's employer, Defendant Temple University ("Temple").  The parties have jointly stipulated to limit the scope of the Motions to Dismiss to Plaintiff's trade secret misappropriation claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), as this Court's jurisdiction rises and falls on the viability of this claim.  For the following reasons, Defendants' Motions to Dismiss are granted in part and denied in part.

## I.    FACTUAL ALLEGATIONS[1]

Since at least 2015, Houser and members of his laboratory ("lab members") at the Temple University School of Medicine have studied heart failure.  One of Houser's projects pertains to "changes in cardiac structure and function" following a heart attack.  As part of this

---

[1] The following facts are taken from the Amended Complaint and taken as true for purposes of this Motion to Dismiss.  *See, e.g.*, *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

research, Houser and his lab members developed a large animal model, here, a pig (the "Pig Model"), to study heart failure and test novel cell and drug therapies for the treatment of the failing heart.  In short, Houser and his lab members induced heart attacks in pigs then re-opened the blocked arteries after ninety minutes.  They then took tissue samples from these models (the "Pig Samples"), conducted tests, and collected data pertaining to heart function (the "Pig Data").  Houser alleges that, together, the Pig Model, the Pig Samples and the Pig Data (the "Pig Materials") constitute his trade secrets.  Houser's research and testing on the Pig Model held "broad clinical significance" for the development of human treatments and therapies because large animal models, like the Pig Model, closely mimic conditions in humans.

Houser alleges that his Pig Materials were not public and that he took measures, including data security and coding protocols recommended by the National Institute of Health ("NIH"), to keep them secure.  To wit, the Pig Data was only available in two places:  (1) on the password-protected lab computer of Thomas Sharp, one of the graduate students working in Houser's lab; and, (2) on a portable hard drive which Houser kept locked in his office.  The Pig Data was coded so that the connection between the data and a specific animal was not readily intelligible.  The coded records were separately maintained by the manager of Dr. Houser's lab "in a locked and secure manner."  Similarly, the Pig Samples were kept in a secured freezer which was accessible only to Houser and his lab members, organized in coded boxes decipherable only to Houser and his lab members.

Tests performed on large animal models, such as the Pig Model, have "broad clinical significance" because these models share more similarities with human patients than do small animal models, like mice models.  Because of their similarities to humans, large animal models

2

are necessary precursors to the development of potential treatments and therapies.  According to the Complaint, Houser's Pig Model was an especially useful analog because it was designed to closely mimic the timing between human heart attacks and their subsequent treatment in a hospital.  The Pig Model thus represented a "gold standard" for a researcher seeking to understand the behavior of the human heart following a heart attack.

At the same time Houser was conducting tests on his Pig Model, his colleague Feldman was studying the relationship between heart failure and levels of a molecule known as "BAG3" on a mouse model.  Feldman did not have a large animal model to conduct his BAG3 research but was aware that Houser had developed such a model for his own research and was also aware of its significance.  This is where the story takes a turn for the worse.  Rather than develop his own large animal model, Feldman told Houser's graduate student, Sharp, that Houser had authorized Feldman to use the Pig Data and Pig Samples for his BAG3 research and would in fact be a collaborator on forthcoming papers at some point in 2014-15.  Under the mistaken impression that he was acting on Houser's request, Sharp provided Feldman with summary figures from the Pig Data and Pig Samples (the "Stolen Pig Materials").  Feldman then conducted his own testing on these materials and used the Stolen Pig Materials to publish a paper in 2015.  The paper included the Pig Data and additional data derived from the Pig Samples.

In reality, Houser had not permitted Feldman to use the Stolen Pig Materials and only learned of Feldman's actions in 2017.  After he became aware of Feldman's alleged use, in or around February 2017, Houser reported Feldman to Temple.  One week after Houser's complaint, Temple offered him an apology from Feldman.  Houser believed that the matter was resolved, and that Feldman would no longer use the Stolen Pig Materials.

