## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN HOUSER, PH.D., FAHA | ) |
| *Plaintiff*, | ) |
| | ) Civil Action No. 2:21-cv-00676-WB |
| v. | ) |
| | ) |
| TEMPLE UNIVERSITY | ) |
| | ) JURY TRIAL DEMANDED |
| AND | ) |
| | ) |
| ARTHUR M. FELDMAN, MD, PHD | ) |
| | ) |
| | ) |
| *Defendants*. | ) |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS
### TO DISMISS THE REMAINING COUNTS OF THE AMENDED COMPLAINT

Nicole D. Galli (PA Id. #78420)
ndgalli@ndgallilaw.com
**ND Galli Law LLC**
One Liberty Place
1650 Market Street
Suite 3600, #00250
Philadelphia, PA 19103
Telephone:      215-525-9580
Facsimile:      215-525-9585

David M. Burkholder, Esquire
Courtney A. Keaveney, Esquire
dburkholder@wispearl.com
ckeaveney@wispearl.com
**WISLER PEARLSTINE, LLP**
460 Norristown Road, Suite 110
Blue Bell, PA 19422
Telephone:      (610) 825-8400
Facsimile:      (610) 828-4887

*Counsel for Plaintiff,*
*Steven Houser, Ph.D., FAHA*

**TABLE OF CONTENTS**

I.  **INTRODUCTION** …………….…..………………………………………… 1
II. **FACTUAL BACKGROUND**…………………………………………… 2
    A. Dr. Houser's Employment Agreement and Temple Policies…………………..  2
    B. The Misappropriation of Dr. Houser's Research…………………………… 3
    C. Temple's So-Called Inquiry Or Investigation Against Dr. Houser……………… 7
III. **STANDARD FOR A MOTION TO DISMISS** …………………………................ 9
IV. **ARGUMENT**…………………………… …………………………………….….... 12
    A. Dr. Houser's Claim for Misappropriation of Trade Secrets Under the Pennsylvania
       Uniform Trade Secrets Act was Timely Filed and Properly Pled……………… 12
        1.    Dr. Houser's PUTSA Claim was Timely Filed……………………… 12
        2.    Dr. Houser Has Adequately Pled the Existence of a Cognizable Trade
             Secret ……………………………………………………………… 20
    B. Dr. Houser's Claim for Breach of Contract Was Properly Pled ……………… 22
        1.    The Creative Work Policy and Inventions and Patents Policy are Terms
             and Conditions of Dr. Houser's Employment Agreement with Temple;
             Temple's Own Language Says so…………………………………… 22
        2.    Dr. Houser Properly Pled a Breach…………………………………. 23
    C. Dr. Houser's Claim for an Accounting Was Properly Pled…………………  24
    D. Dr. Houser's Claim for Conspiracy Was Properly Pled………………………… 26
    E. Dr. Houser's Claim for Specific Injunction Was Properly Pled……………… 28
    F. Dr. Houser's Claim for Conversion Was Properly Pled………………………… 28
    G. Dr. Houser's Claim for Unjust Enrichment Was Properly Pled………………… 29
    H. Dr. Houser's Claim for a Constructive Trust Was Properly Pled……………….. 29

V.  **CONCLUSION**…………… ……………………………………………………...... 30

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Brand Energy & Infrastructure Servs. v. Irex Contracting*
*Grp.*, No. 16-cv-2499 2017 WL 1105648, at *2 (E.D. Pa. Mar. 24, 2017)…………………… 10

*Oakwood Labs. LLC v. Thanoo*,
999 F.3d 892, 910 (3d Cir. 2021)…………………………………………………………………… 10

*Le Tote Inc. v. Urb. Outfitters, Inc.*,
No. CV 20-3009, 2021 WL 2588958 at *2-3 (E.D. Pa. June 24,2021)……….......................... 10

*Mattern & Assocs., LLC v. Latham & Watkins LLP*,
Civ. A. No. 13–6592, 2014 WL 4804068, at *3 (E.D. Pa. Sept. 26, 2014)……………….. 10, 11

*ABB Turbo Sys. AG v. Turbousa, Inc.*,
774 F.3d 979, 985 (Fed. Cir. 2014)…………………………………………………………… 11

*Uni-Systems, LLC v. United States Tennis Ass'n*,
350 F. Supp.3d 143, 177–79 (S.D.N.Y 2018)……………………………………………….. 11

*Pierce v. Montgomery Cty. Opportunity Bd., Inc.*,
884 F. Supp. 965, 970 (E.D. Pa. 1995)………………………………………………… …… 11

*Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman*,
*P.C.*,635 Pa. 427, 445, 137 A.3d 1247, 1258 (2016)………………………………………… 11

*Preston Grp., LLC v. Customers Bank*,
No. 5:20-CV-06516, 2021 WL 3562893 at *8 (E.D. Pa. Aug. 12, 2021)…………… ………. 11

*McKeeman v. Corestates Bank, N.A.*,
2000 PA Super 117, ¶ 14, 751 A.2d 655, 660 (2000)…………………………………….. 11, 12

*Heraeus Medical GmbH v. Esschem, Inc.*,
 927 F.3d 727, 734 (3d Cir. 2019)…………………………………………………. 12, 13, 15, 18, 19

*CODA Development S.R.O. v. Goodyear Tire & Rubber Company*,
916 F.3d 1350, 1361 (Fed. Cir. 2019)…………………………………………………… 14, 15

*Lambda Optical Solutions, LLC v. Alcatel-Lucent USA Inc.*,
2015 WL 5470210 (D. Del. Aug. 6, 2015)………………………………………………… 16

*Abaco Drilling Techs., Inc. v. PV Fluid Prods.*,
Civ. A. No. H-20-1946, 2020 WL 10501993 (S.D. Tex. Aug. 3, 2020)……………………. 16

*Zirvi v Flatley*, 433 F. Supp.3d 448 (S.D.N.Y. 2020)…………………………………… 16, 17

*Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)............................. 18

*E.E.O.C. v. Joseph Paolino & Sons, Inc.*,
Civ. A. No. 92–0578, 1992 WL 382349 (E.D. Pa. Dec. 11, 1992)............................. 19

*Anaconda Co. v. Metric Tool & Die Co.*,
485 F. Supp. 410, 422 (E.D. Pa. 1980)..................................................... 20, 21

*SI Handling Sys., Inc. v. Heisley*,
753 F.2d 1244, 1255 (3d Cir. 1985)........................................................... 21

*Lane v. Com*., 954 A.2d 615, 619 (Pa. Super. Ct. 2008)....................................... 23

*McWhirter v. Selembo*, No. 4:12-CV-704, 2012 WL 4513715 at *4
(M.D. Pa. Sept. 10, 2012), report and recommendation adopted, No. 4:12-CV-704,
2012 WL 4511409 (M.D. Pa. Oct. 1, 2012)..................................................... . 23

*Channel Home Centers v. Grossman*, 795 F.2d 291, 300 (3d Cir.1986)........................ 23

*Traction Tire, LLC v. Total Quality Logistics,
LLC*, No. CV 19-5150, 2020 WL 6044179, at *9 (E.D. Pa. Oct. 13, 2020)................... 24

*Atl. Holdings, Ltd. v. Apollo Metals, Ltd.*,
263 F. Supp. 3d 526, 530 (E.D. Pa. 2017)..................................................... 24

*Dana-Farber Cancer Institute Inc. v. Ono Pharma. Co.*,
964 F.3d 1365, 1371-73 (Fed. Cir. 2020)..................................................... 25

*Allergan USA, Inc. v. Prollenium US Inc.*,
No. 19-126-CFC-SRF, 2019 WL 7298569, (D. Del. Dec. 30, 2019),
*report and recommendation adopted*, 2020 WL 409684 (D. Del. Jan. 24, 2020)........... 25

*Dana-Farber Cancer Institute Inc. v. Ono Pharma. Co.*,
964 F.3d 1365, 1371-73 (Fed. Cir. 2020)..................................................... 25

*Accurso v. Infra-Red Servs., Inc*.
23 F. Supp. 3d 494, 515 (E.D. Pa. 2014) ..................................................... 26

*Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc*.,
340 Pa.Super. 253, 489 A.2d 1364, 1372 (1985)............................................... 26
*Doe v. Kohn, Nast & Graf, P.C.*,
862 F. Supp. 1310, 1328 (E.D. Pa. 1994)..................................................... 27

*Sanzone v. Phoenix Techs., Inc*.,
No. CIV. A. 89-5397, 1990 WL 50732, at *11 (E.D. Pa. Apr. 19, 1990)..................... 27

*Schirmer v. Principal Life Ins. Co.,*
No. 08-CV-2406, 2008 WL 4787568, (E.D. Pa. Oct. 29, 2008)……………………28, 29, 30

**FEDERAL STATUES**:

Federal Rules of Civil Procedure…………………………………………………….. 28, 30

**STATE STATUES**:

Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5301 et seq………………….. passim

## I.    <u>INTRODUCTION</u>

Plaintiff, Steven Houser, PhD, FAHA ("Plaintiff" or "Dr. Houser"), a respected cardiac researcher, has been a member of the faculty at the School of Medicine at Defendant, Temple University ("Temple"), for more than forty (40) years. Nonetheless, for the last three (3) years, Temple and co-defendant Arthur M. Feldman, MD, PhD ("Dr. Feldman"), a colleague of Dr. Houser, (collectively "Defendants") have engaged in a concerted campaign to discredit Dr. Houser, at least in part to divert attention from Dr. Feldman's and Temple's wrongful misappropriation of Dr. Houser's intellectual property. Defendants have tried to dismiss Dr. Houser's federal claim for trade secrets misappropriation, which this Court denied as to Temple but granted as to Dr. Feldman solely on limitations grounds. In that decision, this Court rejected entirely Defendants' arguments that Dr. Houser lacked standing to assert a federal trade secrets claim, failed to articulate a cognizable trade secret, and had not taken reasonable measures to protect his trade secrets. [Dkt. 59.]