3

In late 2019, Houser began to suspect that Feldman had filed patents which included the Stolen Pig Materials.  Houser asked Temple to look into the matter, but Temple told him he would have to wait until the close of an unrelated investigation involving Houser's academic papers.  On November 17, 2020, Houser learned that Temple and Feldman had jointly filed two U.S. patent applications and three foreign patent applications between 2015 and 2020, all of which include the Stolen Pig Materials.  None of the five patents have yet issued and Houser alleges that Temple and Feldman are still relying upon the Stolen Pig Materials to prosecute them.  Houser further alleges that Feldman's company, Renovacor, is using the Stolen Pig Materials to develop treatments for heart failure using BAG3, and that the Stolen Pig Materials were also integral to Renovacor's ongoing efforts to obtain private equity financing, and to a merger between Renovacor and Chardan Healthcare Acquisition Corporation in 2021.

## II.      STANDARD OF REVIEW

In this Circuit, the sufficiency of Houser's trade secret misappropriation claim under the DTSA proceeds in three steps.  First, "the court must take not[e] of the elements a plaintiff must plead to state a claim."  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (alteration in the original) (internal quotations omitted).  Second, the Court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  As part of this step, "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements" are disregarded.  *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

Lastly, "[w]hen there are well-pleaded factual allegations, we assume their veracity, in addition to assuming the veracity of all reasonable inferences that can be drawn from those

4

allegations, and, construing the allegations and reasonable inferences in a light most favorable to the [plaintiff], we determine whether they plausibly give rise to relief." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (alteration in the original) (internal citations and quotations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted).  To be clear, the relevant question is not whether the claimant "will ultimately prevail . . . but whether [the] complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 531 (2011) (internal citations and quotations omitted).

## III.    DISCUSSION

To state a claim under the DTSA, a plaintiff must allege: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce'; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret." *Oakwood Labs*., 999 F.3d at 905 (quoting 18 U.S.C. §§ 1836-39).  To plead the first element, the existence of a trade secret, a plaintiff must first "sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such." *Id.*  Courts will consider whether the owner of the information "has taken reasonable measures to keep . . . [it] secret" and whether the "information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable

5

through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" *Id.* (alterations in the original) (quoting § 1839(3)).

Defendants raise several challenges against Houser's claims under the DTSA, namely: (1) Houser's claims are barred by the DTSA's 3-year statute of limitations period; (2) Houser lacks standing to bring his claim under the DTSA because pursuant to Temple's "Invention Policy" he does not own the Pig Materials, and because Feldman's publication of the Stolen Pig Materials in 2015 extinguished the Stolen Pig Material's trade secret status; (3) the Stolen Pig Materials do not constitute trade secrets because Houser failed to take reasonable measures to keep them secret; and (4) Houser's claims are not covered by the DTSA because they occurred prior to its enactment.[2]

Before delving into Defendants' challenges, some background on the DTSA is helpful. The DTSA is a relatively new statute.  Enacted in 2016 as an amendment to the Economic Espionage Act of 1996, the DTSA is modeled on the Uniform Trade Secret Act of 1979 ("UTSA") and is meant to provide private parties with a federal remedy to redress misuses of certain intangible assets.  Prior to the DTSA's passage, trade secrets were primarily governed by

---

[2] Both Temple and Feldman raise additional challenges to the trade secret status of the Pig Materials for the first time in their reply briefs, contending that the Pig Materials are not trade secrets because:  (1) the Pig Materials are not novel; (2) the Pig Materials do not hold independent economic value; (3) the Pig Data that Sharp provided to Feldman did not exist before Feldman's request; and, (4) the Stolen Pig Materials are not trade secrets because Houser sued after he learned of private equity funds' investments in Renovacor.  "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court." *Laborers' Intern. Union of North Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (alteration in original).  A reply brief "is intended only to provide an opportunity to respond to arguments raised in the response brief; it is not intended as a forum to raise new issues." *United States v. Martin*, 454 F. Supp. 2d 278, 281 n. 3 (E.D. Pa. 2006).  If a party chooses to wait until reply briefing to raise its arguments, then the "Court need not address them." *Filer v. Foster Wheeler LLC*, 994 F. Supp. 2d 679, 692 (E.D. Pa. 2014).  "The reasons are obvious.  It robs the [non-moving party] of the opportunity to demonstrate that the record does not support [a moving party's] factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result." *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000).  Accordingly. Defendants' arguments raised on reply are not considered.

state laws.  Although nearly all states based their trade secret laws on the UTSA, there were differences in the precise language they adopted and how each state's statute was interpreted by its courts.  The result was a far-from-homogenous patchwork of protections for trade secrets. The Senate Committee on the Judiciary observed in their consideration of the DTSA that, "[a]lthough the differences between State laws and the UTSA are generally relatively minor, they can prove case-dispositive. . . ."  S. Rep. No. 114-220, at 2-3 (2016).  The passage of the DTSA was therefore expected to improve trade secret protection in the United States by creating a stable and uniform federal body of trade secret law.