In the instant Motions to Dismiss, Defendants seek to dismiss the remaining Counts of the Amended Complaint, alleging misappropriation of certain of Dr. Houser's trade secrets by Defendants under Pennsylvania law, as well as Counts seeking relief for Breach of Contract, an Accounting, Specific Injunctive Relief, Conversion, Unjust Enrichment, Constructive Trust, Civil Conspiracy and Defamation.[1] Defendants' arguments range from a rehash of arguments already rejected by this Court (*i.e.*, that Dr. Houser has failed to allege a cognizable trade secret), to arguments that ask the Court to ignore well-pled facts, draw inferences *against* Dr. Houser and consider facts extraneous to the pleadings, and, finally, to arguments that are legally flawed. As

---

[1] The Motions to Dismiss brought by Temple [Dkt. 64] ("Temple's Motion") and Dr. Feldman [Dkt. 65] ("Feldman's Motion") (*hereinafter* collectively referred to as "Motions") raise related arguments.  Accordingly, this brief will address both Motions together.

stated below, Defendants' Motions should be denied in full, and Dr. Houser's case should be allowed to proceed to discovery and a decision on the merits of his claims.

## II.     FACTUAL BACKGROUND

### A.     Dr. Houser's Employment Agreement and Temple Policies

As alleged in the Amended Complaint, Dr. Houser has been a party to many agreements with Temple and has, over time, become a tenured member of Temple's faculty. *See* Amended Complaint, ¶ 17. On March 20, 2012, Dr. Houser entered into an employment agreement to serve as the Chairperson of the Department of Physiology and Director of the Cardiovascular Research Center ("2012 Agreement"). *See* Amended Complaint, ¶ 20. The 2012 agreement provided, among other things that:

    a.    The term of the agreement ended on June 30, 2017;

    b.    Dr. Houser served at the "pleasure of the Dean"; and

    c.    Dr. Houser was responsible, both as Chairperson and Director, for "adhering to the policies and guidelines of the department, school, university, and accrediting bodies", "ensuring compliance with all regulations of the Center, School, university and external funding agencies, including time and effort reporting"

*Id*. at ¶ 21.

On March 23, 2017, Dr. Houser entered into another employment agreement ("2017 Agreement") (collectively, "Employment Agreements") with Temple. *Id*. at ¶ 22. In the 2017 Agreement, Temple states that Dr. Houser is responsible for "ensuring compliance with all regulations of the Center, School, University and external funding agencies, including time and effort reporting" and "Compliance with sponsor, University and School policies." *Id*. at ¶ 24. The Employment Agreements (that is, collectively, the 2012 and 2017 Agreements) incorporated Temple's various "policies and guidelines" as terms and conditions of Dr. Houser's employment and Temple's obligations to Dr. Houser. *Id*. at ¶ 26.

## B.    Misappropriation of Dr. Houser's Research Relating to his Pig Model

As explained in exacting detail in the Amended Complaint, in connection with his research projects on heart failure, Dr. Houser and his lab had developed a large animal (*i.e.*, pig) model to study heart failure after myocardial infarction (more commonly known as a heart attack). *See* Amended Complaint, ¶ 59–60.  Dr. Houser's pig model is the "gold standard" for the time between when a heart attack occurs and when treatment is rendered in a typical human patient (*hereinafter*, "Dr. Houser's Pig Model"). *Id.* As part of the research, Dr. Houser's team performed testing that showed that the subjects suffered heart failure with reduced ejection fraction (a decrease in percentage of blood being pumped from the heart with each heartbeat) after inducing a myocardial infarction (heart attack) (*hereinafter*, "Dr. Houser's Pig Data"). *Id.* ¶ 62. Neither the Pig Model, Dr. Houser's Pig Data nor Dr. Houser's Pig Model Tissue Samples[2] were public, nor were they meant to be used by others or leave Dr. Houser's lab without his express permission. *Id.* ¶ 78-79, 81. Dr. Houser's Pig Model took time, money and research to create. *Id*. ¶ 76. In fact, Dr. Houser's work in developing and conducting research with the Pig Model was funded by *both* his endowed chair and NIH. *Id*. ¶ 63.

At the same time as Dr. Houser was conducting his research, Dr. Feldman, who was the Executive Dean of the Temple School of Medicine (and thus Dr. Houser's boss) when the initial misappropriation occurred, was conducting his own research on heart failure. *Id.* ¶ 57–58, 64. Dr. Feldman's research specifically included a project to see if a molecule, known as "BAG3," was altered in heart failure and if correcting the defective molecular concentration would rescue the heart function. *Id.* ¶ 64. In his research, Dr. Feldman studied a small population of human patients suffering from heart failure, with genetic mutations that cause reduced levels of BAG3, and a mouse model that induces heart failure through hypertension (or pressure overload) in the

---

[2] *See* Amended Complaint, ¶ 80-82.

heart and having reduced levels of BAG3. *Id.* ¶ 68. Dr. Feldman did not have a large animal model as part of his research. *See id.* ¶ 68, 71. While mice models are potentially informative, they lack the broad clinical significance of large animal models, which would allow for the testing of potential treatments and therapies for human patients who have suffered a heart attack. *See id.* ¶ 71. Having a large animal model also was important to securing investment and other financial support for a commercial venture based upon this invention. *Id.* ¶ 72. Thus, using data and testing from a large animal model, such as Dr. Houser's Pig Model, was an essential part of the inventive and commercialization processes to complete Dr. Feldman's research. *Id.* ¶ 73.

Being generally aware of Dr. Houser's Pig Model through the course of his duties at Temple, Dr. Feldman seized the opportunity to secure Dr. Houser's Pig Model without investing the time, money, and research necessary to create one for himself. *Id.* ¶ 76. Dr. Feldman embarked on a covert effort to improperly secure access to this pivotal missing link for his research, without having to share the credit (or potential financial gains) from this invention with Dr. Houser.[3] *Id.*

After the Stolen IP[4] was acquired and used in the Feldman Paper, Temple – the holder of legal title to both Dr. Feldman and Dr. Houser's inventions[5] and thus responsible for any and all patenting and licensing of the patents and associated intellectual property – collaborated with Dr. Feldman in further improper disclosures and uses. *See id.* ¶ 51–56, 215–47, 268.

---

[3] The complete details of how Dr. Feldman covertly and improperly obtained access to and use of Dr. Houser's Pig Model and, specifically the Stolen IP can be found in the Amended Complaint. *See id.* ¶ 57–110, 146–51, 213–56, 267–82. Where relevant to the Motions, aspects of this effort are discussed herein.

[4] *See* Amended Complaint, ¶ 86.

[5] As this Court observed, if Dr. Houser's Stolen IP is not considered an "invention" under Temple's policy and/or was not otherwise tendered to Temple, then it remains solely Dr. Houser's property. [Dkt. 59 at 15-16.]

As the Amended Complaint alleges in detail, the initial acts of misappropriation here were when Dr. Feldman first improperly acquired the Stolen IP in 2014 or 2015 and then improperly included Dr. Houser's Stolen IP as Dr. Feldman's own in a paper published in 2015 ("Feldman Paper"). The improper acquisition and publication were but two of the acts of misappropriation: numerous other wrong acts continue to this day, including some taken jointly by Dr. Feldman and Temple. The Amended Complaint specifically alleges multiple wrong acts, including:

- Dr. Feldman's company, Renovacor, Inc. ("Renovacor"), used the Stolen IP (presumably licensed to Renovacor by Temple) in its treatment of heart failure, thereby driving significant private equity investment into Renovacor in 2019 and its merger in 2021. *See* Amended Complaint, ¶¶ 215, 220, 270

- Dr. Feldman and Temple prepared (or had its patent attorneys  prepare), filed, and continued to prosecute the '807 Application, based on and utilizing the Stolen IP, up to and including through April 15, 2021. *See id.* ¶ 215–43, 247, 274–76, 278–79

- Dr. Feldman and Temple prepared (or had its patent attorneys prepare) filed on May 21, 2020, and continued to prosecute the '784 Application, based on and utilizing the Stolen IP, up to and including the present. *Id.* at ¶ 215–21, 243–47, 274–75, 277–79.

- Dr. Feldman and Temple prepared (or had its patent attorneys prepare) filed, and continued to prosecute foreign companion applications to the '807 Application. *Id.* ¶ 274.