However, when faced with the task of interpreting this new law, federal courts have understandably looked to existing jurisprudence interpreting state implementations of the UTSA. This practice is likely compounded by the fact that many litigants, like Houser, bring trade secret claims under both the DTSA and any applicable state trade secret laws.  Consequently, rather than remedying idiosyncrasies between trade secret protection laws, federal courts have sometimes replicated them under the DTSA.  *See, e.g.*, Michael T. Renaud, Nicholas W. Armington, *The Coming Wave of Trade Secret Litigation and the Implications for the Future of Trade Secret Law*, 67 Federal Law. 54, 58 (2020); John M. Callagy & Damon W. Suden, *Defend Trade Secrets Act*, 12 Bus. & Com. Litig. Fed. Cts. § 121:9.50 (4th ed. 2020).  The end result is—once again—a non-uniform morass of trade secrets law.  Interpreting the DTSA poses unique problems because there is relatively little guidance and existing cases may have inadvertently adopted a state's unique approach to trade secrets for the DTSA.  As a result, many of the Defendants' challenges raise unresolved questions requiring careful assessment.

### A.  Statute of Limitations

Defendants contend that Houser's DTSA claims are barred by the DTSA's statute of limitations, which provides that private civil actions "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered.  For the purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation."  18 U.S.C. § 1836(d).  Defendants contend that the three-year statute of limitations began to run no later than February 2017, when Houser reported Feldman's unauthorized taking of the Stolen Pig Materials and 2015 publication to Temple.

The statute of limitations is an affirmative defense; nevertheless, a complaint may be dismissed on statute of limitations grounds when it is apparent on its face that the claim lies outside of the limitations period.  *See Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017).  Here, it is clear from the face of Houser's Complaint that he was aware of Feldman's alleged acquisition of the Stolen Pig Materials and the 2015 paper by February 2017.  This occurred more than three years before the filing of his Complaint of February 12, 2021, so these misappropriations are clearly outside of the statute of limitations.  The question remains as to whether the first misappropriation triggers the statute of limitations for all misappropriations under the "continuing misappropriation" exception in the DTSA.

Underlying this question is a more fundamental one about what trade secrets are.  One school of thought does not treat trade secrets as property *per se*, but instead premises harm based on the violation of a relationship in which the trade secret owner had reason to believe that the information would be kept in confidence.  Once there has been a misappropriation, the basis for

8

trust in the relationship is destroyed and the trade secret owner's cause of action arises.  In other words, "[i]t is the relationship between the parties at the time the secret is disclosed that is protected. . . .[t]he fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated."  *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 293 (9th Cir. 2019).  Under this theory, since subsequent misappropriations do not further breach the relationship, they do not constitute independent claims.  Rather, the statute of limitations begins running upon the discovery of the first misappropriation, and all subsequent misappropriations stem from that first wrong.  *Id.*

The second school of thought, known as the "continuing wrong" approach, restarts the limitations period for each adverse use, because it views trade secrets as a type of property which can be repeatedly and increasingly harmed by serial misappropriations.  *See, e.g.*, *id.* at 292-93; *Underwater Storage, Inc. v. U.S. Rubber Co.*, 371 F.2d 950, 953-55 (D.C. Cir. 1966), *cert. den.*, 386 U.S. 911 (1967).  Under this view, each adverse action restarts the statute of limitations, and constitutes a separate claim for misappropriation.