In 2017, Dr. Houser first learned of Dr. Feldman's improper acquisition of the Stolen IP and improper use of it in the Feldman Paper. *See* Amended Complaint, ¶ 92–93, 97–98. In accordance with Temple's Creative Work Policy, in or around February 2017, Dr. Houser promptly made a good faith allegation of misconduct by Dr. Feldman to Dr. Susan Wiegers (the Senior Associate Dean of Faculty Affairs at the School of Medicine at that time). *Id.* ¶ 100. Approximately one week after Dr. Houser's report, Dr. Wiegers told Dr. Houser that the OVPR would like him to accept an "apology" from Dr. Feldman to resolve the matter. *Id.* ¶ 104. Dr. Houser believed

that he had no further recourse regarding the Stolen IP given that Temple's solution to his complaint was to have Dr. Feldman apologize. *Id.* ¶ 106. In 2017, having reported the issue to the University, Dr. Houser also believed that no further uses would be made of the Stolen IP and so he considered the matter resolved (having reported it to the appropriate Temple authorities). *Id.*

Under no circumstances could Dr. Houser have reasonably anticipated that, once aware of the true owner of the Stolen IP, Temple would permit Dr. Feldman to apply for or continue to pursue patent applications using the Stolen IP (at least not without naming Dr. Houser as a co-inventor), knowing that it consisted of, or was derived from, Dr. Houser's work and not Dr. Feldman's, or to monetize those patent applications through licensing to Dr. Feldman's company, Renovacor, which is pursuing treatments for heart failure utilizing BAG3. *See id.* ¶ 106, 215–22, 248-55.

In late 2019, however, Dr. Houser learned for the first time that Renovacor, had received significant private equity financing. *Id.* ¶ 215. Knowing the importance of patents to obtaining such financing, Dr. Houser became concerned for the first time that the Stolen IP might have been used in patent filings without his knowledge or consent, even though he had made Temple aware that the Stolen IP belonged to him and not Dr. Feldman. *Id.* Accordingly, still believing that the University would handle this matter appropriately, Dr. Houser asked Temple's Integrity Officer and Vice President of Research at Temple, Michele Masucci ("Masucci") if his Stolen IP was being used by Dr. Feldman in any patent filings. *Id.* ¶ 216. Masucci told Dr. Houser that he needed to wait until the conclusion of the investigation against him before he could get an answer to that question. *Id.*

It is Dr. Houser's belief that, Masucci, on behalf of Temple, attempted to deliberately mislead Dr. Houser into believing he could obtain no additional information regarding the poten-

tial use of the Stolen IP in patents at that time and, further, that Temple would address this issue appropriately at that time if needed. *Id.* ¶ 217. Over time in 2020, Dr. Houser grew skeptical of the University's good faith in handling this matter, and thus began his own an investigation into whether the Stolen IP was used in any patent filings. *Id.* ¶ 218. Ultimately, in November 2020 Dr. Houser learned that not only did Dr. Feldman take the Stolen IP and pass it off as his own in the Feldman Paper, but also Temple and Dr. Feldman had indeed compounded the injury to Dr. Houser by including Dr. Houser's Stolen IP in several patent applications in the United States and other countries. *Id.* ¶ 219. At that point, Dr. Houser promptly raised the matter with Counsel and this matter was investigated and filed on February 12, 2021. *See generally* Amended Complaint.

### C.     Temple's So-Called Inquiry Or Investigation Against Dr. Houser

In October 2018, Dr. Houser (and many other scientists and academics across the United States) was notified that Harvard University ("Harvard") was recommending the retraction of approximately 30 academic papers which were authored, co-authored or collaborated on by a now disgraced and former Harvard professor, Piero Anversa ("Anversa"), and/or his group (that is, Anversa, plus a number of other faculty who joined Harvard from New York Medical College when Anversa did). *Id.* at ¶ 111. Dr. Houser had one research paper that was named in the Harvard investigation; however, Anversa was **neither** an author **nor** a co-author on that paper. *Id.* at ¶ 114. AHA agreed to permit the corrected figure, and Drs. Houser and Molkentin later provided data to support the original paper and a ***new*** figure to AHA for correction of the 2010 Paper. AHA accepted the correction and the Notice of Concern, issued while the suspect figure remained uncorrected, was removed. The 2010 Paper otherwise had become and remains accepted and competent scientific research in the field. *Id.* at ¶ 123. Nevertheless, not long after Harvard's announcement about Anversa, from around October 2018 and through September 2019, Masucci

spoke multiple times to Dr. Houser, stating that she would need to begin an "inquiry" – presumably in accordance with the Creative Work Policy – related to the 2010 Paper as a result of Harvard's call for retraction of papers involving Anversa or his group. *Id*. at ¶ 125. However, the real reasons for the Inquiry were not disclosed to Dr. Houser. *Id*. at ¶ 126. Dr. Houser received an email providing him with the time and place at which he had to meet with attorneys from Wilmer Hale, an outside law firm presumably retained by Temple to conduct an investigation into the Anversa matter, and to be prepared to discuss the 2010 Paper with the attorneys. *Id*. at ¶ 129. On October 10, 2019, Dr. Houser met with three attorneys from Wilmer Hale and was questioned for approximately five hours and despite the email that Dr. Houser received that he should be prepared to discuss the 2010 Paper, most of the interrogation focused on other matters not mentioned to Dr. Houser before, including a paper published in 2007 from Dr. Houser's lab in which Anversa was identified as a collaborator. *Id*. at ¶ 130-133. There is no authorization under the Creative Work Policy for the Integrity Officer or Temple or anyone acting on their behalf to require an interrogation or document production pursuant to a "preliminary assessment." *Id*. at ¶ 137; *See generally* Creative Work Policy. Dr. Houser's direct reports and other colleagues of his in the School of Medicine were being interviewed by either Temple or its counsel, Wilmer Hale, in connection with the unspecified claims against him. *Id*. at ¶ 152. After October 2019 and through August, 2020, Dr. Houser made several requests, at least once through his own legal counsel, for Masucci and/or Temple to identify the specific issues for the "Inquiry" or "Investigation" that they were pursuing against him. *Id*. at ¶ 160. Finally, on September 25, 2020, Masucci sent Dr. Houser an email in which she, for the first time, attempted to classify the nearly year-long inquiry as a "preliminary assessment." *Id*. at ¶ 161. Masucci made false statements regarding their inquiry, trying to paint it as a "preliminary assessment." *Id*. at ¶ 162-164. The An-

versa Inquiry/Investigation has been ongoing since September 2019 and continues to this day. *Id.* at ¶ 194. Over that time, Temple's purported "preliminary assessment" has involved the interrogation of Dr. Houser for over 5 hours, demanding voluminous documents and related information – without his knowledge or consent – from his lab colleagues, collecting certain documents and information, demanding additional interrogations with Temple's interrogation team, Wilmer Hale, and ignoring Dr. Houser's every request for clarity, information and the basis and foundation for Temple's actions. *Id.* at ¶ 165. Contrary to Temple's express Creative Work Policy, this "Inquiry" or "Investigation" or whatever it the process is called by Temple, the Anversa Inquiry/Investigation has not been completed within 60 or 90 days or 120 or 180 days from its inception. *Id.* at ¶ 196; *See* Creative Work Policy at Policy, sec. J.

In contravention of Temple's own Creative Work Policy, at no time up to and including the filing of this Complaint was Dr. Houser ever formally notified by Temple or its Integrity Officer (1) in writing, that an Inquiry Committee was to be convened to consider an allegation of misconduct, (2) informed of the nature of the allegation, (3) provided a copy of the Creative Work Policy, or (4) notified that he will have the opportunity to be interviewed by and present evidence to the Inquiry Committee. *Id.* at ¶ 197; *See* Creative Work Policy at Procedures, Art. I.B.1. The frivolous Anversa Inquiry/Investigation has badly damaged Dr. Houser's reputation and continues to badly damage his reputation and position of authority at the School of Medicine and in the greater academic community. *Id.* at ¶ 197. As pled in detail in the Amended Complaint, Dr. Feldman made communications to various colleagues of Dr. Houser, including, but not limited, Patrick O'Connor, and others, which communications were defamatory in character. *Id.* at ¶ 352.

### III. STANDARD FOR A MOTION TO DISMISS

"The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which she bases her claim." *Brand Energy & Infrastructure Servs. v. Irex Contracting Grp.*, No. 16-cv-2499 2017 WL 1105648, at *2 (E.D. Pa. Mar. 24, 2017). Because a complaint need only "contain enough factual matters to suggest the required elements of the claim," allegations of "facts suggestive of the proscribed conduct" satisfy the pleading requirements. *See id.* (cleaned up); *see also Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021) ("The implication of use, especially at the pleading stage, can flow from circumstantial evidence alone."). On a Rule 12(b)(6) motion, the Court must accept such factual matters as true and use them as a basis for drawing all reasonable inferences in favor of the plaintiff. *Oakwood* at 904 ("In addition to assuming the veracity of all reasonable inferences that can be drawn from those [well-pleaded] allegations, and, construing the allegations and reasonable inferences in a light most favorable to the plaintiff, we determine whether they plausibly give rise to an entitlement to relief." (cleaned up)). Thus, the Court cannot dismiss a claim unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Brand Energy* at *2.

To maintain a claim for trade secret misappropriation, a plaintiff need not "'describe trade secrets with particularity' to survive a motion to dismiss." *Le Tote Inc. v. Urb. Outfitters, Inc.*, No. CV 20-3009, 2021 WL 2588958, at *2-3 (E.D. Pa. June 24, 2021) (citations omitted) ("District courts across the Third Circuit have made similar holdings [to that about the DTSA] about the level of detail needed to survive a Rule 12 motion when assessing claims made under the PUTSA"); *see also Mattern & Assocs., LLC v. Latham & Watkins LLP*, Civ. A. No. 13–6592, 2014 WL 4804068, at *3 (E.D. Pa. Sept. 26, 2014) (denying a motion to dismiss because trade secrets need not be disclosed in detail in a complaint; "'the question of whether proprietary in-

formation constitutes a trade secret is an issue of fact, ordinarily resolved by the fact finder after a full presentation of the evidence.'") (citations omitted).