The only court that has yet to address this question under the DTSA determined that the Act incorporates the "relationship school" of thought.  *See B&P Littleford, LLC v. Prescott Mach., LLC*, 2021 WL 3732313 (6th Cir. Aug. 24, 2021).  It is evident from the text of the statute and its legislative history that the DTSA adopts the "relationship school" view of trade secrets and the statute of limitations.  In relevant part, the DTSA states: "For purposes of [the periods of limitations], a continuing misappropriation constitutes a single claim of misappropriation," indicating that the statute of limitations period does not restart upon each misappropriation.  18

U.S.C. § 1836(d).  Indeed, in passing the DTSA, Congress conformed its language on the statute of limitations to that of the UTSA, indicating that Congress intended to follow the UTSA's approach and reject the "continuing wrong" approach.  "[C]lear evidence of congressional intent" taken from legislative history "may illuminate ambiguous text."  *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011).  The Senate Judiciary Committee explained, "[The DTSA] provides a three-year period of limitations in which to bring a claim under the section.  This limitations period, which was reduced from five years during the Committee's markup, is now identical to the limitations period of the UTSA, although a number of States have modified the limitations period in enacting the UTSA."  S. Rep. No. 114-220, at 9-10 (2016).  Committee Reports on a bill, such as the Senate Judiciary Committee's Report, provide the most "authoritative source for finding the Legislature's intent. . . ." *Garcia v. United States*, 469 U.S. 70, 76 (1984).  Providing even further evidence, the commentary to the UTSA expressly states that the phrase "continuing misappropriation constitutes a single claim" is a rejection of the "continuing wrong" approach.  Unif. Trade Secrets Act § 6, cmt.

Based on the foregoing, the statute of limitations period under the DTSA runs for all misappropriations committed by a defendant at the time the plaintiff discovers, or should have reasonably discovered, a defendant's first misappropriation.  In other words, "although the initial wrongful acquisition of the trade secret and each subsequent misuse are separate acts of misappropriation, a claim for misappropriation arises only once . . . at the time of the initial misappropriation, subject to the discovery rule."  *B&P Littleford, LLC v. Prescott Mach., LLC*, 2021 WL 3732313, at *6 (6th Cir. Aug. 24, 2021).  Accordingly, Houser's DTSA claims against Feldman shall be dismissed with prejudice as it is clear from the face of the complaint that the

10

statute of limitations had run by February 2020.

The final question is whether the misappropriations of one defendant trigger the statute of limitations for the subsequent acts of another defendant.  As the rationale underlying trade secret protection is based on the breach of a confidential relationship, the breach of one relationship should not be dispositive for the breach of another.  Therefore, Temple's breach of its relationship with Houser requires different treatment from that of Feldman.  Houser may still pursue his claims under the DTSA against Temple, as the Amended Complaint alleges that he first learned of its alleged misappropriations in November 2020.  There is nothing on the face of the Amended Complaint which suggests that the statute of limitations against Temple has run, so that any further determination on statute of limitations grounds is inappropriate at the motion to dismiss stage.  Defendants' remaining arguments for dismissal are assessed only for Houser's claims against Temple.

### B.  Standing:  The Disclosure of the Stolen Pig Materials

Temple argues that Houser lacks standing to bring his claims under the DTSA because any trade secret in the Stolen Pig Materials was extinguished in 2015 when Feldman first published his paper.[3]  Houser argues that the Third Circuit's opinion in *Oakwood Labs. LLC v. Thanoo* forecloses Temple's argument, because the *Oakwood* plaintiff was permitted to pursue claims under the DTSA for misappropriations occurring after its trade secrets were disclosed to a competitor.  *See* 999 F.3d at 908 n.16.

---

[3] It is not entirely clear from the Complaint if Feldman's publication published all or a portion of the Stolen Pig Materials—Houser describes the publication as having: (1) "contained the Stolen IP and data derived therefrom"; (2) "relied, critically, on Dr. Houser's Pig Data as well as data derived from Dr. Houser's [Pig Samples]"; (3) "used the Stolen IP and data derived therefrom . . . [s]pecifically . . . published figures derived from Dr. Houser's Pig Data . . . and the results of protein testing done on Dr. Houser's Pig Model Tissue"; and finally, (4) "published the Stolen IP."

A trade secret derives its value from its secrecy.  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others"); *Oakwood Labs. LLC*, 999 F.3d at 913 ("[T]rade secret information 'derives [its] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from [that information's] disclosure or use[.]' (alterations in original)).  It stands to reason, therefore, that disclosure can extinguish a trade secret and the owner's rights therein. *Ruckelshaus*, 467 U.S. at 1002 ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished").  The issue here, however, is slightly different from the one presented in *Ruckelshaus* and *Oakwood Labs*.  Instead, since the public disclosure was made by Feldman, a Defendant to this action, the issue is whether his co-Defendant, Temple, can use Feldman's disclosure to shield itself from liability in this action.