Likewise, "dismissal at the pleading stage on statute-of-limitations grounds ordinarily is improper unless it is apparent from the face of the complaint that the claim is time-barred." *ABB Turbo Sys. AG v. Turbousa, Inc.*, 774 F.3d 979, 985 (Fed. Cir. 2014) (cleaned up); *see also Uni-Systems, LLC v. United States Tennis Ass'n*, 350 F. Supp.3d 143, 177–79 (S.D.N.Y 2018). "To approve dismissal on timeliness grounds, the court would have to conclude that plaintiff's complaint alleges facts making it apparent that plaintiff discovered, or 'by the exercise of reasonable diligence should have ... discovered,' the alleged misappropriations at least three years before the statute of limitations ran." *Id.* (citing the identical provision in California's version of UTSA).

If a litigant has pleaded all the necessary elements of a breach of contract action, the count can stand. *Pierce v. Montgomery Cty. Opportunity Bd., Inc*., 884 F. Supp. 965, 970 (E.D. Pa. 1995). "It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman*, P.C.,635 Pa. 427, 445, 137 A.3d 1247, 1258 (2016). If one has adequately pled the elements of a breach of contract, dismissal of the count would be premature. *Preston Grp., LLC v. Customers Bank*, No. 5:20-CV-06516, 2021 WL 3562893, at *8 (E.D. Pa. Aug. 12, 2021).

Additionally, "[i]n order to state a civil action for conspiracy, a complaint must allege (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance

of the common purpose; and (3) actual legal damage." *McKeeman v. Corestates Bank*, N.A., 2000 PA Super 117, ¶ 14, 751 A.2d 655, 660 (2000).

## IV.  ARGUMENT

### A.  Dr. Houser's Claim for Misappropriation of Trade Secrets Under the Pennsylvania Uniform Trade Secrets Act was Timely Filed and Properly Pled

Both Temple and Dr. Feldman contend that Dr. Houser's claim under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5301 et seq. ("PUTSA") is time barred. Additionally, both Defendants contend that Dr. Houser had no cognizable trade secrets. These arguments are fatally flawed and should be rejected.

#### 1.  Dr. Houser's PUTSA Claim Against Defendants was Timely Filed

Although their arguments have varying nuances, in essence, both Defendants erroneously contend that Dr. Houser "should have known about" or "should have investigated" whether Defendants filed patent applications including his Stolen IP at least as early as February 2017, thus barring any PUTSA claims filed after February 2020. These arguments are legally defective and contradict the well-pled facts in the Amended Complaint.

PUTSA provides for a three-year statute of limitations for misappropriation of trade secrets claims, which runs from when a plaintiff discovers or should have discovered the misappropriation, *i.e.,* that it has sustained an injury. *Heraeus Medical GmbH v. Esschem, Inc.,* 927 F.3d 727, 734 (3d Cir. 2019). Although modeled on the Uniform Law Commission's Uniform Trade Secrets Act, the PUTSA does not treat a "continuing misappropriation" as a single claim. *Id.* at 736. Instead, Pennsylvania applies the "separate accrual rule," under which "'a continuing misappropriation gives rise to multiple discrete claims corresponding to each act of misappropriation, and 'because each act violates the law on its own, each act separately triggers its own limitations period.'" *Id*. at 737. Where the federal Defend Trade Secrets Act follows the relationship

theory of trade secret misappropriation, as this Court has held [Dkt. 59 at 8-11], Pennsylvania follows the property theory, under which "each use is a new wrong." *Heraeus*, 927 F.3d at 738. "Continuing misappropriation" has a very specific meaning under the PUTSA. *Id.* at 740-742. A single use that has lingering effects over time is not the kind of "continuing misappropriation" that qualifies. *Id.* Instead, under PUTSA, a "continuing misappropriation" is an affirmative new act that triggers the statute of limitations anew. *Id.* Notably, that "new act" can be a repeat of a prior act – for example, in *Heraeus*, the Third Circuit held that continuing to manufacture goods using the misappropriated trade secret process is a continuing misappropriation as each act of manufacture is a new "use" under the PUTSA. *Id.* Unsurprisingly, although one can recover for continuing misappropriations within the three years preceding the filing of a lawsuit, out of fairness to defendants a plaintiff cannot recover for any acts prior to the three-year period. *Id.* at 740-741.[6]

As explained above, Dr. Houser first learned that Dr. Feldman had improperly acquired the Stolen IP and used it in the Feldman Paper in February 2017. At that time, in accordance with Temple's policies, he notified Temple that the Stolen IP was his and not Dr. Feldman's. Temple's solution was for Dr. Houser to accept an apology from Dr. Feldman. Dr. Houser thought the matter resolved. In November 2020, Dr. Houser discovered for the first time that his Stolen IP (1)

---

[6] Dr. Feldman's quotations from and discussion of *Heraeus* at page 10 of his Memorandum in support of his Motion [Dkt. 65-1 at 10] is misleading and incorrect. The spliced quotes, taken out of context, give the impression that the Third Circuit held that there was some sort of delay penalty, where even if there were acts of misappropriation within the three-year period prior to suit being filed, the fact that the very first act of misappropriation occurred prior to that would make all claims time barred (erroneously contending that "the 784 Application does not *resuscitate* Dr. Houser's otherwise time-barred PUTSA claim"). That is not what the Third Circuit held or even was referring to in the quoted language. Instead, it was referring to the unremarkable concept that acts predating the three-year statute of limitations period would be time barred, while those within the three years prior to suit would not be. Thus, Dr. Houser can bring a timely claim with respect to the '784 Application, even if claims regarding earlier patent applications or other misappropriations are time-barred.

was used in patent applications and (2) their ongoing prosecution, and, thus, (3) was likely also licensed to Renovacor, (4) used in Renovacor's development of its therapies, and (5) used to support Renovacor's private equity investment and later (6) its merger.

The first time that Dr. Houser became aware that *Temple* had engaged in *any* act of misappropriation with respect to the Stolen IP was in November 2020. This was also the first time Dr. Houser became aware that Dr. Feldman engaged in *the additional, separate acts of misappropriation* beyond using the Stolen IP in the 2015 paper, including in the prosecution of the '807 application, the newly filed '784 Application, and for various commercial purposes at Renovacor detailed above. Upon learning of these additional misappropriations, Dr. Houser acted promptly to hire counsel and his suit was filed a few short months later, in February of 2021, well within the three-year statute of limitations period.[7]

Both Temple and Dr. Feldman urge this Court to ignore these fact allegations and find that the statute of limitations as to all acts of misappropriation began to run no later than February 2017, such that any suit filed after February 2020 would be time barred. Temple's argument is two-fold. First, Temple contends, without *any* authority in support of its argument,[8] that the statute of limitations started to run as to both it and Dr. Feldman in February 2017 because, by that time, Dr. Houser knew that both Temple and Dr. Feldman were in possession of the trade secret information.

---

[7] Even if one were to use 2019 as the date that Dr. Houser *should* have become aware of the patent filings, this suit is still timely.

[8] To the extent that Temple is arguing that a statute of limitations runs from the moment one knows a defendant *has access* to the information, even if the plaintiff does not know (nor should have known) that the defendant has misappropriated it, it cites no authority for this proposition and Plaintiff has not located any. Indeed, to the contrary, black letter law instead dictates that the statute of limitations runs when a plaintiff knew or should have known about the *misappropriation i.e.*, the unlawful act – just knowing the defendant *had possession* of the information is insufficient. *Heraeus,* at 734 ("[a] 'limitations period generally begins to run as soon as an injury is sustained'" but "should not 'run against' a plaintiff who is 'ignorant of his loss'") (citations omitted).

The problem with this argument is that it presumes that Dr. Houser should have known that Temple – to his knowledge *at the time* a wholly innocent actor – was itself going to *misappropriate* his information and, further, would act in concert with Dr. Feldman (whom Temple had already implied was a wrongdoer) to engage in additional acts of misappropriation.

Temple's first argument fails because it contradicts the well pled facts in the Amended Complaint, which state that Dr. Houser believed Temple would honor its policies and act appropriately, as well as any inferences that one could draw from them – the fact that Temple caused Dr. Feldman to apologize for his wrongdoing sustains a reasonable inference that Temple believed Dr. Feldman's actions were wrong and should not have occurred. In short, under the circumstances as pled, Dr. Houser neither knew nor should have known that *additional* acts of misappropriation by either Dr. Feldman or Temple were occurring or would occur in the future as of February 2017, such that the statute of limitations did not commence at that time for any acts as to Temple and any subsequent acts as to both Defendants. *See Heraeus*, 927 F.3d at 734.

Temple also argues that this Court should find that the limitations period should be deemed to start running as of January 2017 because that is the date that the '807 patent application, which contained Dr. Houser's information, was published. Temple appears to contend that publication of a patent is "constructive notice" sufficient to trigger the running of the statute of limitations in all circumstances. Temple is incorrect as a matter of law.