While few courts have considered this question in the context of the DTSA, most courts interpreting state trade secret laws have held that a defendant's unauthorized public disclosures cannot shield a co-defendant against liability when the co-defendant knew the trade secret was misappropriated.  *See* 4 Milgrim on Trade Secrets § 15.01 (2021).  The rationale behind this parallels that underlying the doctrine of unclean hands.  As the D.C. Circuit court explained in the leading case of *Underwater Storage, Inc. v. U.S. Rubber Co.*, "[w]e do not believe that a misappropriator or his privies can 'baptize' their wrongful actions by general publication of the secret."  371 F.2d at 955.  In so holding, *Underwater Storage, Inc.* distinguished between

12

individuals who learn of the trade secret from its public disclosure and those who "have received the secret from the misappropriator with knowledge of the wrongful misappropriation. . . . Once the secret is out, the rest of the world may well have a right to copy it at will; but this should not protect the misappropriator or his privies.  Their gain is ill gotten and the passage of time or publication to the rest of the world should not serve to cleanse their hands."  *Id.  See also Syntex Opthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983) (holding that one defendant's patent application for plaintiff's trade secret could not shield all three defendants from liability because "a wrongdoer who has made an unlawful disclosure of another's trade secrets cannot assert that publication to escape the protection of trade secret law" (internal citations omitted)).

This rule makes intuitive sense—why should a defendant's bad act be the very thing that shields his co-defendant from liability when there was knowledge of the misdeed?  In its recent opinion in *Oakwood Labs. LLC*, the Third Circuit implicitly held that this rule holds in the context of the DTSA.  In *Oakwood*, defendant Thanoo, a former employee of Oakwood Laboratories ("Oakwood"), disclosed Oakwood's trade secret to defendant Aurobindo Pharma U.S.A., Oakwood's competitor, before the DTSA's effective date of May 11, 2016, though defendants continued using the trade secret afterwards.[4]  *Oakwood Labs. LLC*, 999 F.3d at 898-99, 908 n.16.  Although, Oakwood could not recover for Thanoo's improper disclosure because

---

[4] Temple argues that all of Houser's misappropriations claims are barred because some of them occurred before the DTSA's effective date of May 11, 2016.  The DTSA is not retroactive; it covers only those acts which "occur[ed] on or after the date of the enactment of this Act."  Defend Trade Secrets Act of 2016, Pub. L. No, 114-153, 130 Stat. 376; *Oakwood Labs.*, 999 F.3d at 908 n.16.  However, as the Third Circuit found in *Oakwood* Labs, there is nothing in the Act's text which bars a trade secret owner from pursuing misappropriation claims for events occurring *after* its enactment, even if there were also misappropriations which occurred prior to its enactment.  *Oakwood Labs. LLC*, 999 F.3d at 908 n.16.  Accordingly, Houser may pursue his misappropriation claims against Temple for acts which post-date the DTSA's enactment.  However, to the extent that Houser's claims are based on Feldman's 2014/2015 improper acquisition and the publication of Feldman's paper in 2015 they shall be dismissed with prejudice because they clearly occurred before the DTSA's effective date.

13

it occurred prior to the DTSA's effective date of May 11, 2016, the Third Circuit permitted Oakwood to pursue its claims based on both defendants' unauthorized uses of its trade secrets. *Id.* at 908 n.16.  The Court did not find that one defendant's disclosure of the trade-secret provided either defendant with a defense against liability for their subsequent misappropriations.

The conclusion that a defendant cannot immunize itself from liability through its co-defendant's public disclosure is also supported by the text of the DTSA.  In defining "trade secret", the DTSA states only that the owner must take "reasonable measures to keep such information secret" and that the information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value for the disclosure or use of the information."  18 U.S.C. § 1839(3).  This definition places import on an owner's measures to maintain his trade secrets; his careless disclosure will extinguish it, but he is not held responsible for the misdeeds of others.  *See, e.g.*, *Ruckelshaus*, 467 U.S. at 1002 ("If an *individual* discloses *his* trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." (emphasis added)).  Moreover, the DTSA's definition of "trade secret" explains that a trade secret's value is derived from the fact that it is not ascertainable through "proper means."  If, however, the trade secret becomes ascertainable through improper means, such as a misappropriator's unauthorized disclosure, then the trade secret's value may not necessarily be extinguished.