Most courts have held that whether the limitations period is triggered (and has run) is a fact issue: the bare fact that a patent application has been published is not by itself sufficient reason to hold that the plaintiff "should have known" about the misappropriation. *See, e.g., CODA Development S.R.O. v. Goodyear Tire & Rubber Company*, 916 F.3d 1350, 1361 (Fed. Cir. 2019) ("Defendants argue that the only reasonable inference to be drawn is against Plaintiffs . . . 'that

Plaintiffs had constructive notice of potential claims in 2009' . . . We disagree. Plaintiffs might have assumed Goodyear lost interest in the technology, given its previous failed investment. Or they might have thought that Goodyear would honor the nondisclosure agreement".);[9] *see also Lambda Optical Solutions, LLC v. Alcatel-Lucent USA Inc.*, 2015 WL 5470210 (D. Del. Aug. 6, 2015) (while the presence of the trade secrets in a patent application is an important factor to be considered "it is not necessarily dispositive, and other factors can and should play a role in the inquiry."); *Abaco Drilling Techs., Inc. v. PV Fluid Prods.*, Civ. A. No. H-20-1946, 2020 WL 10501993 (S.D. Tex. Aug. 3, 2020) (holding that whether a published patent confers constructive notice for a reasonable diligence inquiry is a question of fact and denying a motion to dismiss because "[a] finder of fact would rationally conclude that "reasonable diligence" did not require Abaco to monitor patent applications forever to determine whether Kyker violated the terms of his confidentiality agreement).

There are a few cases, such as those cited by Temple, in which a court has held that, under the particular facts before it the publication of a patent application triggered the statute of limitations. [Dkt. 64 at 415.] Notably, *Zirvi v Flatley*, 433 F. Supp.3d 448 (S.D.N.Y. 2020), the primary case relied upon by Temple, is factually distinguishable from the facts here. In *Zivri*, there was extensive other evidence supporting a conclusion that the plaintiff "knew or should have known" much earlier about the misappropriation. *Id.* at 460-461. Perhaps most damaging is the fact that some of the plaintiffs in the case were also parties in a patent interference proceeding they brought in the US Patent and Trademark Office, over twelve (12) years prior to the suit

---

[9] Notably, *Zirvi* relies upon an earlier Federal Circuit decision, *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 182 F. App'x 994, 999 (Fed. Cir. 2006), which found it appropriate on the facts before it to deem the publication of a patent application as triggering the statute of limitations. But as the more recent Federal Circuit decision in *CODA* makes clear, its ruling in *Advanced Cardiovascular* did not establish a bright line rule and the specific facts before the court matter. *CODA*, at 1361 (statute of limitations "inquiry is fact-specific").

at issue, involving some of the patents that incorporated the allegedly misappropriated trade secrets. *Id.* at 461.

This case is much more like *CODA* and *Abaco* than *Zirvi*. Here, there exist good reasons, as discussed above, why the mere publication of the '807 patent application should not be deemed to have triggered the statute of limitations. Among other things, there are no facts alleged in the Amended Complaint that would support any inference that Dr. Houser had a practice of following patent applications in the field.[10] Dr. Houser had no knowledge that any applications were pending – nor did Temple inform him of that when he complained about the use in the paper, which he justifiably assumed they would do. Further, when Dr. Houser reported the misappropriation to Temple in February 2017, Temple apparently agreed that Dr. Feldman's actions were improper and made him apologize. Based on this, Dr. Houser believed that Temple would honor his rights to his intellectual property and, further, would ensure that Dr. Feldman (and Temple) would not engage in further misappropriations. Under these circumstances, it would be reasonable to infer that Dr. Houser had *no reason* to continue to pursue the issue and research whether any patents were pending. For all these reasons, Temple's motion to dismiss the PUTSA claim on statute of limitations ground should be denied.

Dr. Feldman also makes two arguments as to why the limitations period had allegedly run by February 2020. First, like Temple, he asks this Court to ignore the well pled facts in the Amended Complaint about why Dr. Houser did *not* know about the patent applications, to make credibility determinations against Dr. Houser on this issue (for example, arguing that "it strains

---

[10] To the contrary, the fact that Dr. Houser had to seek assistance in figuring out if Dr. Feldman and Temple applied for any patents and that the investigation took some time supports an inference the contrary. *See* Amended Complaint, ¶¶ 218 and 234. Indeed, should it be material to the Court's decision on the Motions, Plaintiff respectfully requests leave to amend the Amended Complaint to add an express allegation to the contrary as, in fact, Dr. Houser had no such practice.

credulity" to believe that Dr. Houser did not check for patents earlier than 2020), and, finally to draw inferences against Dr. Houser (*e.g.*, arguing that the timing of Dr. Houser's complaint about the paper – February 2017, suggests that he must have known about the January 2017 patent publication[11]). These arguments are all an improper basis for granting a motion to dismiss. *See Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021).

Second, Dr. Feldman also argues that the various acts of misappropriation alleged here in addition to the one Dr. Houser knew of in 2015 (the paper) are not separate acts of misappropriation triggering the statute of limitations anew, but rather merely continuations of the original act. In this regard, Dr. Feldman focuses solely on the most recent patent application, the '784 Application, which is a "continuation" of the '807 Application that published in January 2017. As a matter of law '807 and '784 are separate patents and should be directed to separate (even if related) inventions[12] in order to be allowed, even if they are in the same family. The filing of the '784 application is also a completely separate act from the filing of the parent '807 patent or the prosecution of that patent. The continued use of the Stolen IP in additional patent applications is indistinguishable from the continued use of a trade secret manufacturing process to make additional products, condemned in *Heraeus,* 927 F.3d at 738.[13]

---

[11] The more reasonable inference would be that, had Dr. Houser possessed any knowledge of the January 2017 patent publication using the Stolen IP, he would have complained about that together with his complaint about the prior paper. Thus, the inference is clearly that Dr. Houser was unaware of the patent application.

[12] Indeed, the '807 Application is facing a rejection due to "double patenting" in view of the '784 application. *See* Amended Complaint, ¶ 243.

[13] Much like continuous manufacturing of new products, the prosecution of a single patent application also could be considered a continuing misappropriation under PUTSA where, as here, *See* Amended Complaint ¶ 236-237, the defendant takes affirmative actions during the course of the prosecution to rely upon and use the misappropriated trade secrets in new ways in an effort to secure the patent. This is not a situation where the application was filed long ago and remained untouched thereafter, passively meandering its way through the Patent Office (*i.e.,* having "lingering effects" as discussed in *Heraeus*, 927 F.2d at 741. Instead, Defendants made affirmative choices to inject aspects of the Stolen IP into the claims and to rely upon it for patentability. *See*

Moreover, the Amended Complaint alleges other independent uses beyond the patent applications and prosecution thereof, including licensing the Stolen IP to Renovacor, relying upon the Stolen IP in obtaining funding for Renovacor (bringing revenue back to Temple and Dr. Feldman), and needing to use the Stolen IP to prove efficacy in humans for FDA approval purposes. These are separate wrongful uses of the trade secrets and thus separate misappropriations each triggering the statute of limitations anew. *Heraeus*, 927 F.3d at 740-741.

Finally, Dr. Houser has pleaded, in the alternative, that even if the statute of limitations was triggered in 2017 as to all parties and all acts of misappropriation, his claim is still timely due to Temple's actions in leading Dr. Houser to believe the matter had been fully resolved and in actively concealing (with Dr. Feldman's help) the other acts of misappropriation here (*i.e.*, patent applications and prosecution and thus uses by Renovacor that flowed after). Thus, even if the statute of limitations were triggered in 2017 as to both Defendants and all activities giving rise to the misappropriation claim here, it should be tolled from that time at least until 2019 when Dr. Houser began to suspect that Temple (and Dr. Feldman) had not acted appropriately and had, instead, participated in, perpetuated and expanded upon the earlier misappropriation began by Dr. Feldman. *See E.E.O.C. v. Joseph Paolino & Sons, Inc.*, Civ. A. No. 92–0578, 1992 WL 382349 (E.D. Pa. Dec. 11, 1992) ("equitable tolling is appropriate where . . . the employer has actively misled the (employee) respecting the cause of action," "lulling [plaintiff] into forbearing on his rights" and into not seeking legal counsel). On these well-pleaded facts, equitable tolling should apply if necessary and Dr. Houser's PUTSA claim should be considered timely filed.

For all these reasons, Defendants' arguments as to whether Dr. Houser's claim is barred by the statute of limitations must fail, and their Motions on that ground should be denied.

---

Amended Complaint, ¶¶ 222-247. Thus, even the prosecution of the '807 Application should be deemed a continuing misappropriation.

19

## 2.    Dr. Houser Has Adequately Pled the Existence of a Cognizable Trade Secret

In arguing that Dr. Houser failed to allege a cognizable trade secret, Temple merely re-hashes its prior argument that any "trade secret" status of the Stolen IP was lost when the 2015 Paper was published, or, at the latest, when the first patent application was published. [Dkt. 64 at 5]. This argument was properly rejected once by this Court under an "unclean hands" doctrine, and should be rejected again. [Dkt. 59 at 11-15.]