Thus, in sum and substance, where a disclosure is not by the trade secrets owner's own actions and would in and of itself constitute an actionable misappropriation, the disclosure does

14

not bar recovery *vis a vis* the wrongdoer or an individual or entity which knew of the

wrongdoer's misdeeds.  Applied here, Feldman's publication of all or a portion of the Pig

Materials does not bar Houser from bringing misappropriation claims under the DTSA against

Temple because Houser has alleged that Temple knew of Feldman's alleged misappropriations.

### C.  Standing:  Ownership of the Pig Materials

The DTSA provides a right of action to "an *owner* of a trade secret that is

misappropriated."  18 U.S.C. § 1836 (emphasis)[5].  Temple argues that Houser's Complaint must

be dismissed because he does not own the Pig Materials, because it—Temple—does.  But, it

does not focus the argument for dismissal on the DTSA's definition of  "owner".  Rather, it

contends that Houser is not an owner because he was required to assign "rights, title and interest"

in any "invention" to Temple pursuant to the University's "Inventions Policy," a copy of which it

appends to its motion to dismiss as Exhibit B.[6]

Thus, at least for the purposes of this Motion to Dismiss, the issue of ownership is a

factual one which turns on the interpretation of the Inventions Policy in the context of the

allegations found in the Complaint.  As thus considered, it is not apparent that the "Pig

---

[5] Under the DTSA, an owner is "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed."  18 U.S.C. § 1839(4).

[6] In considering a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  As an exception to this general rule, courts may also consider "an undisputedly authentic document that defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), *cert. denied,* 510 U.S. 1042 (1994).  A plaintiff's claims are based on a document if the document "is integral to or explicitly relied upon in the complaint."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, Houser references, quotes, and cites specific paragraphs of the Inventions Policy in his Complaint and does not dispute the authenticity of the copy appended to Temple's motion.  Accordingly, the Inventions Policy will be considered on this Motion to Dismiss.

Materials" constitute an "invention" under the Inventions Policy or that the Inventions Policy applies to them.  The Inventions Policy does not define "invention" other than by specifying that it includes "computer related software and ancillary materials" but does not include "pure works of art or musical compositions."  To be considered "an invention," an inventor must first report the invention he or she deems "worthy of evaluation" to the appropriate provost and office. Upon receiving notice, Temple must, among other things, determine whether any entity or outside sponsor, such as a federal research entity, may have ownership rights, and negotiate ownership agreements with that entity.  After this determination, the inventor must then "execute all appropriate assignments to the university."

The Complaint contains no allegations concerning whether Houser took steps to declare the Pig Materials an "invention" within the meaning of the Inventions Policy, whether Temple evaluated the Pig Materials and determined that they were an invention, or whether Houser executed any agreements assigning the Pig Materials to Temple.  Each of these issues requires further factual investigation to determine who "owns" the Pig Materials according to the Inventions Policy, and what those ownership interests are.  And once those facts are marshalled, the question remains as to who is the "owner" of the Pig Materials as defined by the DTSA. Consideration of a motion to dismiss requires only a determination as to whether the factual allegations in a complaint state a plausible claim; it does not require a determination as to what the facts *actually* are.  It would therefore be improper to determine the owner(s) of the Pig Materials at this stage of the litigation.  Accordingly, Temple's motion to dismiss based on Houser's ownership of the Pig Materials shall be denied.

16

### D.  Reasonable Measures to Maintain Secrecy

Under the DTSA, a trade secret owner must take "reasonable measures" to maintain the

secrecy of his trade secret.  18 U.S.C. § 1839(3)(A) (emphasis added).  Temple contends that

Houser's Complaint fails to allege that he took reasonable means to maintain the secrecy of his

Pig Materials for three reasons:  (1) because Sharp "had unrestricted access to the [Stolen Pig

Materials] and was able to access and disclose this information at will and upon request"; (2)

because the Complaint makes no factual averments regarding the steps Houser took to keep the

Pig Materials secret; and finally, (3) because the Complaint's allegation that Feldman was

"generally aware" of Houser's work indicates that the Pig Materials were not secret.