Dr. Feldman's argument that Dr. Houser has not pled cognizable trade secrets, like his arguments on the limitations issue, invites this Court to ignore well pled facts, draw inferences against Dr. Houser and consider facts extraneous to the Amended Complaint. Dr. Feldman relies on a strained view of Dr. Houser's allegations to minimize the nature and value of the Pig Model and its associated data and tissue. [Dkt. 65-1 at 12-14.] Dr. Houser expressly alleged that the Stolen IP (including the Pig Model, data and tissue) was valuable and kept secret. *See* Amended Complaint, ¶ 60-63, 68-74, 76, 78-81. He alleged that it took time, money and research to create it, specifically alleging that his work was funded by both his endowed chair and an NIH grant. *Id.* ¶ 63, 76. Contrary to the inferences Dr. Feldman attempts to draw, it is a reasonable inference from these allegations that developing a Pig Model was not "readily ascertainable," but required significant investment of time, money and resources and thus, is, by definition, a trade secret. *See* PUTSA 12 Pa. C.S. ¶ 5302 (defining a trade secret).

Relatedly, Dr. Feldman also repeatedly argues that the Stolen IP could not be a trade secret because it was not "novel" [Dkt. 65-1 at 12-14] – but novelty is not a standard for trade secrets. A trade secret can be a combination of generally known elements, provided they are combined in such a way as to provide the trade secret owner some competitive advantage. *Anaconda Co. v. Metric Tool & Die Co.*, 485 F. Supp. 410, 422 (E.D. Pa. 1980) ("'[A] trade secret can exist

in a combination of characteristics and components, each of which, by itself, is in the public do-main, but the unified process, design and operation of which, in unique combination, *affords a competitive advantage* and is a protectable secret.'") (citation omitted) (emphasis added); *see also SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985) (quoting *Anaconda*, at 422) ("'A trade secret may be no more than a slight mechanical advance over common knowledge and practice in the art.'").

Here, Dr. Houser has alleged just such a competitive advantage. *See* Amended Com-plaint, ¶ 215-243, 247, 270, 274-279. For Dr. Feldman to show that his ideas about BAG3 were broadly applicable in all situations, he needed to show it applied in a pig model – which he did not have. *Id.* Research support from a pig model was necessary to obtain FDA approval. *Id.* Dr. Feldman did not have that. *Id.* The Stolen IP was necessary to secure a patent on the invention in the '807 and '784 Applications (among others) – he did not have that research without Dr. Houser's trade secrets. *Id.* Demonstrating that his theory applied in a pig model was required to obtain funding for Renovacor – and Dr. Feldman did not have a pig model. *Id.* All of these alle-gations more than amply demonstrate the competitive value of the Stolen IP, which indisputably was maintained as confidential by Dr. Houser. [Dkt. 59 at 18 ("Houser has more than met his burden" of alleging reasonable measures to maintain secrecy of his trade secrets).] By definition, then, as alleged in the Amended Complaint, the Stolen IP is a trade secret. Dr. Feldman will have ample opportunity during this litigation to try to demonstrate, with evidence, that the Stolen IP is *not* a trade secret – but now is not that time. His motion to dismiss Dr. Houser's PUTSA claim should be denied.

   **B.**  **Dr. Houser's Claim for Breach of Contract Was Properly Pled**

      **1.**  **The Creative Work Policy and Inventions and Patents Policy are Terms and Conditions of Dr. Houser's Employment Agreement with Temple; Temple's Own Language Says So**

Dr. Houser's Amended Complaint sufficiently pleads a cause of action for breach of contract against Temple. First, all of the cases cited by Temple in support of the argument that the Policy on Misconduct in Research and Creative Work, Policy No. 02.54.01 (the "Creative Work Policy") and the "Inventions and Patents" (hereafter, "Inventions Policy") do not constitute contracts between Dr. Houser and Temple are not analogous to the facts here. For example, these cases *all* involve a discharged employee attempting to use the Employee Manual/Policies to overcome the employee-at-will presumption to assert a claim for breach of contract. To the contrary here, Dr. Houser does not need to use the Employee Manual/Policies to overcome any presumptions of employment-at-will since he had express employment contracts with Temple.

Second, as is clear from the Amended Complaint and the agreements themselves, Temple expressly and obviously intended to be bound by the Creative Work Policy and Inventions Policy as terms of Dr. Houser's Employment Agreements (as that term is defined in the Amended Complaint). Dr. Houser's Employment Agreements use specific language *incorporating* Temple's various "policies and guidelines" as terms and conditions of Dr. Houser's employment and Temple's obligations to Dr. Houser. Temple cannot argue, on the hand, that these policies are strictly enforceable against Dr. Houser as conditions of his employment, yet simultaneously argue, on the other hand, that they are immune from the same conditions when their agreements incorporate the very conditions at issue.

Temple – not Dr. Houser – drafted the Employment Agreements. These were not negotiated agreements. Temple ***chose*** to include the language incorporating its own policies into the Employment Agreements. Temple ***chose*** to make its policies part of the terms and conditions of Dr. Houser's employment. Thus, the Employment Agreement themselves, drafted by Temple's own hand, are demonstrable evidence that Temple intended to be bound by the policies as part of

22

Dr. Houser's Employment Agreements. Further, if any reasonable ambiguity in the language of the Employment Agreements could exist, that ambiguity, as a matter of law, must be construed against Temple as their drafter. *Lane v. Com.,* 954 A.2d 615, 619 (Pa. Super. Ct. 2008).

Nonetheless, if Temple's intent could be doubted despite the very language it used in the Employment Agreements incorporating the challenged policies as terms of Dr. Houser's employment, that intent is a question of fact that cannot be decided at this juncture. "The issue of whether a contract has arisen between two parties generally presents a question of fact, particularly where the record contains conflicting evidence regarding intent." *McWhirter v. Selembo*, No. 4:12-CV-704, 2012 WL 4513715, at *4 (M.D. Pa. Sept. 10, 2012), report and recommendation adopted, No. 4:12-CV-704, 2012 WL 4511409 (M.D. Pa. Oct. 1, 2012); *see Channel Home Centers v. Grossman*, 795 F.2d 291, 300 (3d Cir.1986) ("Under Pennsylvania law, when the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact.") (citation omitted).

## 2.    Dr. Houser Properly Pled a Breach

Dr. Houser properly pled that Temple breached the Employment Agreements.[14] Temple's argument that Dr. Houser failed to do so simply because the Creative Work Policy allegedly does not prohibit Temple's sweeping and overreaching actions is wholly misplaced. As painstakingly averred in the Amended Complaint, ***nothing*** in the policy written by Temple gives it the authority to engage in the sweeping investigations described in the Amended Complaint, most certainly as to the initial Inquiry/Investigation relating to Piero Anversa. According to Temple, this matter

---

[14] In its Motion, Temple has mischaracterized this Court's statements in its Memorandum Opinion denying Dr. Houser's Motion for Protective Order to try to support Temple's contention that it was not required to comply with the notice requirements as provided by The Creative Work Policy since, Temple claims, it was only in the "preliminary stage" of one of the investigations against Dr. Houser. This Court actually stated, however, in page 6 of its Memorandum Opinion that Temple was "at the *inquiry* phase." *See* Dkt 57 at page 6 (emphasis added). In fact, this Court identified Stage 1 to be the "inquiry phase." *Id*.

is still a "preliminary assessment." No such rules or procedures – under Temple's policies or those of any governing body – authorize Temple to conduct the breadth and depth of investigation it is now doing under the flimsy guise of a "preliminary assessment." Temple's policies clearly govern the specific protocols to be followed in each stage of an inquiry/investigation. Therefore, any allegations by Dr. Houser that Temple has not followed these protocols or is exceeding the bounds of them, undoubtedly constitutes a proper pleading of a breach. Temple has failed repeatedly to abide by its own policies (and those of the Office of Research Integrity ("ORI")) in its so-called inquiries/investigations against Dr. Houser. "[W]hen performance of a duty under a contract is due any non-performance is a breach." *Traction Tire, LLC v. Total Quality Logistics, LLC*, No. CV 19-5150, 2020 WL 6044179, at \*9 (E.D. Pa. Oct. 13, 2020); *quoting Atl. Holdings, Ltd. v. Apollo Metals, Ltd*., 263 F. Supp. 3d 526, 530 (E.D. Pa. 2017).

Further, the issues Temple attempts to assert in the Motion raise questions of fact as to Temple's alleged compliance (or lack thereof) with its own policies which issues can only be resolved through discovery. The matters are not ripe at this juncture and the Amended Complaint satisfies Dr. Houser's pleading burden under the law. Thus, dismissal of Dr. Houser's breach of contract claim is unwarranted, as he pled the required elements sufficient to proceed on the breach of contract claim.

### C.    Dr. Houser's Claim for an Accounting Was Properly Pled

Temple's arguments that Dr. Houser has not properly pled a claim for accounting are incorrect. For the reasons stated above, because Dr. Houser has properly pled a breach of contract by Temple, his claim for an accounting is proper and cannot be dismissed.