Based on the statute's use of the word "reasonable," it is clear that an owner need not

take "every conceivable measure" to shroud his or her trade secret in absolute secrecy.  *See, e.g.*,

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 543 (7th Cir. 2021).  Indeed, "sufficient

secrecy" is all that is needed, meaning that, "except by use of improper means, there would be

difficulty in acquiring the information."  *See, e.g.*, *Zabit v. Brandometry, LLC*, 2021 WL

1987007, at *11; *See also* Restatement (First) of Torts §757 (Am. L. Inst. 1939).

Thus, a complaint sufficiently alleges "reasonable measures" to maintain secrecy of a

trade secret where the facts alleged support an inference that access was limited such that it

would be difficult to acquire such trade secrets.[7]  An assessment beyond this level of detail is the

---

[7] This is consistent with the commentary to the UTSA.  The UTSA specifies that reasonable efforts to maintain
secrecy include measures taken to control disclosure and that public disclosure or acts of carelessness can preclude
protection.  Courts in this circuit have generally only dismissed DTSA claims on this ground where there are plain
allegations that the owner made its own trade secrets public.  *Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153,
167 (E.D. Pa. 2017); *Profit Point Tax Tech., Inc. v. DPAD Grp.*, 2020 WL 759952, at *5-6 (W.D. Pa. Jan. 29, 2020);
*Le Tote Inc.*, 2021 WL 2588958, at * 4 (finding that allegations that a trade secret owner required limited access to
and required confidentiality agreements prior to disclosure of a trade secret were sufficient to allege reasonable
measures); *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018) (finding that a trade secret

job of the factfinder.

Houser has more than met his burden.  He has alleged that he adhered to industry standard protocols recommended by the NIH, that the Pig Materials were kept only in his lab or his office and were either locked or password protected.  As an additional security measure, Houser coded both the Pig Samples and the Pig Data so that they were intelligible to only Houser or his lab members.  Moreover, the Complaint makes clear that Feldman only acquired the Stolen Pig Materials by virtue of his misrepresentations to Sharp.[8]

Furthermore, Sharp's ability to access and disclose the Pig Materials and Feldman's general awareness of Houser's work do not undermine the reasonableness of Houser's security measures.  Sharp was a graduate student working in Houser's lab on the Pig Model who was given access to the Pig Materials only to further Houser's work.  If this court adopted Temple's faulty logic, then a trade secret would cease to exist any time an owner needed to disclose or permit an employee to access the trade secret to do their work.  The DTSA does not require this kind of "absolute secrecy."  For similar reasons, Feldman's general awareness of the Pig Materials is inconsequential—otherwise, quintessential trade secrets like Coca Cola's secret formula would not qualify for protection as most people are "generally aware" of their existence. The point is that they do not know the exact formula, and thus, it remains a trade secret.

---

owner alleged reasonable measures where the trade secrets were labelled confidential and trade secret owner took measures to restrict access).

[8] Temple's two legal citations to the contrary are inapplicable.  Plaintiffs in those cases:  (1) alleged that they disclosed the information at issue to customers who had no duty to maintain confidentiality, *Profit Point Tax Tech., Inc.*, 2020 WL 759952, at *5-6; (2) conclusorily alleged that they restricted access to the trade secret without describing the measures they took, *id.* at 6; or, (3) broadly displayed the information at issue and failed to allege any measures taken to establish its confidentiality, such as a non-disclosure or confidentiality agreement.  *Revzip, LLC v. McDonell*, 2019 WL 6701835, at *6 (W.D. Pa. Dec. 9, 2019).

## IV.    CONCLUSION

In conclusion, Houser's DTSA claims against Feldman shall be dismissed with prejudice. Further, Houser's DTSA claims and requests for relief against Temple which are premised on Feldman's 2014/2015 acquisition of the Stolen Pig Materials and his 2015 paper shall also dismissed with prejudice.  The motions to dismiss shall be denied with respect to all other DTSA claims against Temple.

An appropriate order follows.


**BY THE COURT:**


**/s/Wendy Beetlestone, J.**
**_____**
**WENDY BEETLESTONE, J.**

19