Temple also argues that Dr. Houser has not properly alleged the need for an accounting here because he has not adequately alleged that he is a joint inventor on the patent applications at

24

issue. Here, Dr. Houser has alleged that his work appears in the specification of the patent applications at issue, and not merely as general background information but directly related to the invention. *See* Amended Complaint,[15] ¶ 222-247, 290-292. Indeed, he further alleges that the Stolen IP was material to the validity of the claims and relied on during the prosecution of the applications. *See* Amended Complaint, ¶ 229-232, 235-237. While Dr. Houser's contribution might not rise to the level of Dr. Feldman's, as a matter of law, one can be a joint inventor even if one's contribution to the conception of the invention is small. *See Dana-Farber Cancer Institute Inc. v. Ono Pharma. Co.*, 964 F.3d 1365, 1371-73 (Fed. Cir. 2020); *see generally* 2 Chisum on Patents ¶ 2.02 (2021). These allegations sufficiently establish that Dr. Houser has a viable claim to being a joint inventor on the patent applications, and thus entitled to an accounting of any revenue derived therefrom.[16] Defendants' motions to dismiss this claim should be denied.

### D.    Dr. Houser's Claim for Conspiracy Was Properly Pled

Dr. Houser properly pled the requisite elements of civil conspiracy between Dr. Feldman and Temple. *See* Amended Complaint, ¶341-350. Dr. Feldman argues that Dr. Houser has failed

---

[15] For example, during the prosecution of the '807 Application, Temple amended the claims to overcome a Patent Office rejection to specifically encompass treatments for "human patients suffering from heart failure with reduced ejection fraction," which is a much broader category of heart failure than Dr. Feldman's own research would support (Dr. Feldman's research only supported the efficacy of such treatments for heart failure caused by hypertension (in mice), a rare form of heart failure caused by a genetic mutation (in human patients) or end stage heart failure (again in human patients). *See* Notice of Allowance and Allowed Claims, attached hereto as Exhibit A & the '807 Application, attached to Am. Compl. as Exhibit D; *see also Allergan USA, Inc. v. Prollenium US Inc.*, No. 19-126-CFC-SRF, 2019 WL 7298569, at *8 n.5 (D. Del. Dec. 30, 2019), *report and recommendation adopted*, 2020 WL 409684 (D. Del. Jan. 24, 2020) ("The court may consider the prosecution history of the [patent] application on a motion to dismiss because it is a matter of public record.") Only Dr. Houser's research supported a claim for an invention of this breadth and was material to the conception of the invention as a treatment for *all* forms of heart failure, including the most common.

[16] Whether or not Dr. Houser is co-inventor of the invention claimed one or more claims of any patent that ultimately issues here remains to be seen, as no patent has yet issued (although the '807 Application was allowed). For that reason, he has not yet asserted a claim for correction of inventorship under 35 U.S.C. ¶ 256; however, to the extent that Defendants are already profiting from licensing the pending applications, Dr. Houser should be entitled to share in those profits.

to establish that Defendants acted with malice. In taking the allegations pled by Dr. Houser as true, the only proper conclusion is that Defendants obviously acted with malice in an attempt to injure Dr. Houser. If Defendants' actions, as claimed by Dr. Feldman, were really in the pursuit of innovative scientific discovery, one would undoubtedly conclude that they would involve the inventor of the Stolen IP, Dr. Houser, in this process. They did not. They were notified of their omission (whether it was intentional or not remains to be seen in discovery, though it appears to be completely intentional). They did nothing to correct the substantial error and Dr. Houser remains uncredited as the inventor of the Stolen IP (while Temple and Dr. Feldman reap monetary benefits, among others, because of it). The fact that Defendants conspired together to deprive Dr. Houser of his ownership and monetary rights to the Stolen IP instead of involving him in the process sufficiently established that Defendants acted with the purpose of injuring Dr. Houser. There is no other logical conclusion. As pled, there was no justification for the acts and omissions of Temple and Dr. Feldman.

In response, Temple simply relies on one, nonprecedential decision which states that no such exception to the intracorporate conspiracy doctrine exists to support dismissal of Dr. Houser's claim. However, the court in *Accurso v. Infra-Red Servs., Inc.* 23 F. Supp. 3d 494, 515 (E.D. Pa. 2014) cites to a Pennsylvania Superior Court decision which held that the exception **does exist**: *Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 340 Pa.Super. 253, 489 A.2d 1364, 1372 (1985) ("[S]ufficient facts have been alleged to allow count 7 of the complaint to proceed to trial. We cannot, at this point, accept appellees' theory that a conspiracy cannot occur in the context of the 'single entity' of a hospital and its medical staff. In the instant case, appellant has alleged that appellees did not have the responsibility or legal function to review the professional abilities of other professional staff members under the medical staff constitution and

by-laws." (citations omitted)). Further, when tasked with the making the determination of whether the Pennsylvania Supreme Court would recognize such an exception, the District Court determined that the answer was still unclear. *Id*. Ultimately, as conveniently ignored by Defendants, the District Court concluded "for several reasons, then—including the indicated indeterminacy of the case law—Mr. Accurso's civil conspiracy claim should be permitted to proceed…" *Id*. Just like the above-mentioned case, this Court should permit Dr. Houser's civil conspiracy claim to proceed under the facts averred and current status of Pennsylvania law.

Notwithstanding the above, Dr. Houser's claim for civil conspiracy nevertheless is sufficiently pled to survive Defendants' Motion to Dismiss. "A corporation can conspire with its agents or employees if the agents or employees are acting not for the corporation, but for personal reasons, and one of the parties to the conspiracy is not an agent or employee of the corporation." *Doe v. Kohn, Nast & Graf, P.C*., 862 F. Supp. 1310, 1328 (E.D. Pa. 1994). "This rule has been read expansively to allow a claim for civil conspiracy to go forward where agents or employees act outside of their roles as officers and employees of the corporation even in the absence of a co-conspirator from outside the corporation." *Id*. In accord with this law, this Court has denied a motion to dismiss where a complaint may be read to state that defendants "…conspired not solely in their capacity as corporate managers, but also as individuals who would realize an enhanced return..." *Sanzone v. Phoenix Techs., Inc.*, No. CIV. A. 89-5397, 1990 WL 50732, at *11 (E.D. Pa. Apr. 19, 1990). Therefore, Dr. Houser has pled that Dr. Feldman conspired with Temple to deprive Dr. Houser of his ownership and monetary rights to the Stolen IP, so that Defendants could use the Stolen IP to earn significant monies (and thereby increase their own respective shares and prestige) and that this was done also for Dr. Feldman's own personal benefit. *See* Amended Complaint, ¶ 342-343. Temple and Dr. Feldman cannot avoid liabil-

ity merely because Dr. Feldman was an employee of Temple[17]. Dr. Feldman, as alleged in the Amended Complaint, clearly acted for his own benefit as he stands to reap astronomical benefits from the Stolen IP, most of which will go way beyond Temple.

Further, Defendants merely proclaim without a viable underlying substantive claim that a civil conspiracy claim may not lie here. As pled in the Amended Complaint, Dr. Houser has properly pled viable claims for Misappropriation of Trade Secrets under 12 PA.C.S. § 5301, Breach of Contract, Unjust Enrichment, and Conversion to support the foundational torts for a civil conspiracy claim. Defendants have failed to establish the lack of a viable underlying substantive claim.

### E.    Dr. Houser's Claim for Specific Injunction Was Properly Pled

The Federal Rules of Civil Procedure permit a Plaintiff to plead alternative claims of relief regardless of their inconsistency. *Schirmer v. Principal Life Ins. Co*., No. 08-CV-2406, 2008 WL 4787568, at *4 (E.D. Pa. Oct. 29, 2008); Fed.R.Civ.P. 8(d). In accordance with the Federal Rules of Civil Procedure, Dr. Houser is permitted to plead a cause of action for specific injunction as a separate count.

### F.    Dr. Houser's Claim for Conversion Was Properly Pled

Both Temple and Dr. Feldman argue that Dr. Houser has not properly alleged a claim for conversion of intellectual property here because he has not and cannot allege that the Stolen IP was shared with Dr. Feldman *by Dr. Houser* in the context of a confidential relationship.[18] [Dkt.

---

[17] Dr. Houser has obtained correspondence confirming precisely the facts he alleged about Dr. Feldman's dishonesty in passing off the Stolen IP as Dr. Feldman's own. In the same correspondences, Temple further confirmed that it knew of Dr. Feldman's dishonesty. But as alleged in the Amended Complaint, neither Temple nor Feldman has taken any action to correct Dr. Feldman's lies. The conspiracy claim is well-pled.

[18] Defendants also rely on their arguments, discussed elsewhere, that the Stolen IP is not confidential and not a trade secret. Dr. Houser will not repeat his responses to those arguments here but incorporates them herein by reference.

64 at 13 & Dkt. 65-1 at 17-18]. None of the cases relied upon by Defendants support this proposition. The cases instead articulate the unremarkable proposition that Dr. Houser must have been in a "confidential relationship" with Defendants. And indeed he was: he was and is employed by Temple and Dr. Feldman was his boss at the time of the initial misappropriation. Thus, Defendants' motions to dismiss this claim should be denied.

### G.    Dr. Houser's Claim for Unjust Enrichment Was Properly Pled

Both Temple and Dr. Feldman argue that Dr. Houser has not properly alleged a claim for unjust enrichment here because he allegedly has not pled a benefit conferred upon them by Dr. Houser that they are retaining improperly. Defendants' argument is simply frivolous. Dr. Houser has alleged in numerous places throughout the Amended Complaint that Temple and Dr. Feldman improperly benefited from the use of his Stolen IP in being able to rely upon it with the patent applications and prosecution of the patents, in licensing the joint invention to Renovacor, as to Dr. Feldman, in obtaining funding for Renovacor, and, ultimately, in seeking FDA approval for any therapy developed by Renovacor. *See* Amended Complaint, ¶¶ 215-243, 247, 270, 274-279. Even more simply, there can be no dispute that Dr. Feldman avoided spending money to develop his own pig model and instead used Dr. Houser's (without his permission), thus at a minimum saving him (and Temple) that cost. *See* Amended Complaint, ¶ 76. Defendants' motions to dismiss this claim should be denied.

### H.    Dr. Houser's Claim for Constructive Trust Was Properly Pled

The Federal Rules of Civil Procedure permit a Plaintiff to plead alternative claims of relief regardless of their inconsistency. *Schirmer v. Principal Life Ins. Co*., No. 08-CV-2406, 2008 WL 4787568, at *4 (E.D. Pa. Oct. 29, 2008); Fed.R.Civ.P. 8(d). In accordance with the Federal

Rules of Civil Procedure, Dr. Houser is permitted to plead a cause of action for specific injunction as a separate count.

## V.   CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' Motions to Dismiss and allow Dr. Houser's case to proceed to discovery and a decision on the merits.

Dated: December 1, 2021                  Respectfully submitted,


*/s/ Nicole D. Galli*
Nicole D. Galli (PA Id. #78420)
ndgalli@ndgallilaw.com
**ND Galli Law LLC**
One Liberty Place
1650 Market Street
Suite 3600, #00250
Philadelphia, PA 19103
Telephone:      215-525-9580
Facsimile:      215-525-9585


*/s/ David M. Burkholder*
David M. Burkholder, Esquire
Courtney A. Keaveney, Esquire
dburkholder@wispearl.com
ckeaveney@wispearl.com
**WISLER PEARLSTINE, LLP**
460 Norristown Road, Suite 110
Blue Bell, PA 19422
Telephone:      (610) 825-8400
Facsimile:      (610) 828-4887



*Counsel for Plaintiff,*
*Steven Houser, Ph.D., FAHA*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon all counsel of record below via the Court's ECF system on the date below.

James A. Keller, Esquire
Darius C. Gambino
Carolyn A. Pellegrini
Saul Ewing Arnstein & Lehr LLP
1500 Market Street
Philadelphia, PA 19102
(215) 972-1964
james.keller@saul.com
darius.gambino@saul.com
carolyn.pellegrini@saul.com

*Counsel for Defendant, Temple University*

Michael J. Fortunato, Esquire
Rachael Luken Carp, Esquire
Rubin, Fortunato & Harbison P.C.
10 South Leopard Road
Paoli, PA 19301
mfortunato@rubinfortunato.com
rcarp@rubinfortunato.com

*Counsel for Defendant, Arthur Feldman MD; Ph.D.*

Date: December 1, 2021                    */s/   Courtney A. Keaveney___*

1

# Exhibit "A"



U<small>NITED</small> S<small>TATES</small> P<small>ATENT AND</small> T<small>RADEMARK</small> O<small>FFICE</small>

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/115,807 | 08/01/2016 | Arthur M. FELDMAN | 055211-0506660 | 5016 |

27500          7590          12/01/2021
PILLSBURY WINTHROP SHAW PITTMAN LLP (CV)
ATTENTION: DOCKETING DEPARTMENT
P.O BOX 10500
McLean, VA 22102

| EXAMINER |
|---|
| POLIAKOVA-GEORGAN, EKATERINA |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1635 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/01/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

Docket_IP@pillsburylaw.com

| *Corrected*<br>*Notice of Allowability* | **Application No.**<br>15/115,807 | **Applicant(s)**<br>FELDMAN et al. | |
|---|---|---|---|
| | **Examiner**<br>EKATERINA POLIAKOVA | **Art Unit**<br>1635 | **AIA (FITF) Status**<br>Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>amended claims filed on 10/07/2021.</u>.

 ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>1,51 and 54-74</u> . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

 **Certified copies:**

 a) ☐All     b) ☐ Some*     c) ☐ None of the:

 1. ☐ Certified copies of the priority documents have been received.

 2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

 3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

 * Certified copies not received: _____ .

 Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
 **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

 ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

 **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____.

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☐ Examiner's Amendment/Comment

6. ☐ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

/EKATERINA POLIAKOVA-GEORGANTAS/
Primary Examiner, Art Unit 1635

FELDMAN, *et al.* - 15/115,807
Attorney Docket:  055211-0506660

## IN THE CLAIMS:

1. (Previously Presented) A method of treating a human patient suffering from heart failure with reduced ejection fraction, wherein the human patient expresses a decreased level of BCL2-associated athanogene 3 (BAG3) polynucleotide or polypeptide, comprising:

administering to the human patient a therapeutically effective amount of an isolated BAG3 gene, BAG3 polynucleotide, BAG3 protein, BAG3 polypeptide or an expression vector comprising a BAG3 polynucleotide or cDNA sequence thereof to increase expression or amount of BAG3 polypeptides or proteins in a target cell or tissue in the human patient.

2.-50. (Canceled)

51.     (Previously Presented) The method of claim 1, wherein the human patient has a mutation in their BAG3 polynucleotide or polypeptide.

52. – 53. (Canceled)

54.     (Previously Presented) The method of claim 1, wherein the expression vector comprises a viral vector, eukaryotic or prokaryotic plasmid, or yeast vector.

55.     (Previously Presented) The method of claim 54, wherein the viral vector comprises an adeno-associated virus vector (AAV), adenovirus vector, coxsackie virus vector, a cytomegalovirus vector, a lentivirus or retroviral vector.

56.     (Previously Presented) The method of claim 55, wherein the adeno-associated virus comprises: serotype 1 (AAV1), serotype 2 (AAV2), serotype 3 (AAV3), serotype 4 (AAV4), serotype 5 (AAV5), serotype 6 (AAV6), serotype 7 (AAV7), serotype 8 (AAV8), or serotype 9 (AAV9) capsid protein.

57.     (Previously Presented) The method of claim 1, wherein the heart failure with reduced ejection fraction is identified by:

obtaining a biological sample from the human patient; and

detecting a mutation in BAG3 molecules and/or measuring the level of BAG3 polynucleotide or polypeptide in the biological sample wherein a decreased level of BAG3

4815-7613-8237.v1

FELDMAN, *et al.* - 15/115,807
Attorney Docket:  055211-0506660

molecules as compared to a normal control is indicative of heart failure with reduced ejection fraction in the human patient.

58.     (Previously Presented) A method of treating a human patient suffering from heart failure with reduced ejection fraction, comprising:

obtaining a biological sample from a human patient;

measuring the level of BCL2-associated athanogene 3 (BAG3) polynucleotides, polypeptides in the biological sample and/or detecting a mutation in a BAG3 polynucleotide or polypeptide; and,

administering a BAG3 polynucleotide, expression vector comprising a BAG3 polynucleotide or cDNA sequence thereof, or polypeptide to the human patient if the human patient expresses a decreased level of BAG3 polynucleotide or polypeptide compared to control.

59.     (Previously Presented) The method of claim 1, wherein the human patient suffers from familial dilated cardiomyopathy.

60.     (Previously Presented) The method of claim 1, wherein the human patient suffers from non-familial dilated cardiomyopathy.

61.     (Previously Presented) The method of claim 58, wherein the human patient suffers from familial dilated cardiomyopathy.

62.     (Previously Presented) The method of claim 58, wherein the human patient suffers from non-familial dilated cardiomyopathy.

63.     (Previously Presented) The method of claim 1, wherein the BAG3 gene, BAG3 polynucleotide, BAG3, protein, BAG3 polypeptide or an expression vector comprising a BAG3 polynucleotide or cDNA sequence thereof is comprised in a pharmaceutical composition.

64.     (Previously Presented) The method of claim 58, wherein the BAG3 polynucleotide, expression vector comprising a BAG3 polynucleotide or cDNA sequence thereof, or polypeptide administered to the human patient is comprised in a pharmaceutical composition.

4815-7613-8237.v1

FELDMAN, *et al.* - 15/115,807
Attorney Docket:  055211-0506660

65.    (Previously Presented) The method of claim 1, wherein the expression vector comprising a BAG3 polynucleotide or cDNA sequence thereof further comprises a cardiac specific promoter.

66.    (Previously Presented) The method of claim 65, wherein the expression vector comprising the BAG3 polynucleotide or cDNA sequence that further comprises a cardiac specific promoter is flanked by one or more inverted terminal repeats (ITRs).

67.    (Previously Presented) The method of claim 66, wherein the one or more ITRs comprise AAV2 ITRs.

68.    (Previously Presented) The method of claim 58, wherein the expression vector comprising a BAG3 polynucleotide or cDNA sequence thereof further comprises a cardiac specific promoter.

69.    (Previously Presented) The method of claim 68, wherein the expression vector comprising the BAG3 polynucleotide or cDNA sequence that further comprises a cardiac specific promoter is flanked by one or more inverted terminal repeats (ITRs).

70.    (Previously Presented) The method of claim 69, wherein the one or more ITRs comprise AAV2 ITRs.

71.    (Previously Presented) The method of claim 1, wherein the human patient suffers from ischemic heart disease.

72.    (Previously Presented) The method of claim 58, wherein the human patient suffers from ischemic heart disease.

73.    (Previously Presented) The method of claim 1, wherein the human patient suffers from non-ischemic cardiomyopathy.

74.    (Previously Presented) The method of claim 58, wherein the human patient suffers from non-ischemic cardiomyopathy.

4