## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN HOUSER,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 21-0676** |
| | : | |
| **ARTHUR FELDMAN AND TEMPLE** | : | |
| **UNIVERSITY,** | : | |
| **Defendants.** | : | |

### MEMORANDUM OPINION

This is a fight between two distinguished academics and the University at which they have tenure over a Pig Model that could have far reaching consequences in the development of treatments and therapies for certain types of heart attacks.  Defendants Dr. Arthur Feldman ("Feldman") and Temple University ("Temple" or the "University") seek to dismiss, pursuant to Federal Rule of Procedure 12(b)(6), Plaintiff Steven Houser's claims for trade secret misappropriation under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S. § 5301, *et seq.*, breach of contract, defamation, civil conspiracy, unjust enrichment, conversion, specific injunctive relief and a constructive trust.  For the following reasons, Defendants' Motions to Dismiss shall be granted in part and denied in part.

### I.    BACKGROUND[1]

As this opinion is written primarily for the benefit of the Parties, only those facts and details pertinent to the instant Motion will be discussed and familiarity with the prior decisions in this matter will be assumed.  *See Houser v. Feldman*, 2021 WL 4991127 (E.D. Pa. Oct. 27,

---

[1] The following facts are taken from the Amended Complaint.  They are assumed to be true for purposes of this Motion to Dismiss, and all inferences from the facts alleged are construed in the light most favorable to Plaintiff. *See, e.g.*, *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 & 231 (3d Cir. 2008).

2021); *Houser v. Feldman*, 2021 WL 4963534 (E.D. Pa. Oct. 26, 2021).

Houser and his laboratory staff ("lab") developed a pig model ("Pig Model") by inducing heart attacks in pigs and opening their arteries after ninety minutes. He and his lab then took tissue samples from these models ("Pig Samples"), conducted tests of therapies for the treatment of heart failure, and collected data pertaining to heart function ("Pig Data"). Houser alleges that, together, the Pig Model, Pig Samples and Pig Data ("Pig Materials") constitute his trade secrets. He further alleges that the Pig Materials are valuable because they have "broad clinical significance" as tests on such models are necessary precursors to the development of potential treatments and therapies for humans.

Defendant Feldman, like Houser, was studying heart failure. Specifically, he was studying the relationship between heart failure and levels of a molecule known as "BAG3" on a mouse model. Feldman did not have a large animal model like Houser's Pig Model, and his mouse model did not hold the same degree of relevancy or significance to the development of human therapies and treatments. For whatever reason, sometime in 2014 or 2015, Feldman told one of the graduate students working in Houser's lab, Thomas Sharp, that Houser had authorized Feldman to use the Pig Data and Pig Samples for his BAG3 research and that Houser would be a collaborator on forthcoming papers. In reality, Houser had not provided any such authorization, and Feldman had managed to lure Sharp into providing him with Houser's trade secrets ("Stolen Pig Materials"). In 2015, Feldman and Sharp co-authored and published a paper that included the Stolen Pig Data and additional data derived from the Pig Samples. In 2017, Houser learned of this and reported Feldman to the Senior Associate Dean of Faculty Affairs at Temple's School of Medicine, who in turn, forwarded Houser's report to Temple's Integrity Officer and Vice President of Research, Michele Masucci.

2

Houser's report was made pursuant to Temple's "Policy on Misconduct in Research and Creative Work" ("Policy on Misconduct"), which protects "traditional principles of academic freedom" and requires that individuals "engag[ing] in or supervis[ing] research or creative work conduct[] their activities in an ethical manner."  Houser contends that the Policy on Misconduct is incorporated into Houser's employment agreements with Temple.  By way of background, over the course of his time at the University, Houser has had several employment agreements with Temple.  Two employment agreements cover the period of time relevant to this lawsuit—one which began on March 20, 2012 and expired June 30, 2017, and a second which ran from March 23, 2017 to June 30, 2022.  One of Houser's enumerated responsibilities and duties under the 2012 agreement was to "adher[e] to the policies and guidelines of the department school, university and accrediting bodies."  Houser was similarly obligated, under the 2017 agreement, to "ensur[e] compliance with sponsor, University and School policies."  Houser contends that these duties made all of Temple's policies, including the Policy on Misconduct, terms and conditions of both of his employment agreements.

The Policy on Misconduct provides that it "typically will be followed" upon a report of misconduct.  Under its terms, an individual may complain of a violation or act of misconduct by reporting it to an Integrity Officer, like Masucci, who "preliminarily will assess" the complaint and determine whether sufficient information exists to refer the matter to an "Inquiry Committee."  The Inquiry Committee then evaluates whether there is sufficient evidence of actionable misconduct to warrant an investigation or a formal proceeding to impose discipline or dismissal.  The Committee provides a recommendation to the President of the University on the propriety of a formal proceeding, who ultimately decides whether to pursue further action or impose discipline.

About a week after Houser's report regarding Feldman's theft of his Pig Materials, Houser was told that Masucci would like him to accept an apology from Feldman. Houser accepted the apology and assumed that was all that could be done; Feldman did not return the Stolen IP or correct the 2015 Paper to note Houser's contribution. As far as Houser is aware, no inquiry or investigation into Feldman was launched pursuant to the Policy as a result of his complaint.

Things were quiet for a while, but then in October of 2018, Houser learnt, through a public posting by Harvard University, that a peer-reviewed paper he had authored with other academics was under scrutiny by Harvard and the American Heart Association for including a potentially fabricated figure. The concern arose due to the paper's affiliation with a disgraced former professor at Harvard University. Houser corrected the figure, the paper was unflagged and "remains accepted and competent scientific research." But that was not the end of the matter.

Around this time, Feldman—according to the Amended Complaint—began to falsely tell other people, including Houser's colleagues, that Houser was under investigation by Harvard as well as the National Institute of Health. Also, sometime between October 2018 through September 2019, Temple began a preliminary assessment into Houser related to the peer-reviewed paper as well as Houser's ties with the Harvard professor.[2] As part of Temple's assessment, on October 10, 2019, Houser was interviewed by attorneys from the law firm of Wilmer Hale LLP. At that interview, Houser complained about false statements Feldman made

---

[2] The scope and purpose of this investigation is not clear from the Amended Complaint, likely because Houser himself avers that he was never informed about the scope of the inquiry or "the real reasons for the Inquiry." He alleges that Temple launched an "inquiry" into this paper, and asked Houser's staff and co-workers to gather information regarding "the collaboration between" Houser and the Harvard Professor."

to two faculty members, Dr. John Daly and Patrick O'Connor, about Houser being under investigation.  Somewhere in the midst of all this, Temple interviewed Houser's laboratory staff and collected his scientific notebooks and other documents.

While this investigation was pending, Houser contacted Masucci to ask whether Feldman had used the Stolen Pig Materials in connection with any patent filings as he had learned that Feldman's company, Renovcar, had obtained significant private investment for its BAG3 treatments.  Masucci noted it was a fair question but declined to provide an answer until the close of Temple's investigation.

Houser's troubles only continued to mount.  In 2020, Temple launched a second investigation into Houser following a complaint from the Office of Research Integrity of Department of Health and Human Services ("Office of Research Integrity").  This complaint pertained to anonymous allegations of plagiarism or fabrication made on the publishing website "PubPeer."  This investigation is governed by regulations promulgated by the United States Secretary of Health and Human Services.  *See, e.g.*, *Houser*, 2021 WL 4963534, at *1.

Over time, due to the investigations and Temple's failure to respond to his own complaints about Feldman, Houser lost faith in Temple.  He again complained to counsel for Temple (in January 2020) and to Masucci that he believed Feldman had defamed him, but the University took no action.  Because he no longer believed that Temple would respond in good faith to his question as to whether Feldman used the Stolen Pig Materials in patent filings, he enlisted a colleague to help him independently research the issue.  This search led him to the discovery, on November 17, 2020, that Feldman and Temple had jointly filed two U.S. patent applications and three foreign patent applications between 2015 and 2020, all of which include the Stolen Pig Materials.  As of the date of the Amended Complaint, none of the five patents had

issued.  Houser alleges that the Defendants are relying on the Stolen Pig Materials to prosecute

the patents.  He further alleges that Renovacor is using the Stolen Pig materials to develop

treatments for heart failure using BAG3, and that the Stolen Pig Materials were integral to both

Renovacor's obtaining private equity financing and also merging with another entity—Chardan

Healthcare Acquisition Corporation.

Houser alleges that based on the contribution of his Pig Materials to these inventions, he

is, pursuant to the terms of Temple's Policy on Inventions and Patents ("Inventions Policy"),

entitled to a portion of the net income from the use of his Pig Materials, but that he will be

deprived of his profits because he is not named as an inventor or contributor on the patents.

## II.   STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

facially plausible when "the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Plausibility is

"not akin to a probability requirement", *id.*, in that it need not be probable or likely that the

plaintiff "will ultimately prevail on his . . . claim."  *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

Rather, it asks only "for more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678.

To satisfy this standard, the allegations in a complaint must rise above mere speculation;

conclusory statements are insufficient.  *Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 542 (3d

Cir. 2012).  Indeed, "[i]n light of *Twombly*, it is no longer sufficient to allege mere elements of a

cause of action; instead a complaint must allege facts suggestive of [the proscribed conduct]."

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (internal quotation marks omitted) (quoting *Phillips*, 515 F.3d at 233 (3d Cir. 2008)).  Therefore, stating a claim "requires a complaint with enough factual matter (taken as true) to suggest the required element," and calls for "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."  *Id.* (internal quotation marks omitted).  "In other words, 'there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation.'"  *Id.*

Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678.  And for similar reasons, "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements" are disregarded under these standards.  *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

### III.    DISCUSSION

#### a.    Breach of Contract

Houser's breach of contract claim relies on his allegations that the Policy on Misconduct is a component of his employment contracts and thus is part of a "binding and enforceable agreement[]" between him and Temple.  He alleges that Temple breached the terms of such employment contract by investigating him in a manner that did not adhere to the procedures laid out in the Policy on Misconduct and by failing to initiate inquiries or investigations pursuant to the same policy following his complaints about Feldman's theft and defamatory statements. Temple argues, with reference to the University Employee Manual (which it attaches to its brief), that the policy does not form part of an employment contract in that the Manual states that "nothing in this manual constitutes a contract, express or implied."

Generally, in considering a motion to dismiss, "courts [] consider only those allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  As an exception to this general rule, courts may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1996 (3d Cir. 1993), *cert. denied*, 510 U.S. 1042 (1994).  A plaintiff's claims are based on a document if the document is "integral to or explicitly relied upon in the complaint. . . ."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted).

Here, Houser's Amended Complaint references, quotes, and cites specific paragraphs of the Policy on Misconduct, so it accordingly falls within the "narrowly defined types of material" that may be considered without converting a motion to dismiss into one for summary judgment. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999).  Thus, it will be considered in arriving at a decision on this Motion to Dismiss.  In contrast, however, the University Employee Manual is not mentioned anywhere in the Amended Complaint.  Thus, to the extent that Temple's Motion to Dismiss depends upon statements found in the Manual, it fails to defeat Houser's breach of contract claim at this stage of the litigation.

Temple's argument that the Amended Complaint fails to identify the breach of any provision of the Policy on Misconduct (should the policy be deemed part of his employment contracts—as Houser says it should) fares better.  Under Pennsylvania law, to properly plead a breach of contract claim a plaintiff must allege: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting

*CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999)).  Houser alleges that Temple breached the Policy on Misconduct in conducting its two preliminary assessments into his paper and the Office of Research Integrity's complaint because they have been longer in duration and more searching in their review than permitted by the Policy.  Temple counters that the Policy itself does not impose any duties or include any limits on preliminary assessments, so, it did not violate the Policy in conducting its assessments.

The question thus raised is whether the Policy on Misconduct imposes a duty or limit on the duration and scope of a preliminary assessment, which here (again, assuming for the purpose of this Motion to Dismiss that the Policy on Misconduct forms part of Houser's employment agreement with the University) is a question of contract interpretation.  Contracts must be "construed in accordance with the terms of the agreement as manifestly expressed" which means that "the accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties" control.  *See Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994); Restatement (Second) of Contracts § 2 (Am. L. Inst. 1981) (a contractual promise is a "manifestation of intention to act or refrain from acting in a specified way. . . .").  A court rules on the unambiguous terms of a contract as a matter of law, while any ambiguous portions are left to the interpreted by the fact finder.  *See Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980).  The portion of the Policy relevant to a preliminary assessment provides:

> Upon being advised of an allegation of misconduct, the Integrity Officer preliminary will assess whether sufficient information exists to refer the matter to an Inquiry Committee and what, if any, government support or applications for support might trigger government agency oversight of the allegation.  The Integrity Officer will prepare a written report of his or her conclusions.

The language of the Policy on Misconduct is clear and unambiguous in that it *does not* impose

limits or other duties in the scope or duration of the preliminary assessment on Temple. *See*

*Willison*, 637 A.2d at 982 (the "plain meaning of the language used, rather than the silent

intentions of the contracting parties, determines the construction. . . ."). Temple cannot breach a

duty it did not owe. Accordingly, Houser has failed to plead a claim of breach on this basis, and

his claim, to the extent that it is premised on Temple assessments into his paper and the Office of

Research Integrity's complaint, shall be dismissed with prejudice.

Houser, however, raises a second theory of breach also founded on the Policy on

Misconduct—that Temple breached it by failing to assess or take any action on his complaints

about Feldman's defamation or misappropriation of his Pig Materials. Temple does not address

this theory in its briefing. Accordingly, his contract claim, to the extent that it is premised on

this theory, survives. *See Duran v. Equifirst Corp.*, 2010 WL 936199, at *3 (D.N.J. Mar. 12,

2010) ("The absence of argument constitutes waiver in regard to the issue left

unaddressed. . . .").

Temple also moves for dismissal of Houser's breach of contract claim based on the

Inventions Policy. The Inventions Policy, noted briefly above, entitles university employees to a

certain percentage of the profits of their inventions if they were developed through research

sponsored by Temple, or in Temple's facilities. Like the Policy on Misconduct, Houser alleges

that the Inventions Policy is incorporated as a term of his employment agreements. Temple

argues that, given the statements in the Employee Manual, the Inventions Policy is not part of

any contract between Temple and Hauser. But, as explained above, it is improper to consider

terms in the Manual at this stage of the litigation. Houser has alleged that as an inventor, the

Inventions Policy entitled him to a percentage of the net income from the invention. He further

alleges that Temple excluded him from sharing those proceeds, in violation of the terms of the

Invention Policy.  As such, he has adequately plead a breach of the Inventions Policy (assuming for now that it is part of his employment contract with Temple).  Accordingly, Temple's Motion to Dismiss Houser's breach of contract claim arising from the Inventions Policy will be denied.

### b. <u>Accounting</u>

Houser also seeks an accounting from Temple "to determine his interest in and any pecuniary renumeration to which he might be entitled" as the owner or inventor of the Stolen Pig Materials, which were used in Feldman and Temple's joint patent applications and to obtain investment in Renovacor.  Temple argues this claim must be dismissed because Houser has failed to allege—as he must for his accounting claim to be properly pled—that there was a valid contract, and second, that this contract created a relationship whereby Temple had a legal duty to account to Houser.  *Bordoni v. Chase Home Fin. LLC*, 374 F. Supp.3d 378, 387 (E.D. Pa. 2019); Pa. Civ. R. P. 1021(a).  Both arguments are unpersuasive.

Temple again argues that neither the Policy on Misconduct nor the Inventions Policy can serve as the basis for an accounting because the Employment Manual contains a disclaimer and otherwise lacks any statement of "clear intent" to create a contract.  But as explained *supra*, it would be improper to consider the terms of the manual in deciding the Temple's Motion to Dismiss because the Amended Complaint makes no mention of it.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.  As determined *supra*, at least for the purposes of this opinion deciding Temple's Motion to Dismiss, both the Policy on Misconduct and the Inventions Policy are "incorporated" as terms of Houser's employment agreement, and, thus, are part of a "binding and enforceable agreement" between him and Temple.

Temple concedes that it "may have a duty to account to an "inventor" for royalties from 'inventions' under the Inventions Policy."  However, it argues that it owes no such duty to

Houser, at least with respect to what it refers to as the '807 patent application, because he is not an "inventor" of the proposed patent.[3]   In support of this reading, Temple relies on the definition of "inventor" as used in 35 U.S.C. § 256 which provision concerns the correction of the named inventor of a patent.[4]   But the Invention Policy neither refers to Section 256 nor incorporates its provisions.   Indeed, the term "inventor" is not defined in the Policy.   Temple has thus provided no viable argument was to why Section 256 should inform an analysis of the Policy's terms.[5]   Absent that, the argument is unsustainable.   *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010) (stating that a litigant must "offer some argument or development of its theory").   Temple's Motion to Dismiss will therefore be denied with respect to Houser's claim for an accounting.

### c.   <u>Misappropriation of Trade Secrets</u>

Houser claims that Feldman and Temple's theft and use of the Stolen Pig Materials constituted misappropriation under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. §5301, *et seq.* ("PUTSA").   Defendants seek to dismiss Houser's claims on two grounds: (1) that it is time-barred; and, (2) that there is no trade secret at issue.

---

[3] In its Motion to Dismiss, Temple only challenges Houser's inventorship of the '807 Patent Application; it does not mention or challenge the other patent applications described in the Amended Complaint.   Accordingly, Houser's accounting claim, to the extent that it is premised on these other patent applications, also survives.   *See Duran*, 2010 WL 936199, at *3 ("The absence of argument constitutes waiver in regard to the issue left unaddressed. . . .").

[4] 35 U.S.C. § 256 pertains to the "Correction of named inventor" on an issued patent.   Section 256 requires a person who contends that she is an inventor to demonstrate that she "contribute[d] to the conception of the claimed invention."   *See Blue Gentian v. Tristar Prods., Inc.*, 434 F. Supp.3d 203, 214 (D.N.J. 2020) (quoting *Eli Lilly & Co. v. Aradigm Corp.*, 376 F. 3d 1352, 1358 (Fed. Cir. 2004)).

[5] Houser also argues that he has sufficiently alleged that he would qualify as an "inventor" even under the patent law cited by Temple.   The standard to correct inventorship under this law, 35 U.S.C. § 256, requires an inventor to demonstrate that he or she "contribute[d] to the conception of the claimed invention."   *See Blue Gentian*, 434 F. Supp.3d at 214 (D.N.J. 2020).   Here, Houser alleges that the Stolen Pig Materials were "used" and "relied upon" in the patent application and were "essential piece[s] of the claimed invention[s]" or "essential to the validity of the pending claims."   As there is no "explicit lower limit on the quantum or quality of the inventive contribution required for a person to qualify as a joint inventor[,]" *id.* at 217-18, Houser's allegations would pass muster under Section 256's standard, even if it were applicable here.

1. <u>**Statute of Limitations**</u>

Generally, a defense premised on the statute of limitations is an affirmative defense, which the Federal Rules of Civil Procedure require to be raised in an answer, not a motion to dismiss. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Nonetheless, in this Circuit an affirmative defense may be raised in a motion to dismiss when it is "apparent on the face of the complaint" that the claim lies outside of the limitations period. *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). "The face of the complaint" has, in turn, been interpreted to mean the allegations contained in the complaint, matters of public record, "materials embraced by the complaint, and materials attached to the complaint." *See Hoffman v. Nordic Naturals, Inc.*, 837 F.3d 272, 280 n.52 (3d Cir. 2016) (quoting *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012)). The burden of establishing the applicability of an affirmative defense rests with the defendant. *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 292 (3d Cir. 2010).

A claim for misappropriation under the PUTSA must be brought "within three years after the misappropriation was discovered or by the exercise of reasonable diligence should have been discovered," or will be barred by the statute of limitations. *Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 736 (3d Cir. 2019) (citing 12 Pa. C.S. § 5307) ("*Heraeus*"). The PUTSA defines "misappropriation" as, *inter alia*, the acquisition of a trade secret by one who knows or has reason to know it was acquired by improper means, or the disclosure or use of a trade secret by someone who improperly acquired it or knew or had reason to know that the trade secret was acquired through improper means. 12 Pa. C.S. § 5302.

Although the PUTSA—like the federal Defend Trade Secrets Act ("DTSA")—is modeled on the Uniform Trade Secrets Act ("UTSA"), it diverges from both these laws on how the statute of limitations operates for claims of "continuing" misappropriations. Both the DTSA and the UTSA treat claims that a defendant repeatedly misappropriated a plaintiff's trade secret,

*i.e.*, a "continuing misappropriation," as a single claim of misappropriation instead of a series of claims. *See Houser v. Feldman*, 2021 WL 4991127, at *4-5 (E.D. Pa. Oct. 27, 2021). In doing so, these two statutes conceive of trade secrets as "the violation of a relationship in which the trade secret owner had reason to believe that the information would be kept in confidence" which is "not torn anew with each added" misappropriation. *Id.*

By contrast, each misdeed that would qualify as a misappropriation under the PUTSA gives rise to a separate claim for liability. As each act of misappropriation constitutes a separate claim, "each act separately triggers its own limitations period." *Heraeus*, 927 F.3d at 737. Therefore, the statute of limitations for each distinct misappropriation accrues separately from that of other misappropriations. *Id.* In treating repeated acts of misappropriation in this manner, Pennsylvania eschewed the "relationship view" of trade secrets endorsed by the UTSA and the DTSA and instead adopted the "property view." *Id.* at 738. The property view conceives of trade secrets "in the nature of property" which can be "damaged or destroyed by the adverse use," such that "each use is a new wrong." *Id.* (quoting *Monolith Portland Midwest Co., v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 293 (9th Cir. 1969)).

Notably, the PUTSA's also incorporates the "discovery rule" in the operation of its statute of limitations. When the discovery rule applies, "the limitations period only begins to run once the plaintiff is no longer ignorant of his loss, *i.e.*, once he is able to ascertain the fact of a cause of action." *Id.* at 734 (internal citation and quotation marks omitted). This means that, under the PUTSA, a plaintiff has three years to file an action once he "discovers" or "should have . . . discovered" the misappropriation. *Id.* (quoting 12 Pa. C.S. § 5307). The discovery rule does not toll the statute of limitations until the plaintiff knows of "all operative facts" or of "the exact nature of his injury"; it will run so long as it "objectively appears that the plaintiff is

14

reasonably charged with the knowledge that he has an injury caused by another." *Id.* (emphasis, internal citations, quotation marks omitted).

Whether the discovery rule applies to toll the statute of limitations is a question that is considered at the earliest on a motion for summary judgment, not a motion to dismiss.[6]  And even then, a claim may be dismissed on this basis at this juncture only when "the undisputed facts lead unerringly to the conclusion that the time it took to discover an injury was unreasonable as a matter of law." *Haggart*, 703 A.2d at 528 (quoting *A. McD*, 621 A.2d at 130). Except for this narrow set of circumstances, the issue will be left for the jury "to determine whether a plaintiff should have made a timely discovery of his injury." *Id.*; *Smith*, 153 A.2d at 481 ("Whether the statute has run on a claim is usually a question of law for the judge, but where, as here, the issue involves a factual determination, *i.e.* what is a reasonable period, the determination is for the jury.").

In the Amended Complaint, Houser raises several theories of misappropriation by Feldman and Temple, including:  (1) Feldman's theft of his trade secrets; (2) Feldman's 2015 publication which included the Stolen Pig Materials; (3) Temple and Feldman's joint patent applications, which included the Stolen Pig Materials; and, (4) Temple and Feldman's continued use of and reliance on the Stolen Pig Materials to prosecute their patent applications.[7]

---

[6] *See, e.g.*, *Heraeus*, 927 F.3d at 734. (dismissing certain misappropriation claims at summary judgment on grounds that statute of limitations, even under discovery rule, started nine months earlier than plaintiff argued); *Haggart v. Cho*, 703 A.2d 522, 528 (Pa. Super. 1997) (dismissing claim against psychiatrist at summary judgment because, *inter alia*, the discovery rule did not toll plaintiff's claim); *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (dismissing claim at summary judgment because plaintiff "should have" discovered its claim earlier than it had, such that the statute of limitations would have run by the time it brought its suit); *A. McD v. Rosen*, 621 A.2d 128, 130-31 (Pa. Super. 1993) (same); *Smith v. Bell Tel. Co. of Pa.*, 153 A.2d 477, 482 (Pa. 1959) (holding that whether plaintiff's efforts to discover his injury was reasonable was a question for the jury to determine at trial, not the judge).

[7] Houser also alleges three other theories upon which his PUTSA misappropriation claim is premised that are not addressed in Defendants' Motions to Dismiss.  These theories of misappropriation include: (1) that Feldman's company, Renovacor, continued to use the Stolen Pig materials to develop treatments for heart failure using BAG3; (2) that Temple and Feldman used the Stolen Pig Materials to obtain private equity financing for Renovacor; and,

Of these theories underlying Houser's misappropriation claim, only the first two are clearly time-barred.  Houser avers that he first learnt of Feldman's theft and 2015 publication including the Stolen Pig Materials by February 2017.  It is therefore evident from the face of the Complaint that the statute of limitations for these alleged misappropriations had run by February 2020—a year before the present lawsuit was brought.  Accordingly, Houser's claim premised on these two misappropriations are time-barred and shall be dismissed with prejudice.

Defendants also argue that Houser's PUTSA claim stemming from their patent applications are time-barred in that, although Houser claims he learned of the patent applications in 2020, he "should have known of" the applications by the date of their application or, at the latest, February 2017, when Houser reported Feldman's misappropriations to Temple.[8]  The Defendants thus argue that the discovery rule does not toll Houser's remaining theories of misappropriation under the PUTSA.

But as noted before, determining whether the discovery rule does or does not toll a claim is a question that cannot be decided on a motion to dismiss.  *Haggart*, 703 A.2d at 528.  Indeed, dismissing Houser's misappropriation claim based on when Defendants believe he "should have known" of their misdeeds would clearly be at odds with this Circuit's rule that a claim can be dismissed only when the statute of limitation's expiry is clear from the face of the complaint.[9]

---

(3) that Temple and Feldman used the Stolen Pig Materials to merge Renovacor with Chardan Healthcare Acquisition Corporation.  As neither Defendant addresses these theories of misappropriation in their briefing, they have not moved to dismiss Houser's PUTSA claim premised on these grounds.  Accordingly, Houser's PUTSA claim, to the extent that it is premised on these alleged misappropriations, survives.  *See Duran*, 2010 WL 936199, at *3 ("The absence of argument constitutes waiver in regard to the issue left unaddressed. . . .").

[8] Temple also argues that once Houser reported Feldman's behavior, he should have known that Temple "had access to, and use of, the Stolen Pig Materials" and thus would begin misappropriating them.  But Houser does not allege that he provided Temple with the Stolen Pig Materials when making his report, nor (on a motion to dismiss standard) can it be extrapolated from Feldman's theft that Temple had access to Houser's trade secrets.

[9] Temple argues that the statute of limitations on the misappropriations based on the patent applications began to run when they were filed, because "patent applications put parties on constructive notice."  Temple cites to two non-binding decisions by district courts outside of this Circuit, neither of which consider the discovery rule under the

16

*Iqbal*, 556 U.S. at 678.

## 2.   The Existence of a Trade Secret

Beyond the statute of limitations issue, Defendants argue that Houser's PUTSA claim must fail because he has not alleged the existence of a trade secret.

Temple argues that the Stolen Pig Materials do not qualify as trade secrets because Feldman's publication of them in his 2015 Paper and their subsequent publication and disclosure by the Defendants' patent applications eviscerated their trade secret status.  There are two problems with Temple's argument.  First, though Temple represents that the PUTSA and DTSA interpret "trade secret" the same way, it offers nothing to support its argument that the statutes are consistent on the question of whether a defendant's publication of a trade secret destroys its status.  Indeed, the only case law Temple cites for this argument are non-binding, out-of-Circuit opinions which hold that patent-filings may start running the statute of limitations under DTSA.  Neither of Temple's cited cases hold that a defendant's disclosure of a trade secret through a publication or patent application destroys a litigant's PUTSA claim.  Second, since this Court previously held that the defendant's publication of a trade secret did not defeat Houser's DTSA claim, s*ee Houser*, 2021 WL 4991127, at *5-7, if Temple was correct that the DTSA and PUTSA were consistent on this issue it would only mean that its argument must also fail against Houser's PUTSA claim.

Feldman's arguments do not fare better.  He argues that the Stolen Pig Materials are not trade secrets under the PUTSA because pig models, like Houser's, are commonly used and

---

PUTSA.  *See, e.g.*, *WesternGeco v. Ion Geophysical Corp.*, 2009 WL 3497123, at *4 (S.D. Tex. Oct. 28, 2009) (considering the "discovery rule" as applied to a breach of contract claim under Texas law); *Zirvi v. Flatley*, 433 F. Supp.3d 448, 459 (S.D.N.Y. 2020) (considering the discovery rule under the DTSA).  Temple offers no explanation as to why these analyses should be instructive on the interpretation of the PUTSA.

standard in their industry.  In support of this, Feldman points to a 2011 study—which is not referenced anywhere in the Amended Complaint—that used its own pig model.  Feldman further argues that Houser has even conceded that the Pig Model is "industry-accepted, readily ascertainable, knowable and repeatable" because the Amended Complaint describes the Pig Model as a "gold standard."  As already explained, this Court cannot consider materials, like the referenced 2011 study, which are wholly external to a complaint in deciding a motion to dismiss as it would convert it into a motion for summary judgment.  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d at 287.  Further, the phrase "gold standard" does not necessarily mean that something is a well-known or established standard—by dictionary definition it means only that it is a very good version of something against which other versions can be compared.  *See e.g.*, *Gold standard*, Cambridge English Dictionary, https://dictionary.cambridge.org/dictionary/english/gold-standard (last visited Apr. 18, 2022). This argument, therefore, does not preclude a finding that Houser's Pig Materials are trade secrets.

Feldman also argues that the Stolen Pig Materials are not trade secrets because they were "not the focus of [Houser's] research" but were instead "a tool."  In so arguing, Feldman posits that only "cell and drug therapies" tested upon the model could qualify as trade secrets.  Even assuming *arguendo* that the Stolen Pig Materials are a "tool," Feldman fails to cite any law or authority to support his argument that a tool can never qualify as a trade secret.  Where, as here, an argument contains "no more than a conclusory assertion" it "will be deemed waived." *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997); *see also* E.D. Pa. Local Civ. R. 7.1(c) (requiring that "(e)very motion . . . shall be accompanied by a brief containing a concise statement of the legal authorities relied upon in support of the motion.").

Accordingly, Defendants' Motion shall be granted only with respect to Houser's claims founded on Feldman's original theft and the 2015 publication, which shall be dismissed with prejudice; it shall be denied with respect to all other alleged misappropriations.

### d.  Conversion

Defendants argue that Houser's claim for conversion of his trade secrets must be dismissed because he has failed to plead—as they maintain he must—that the trade secrets were communicated within the context of a confidential relationship.  In support of this argument, Defendants rely upon *Teva Pharmaceuticals USA, Inc. v. Sandhu*, which dismissed a conversion claim for this very reason.  291 F. Supp.3d 659, 680 (E.D. Pa. 2018).  The *Teva* court held that a claim for conversion of trade secrets consists of three elements: (1) that a plaintiff own a trade secret; (2) that the trade secret was communicated to the defendant within a confidential relationship; and, (3) that the defendant used the trade secret to the plaintiff's detriment.  *Id*. This test has been followed by a handful courts within this district[10] and appears to have originated from the 1980 decision *Sims v. Mack Truck Corporation*.  488 F. Supp. 592, 597 (E.D. Pa. 1980), *overruled on other grounds by SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244 (3d Cir. 1985).  Upon closer review, the *Sims* court appears to have inadvertently blended the tests for a claim of a misappropriation of a trade secret and a claim for the conversion of valuable business information.  *Id.* at 597 (applying cases on claims for the misappropriation of a trade secret to a claim for conversion).

In contrast, a claim for conversion under Pennsylvania law is "the deprivation of

---

[10] *See, e.g.*, *Fluid Power, Inc. v. Vickers, Inc.*, 1993 WL 23854, at *3 (E.D. Pa. Jan. 28, 1993) (citing *Sims*, 488 F. Supp. at 597); *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*, 2001 WL 856946, at *8 (E.D. Pa. July 26, 2001) (citing *Fluid Power*, 1993 WL 23854, at *3); *Am. Hearing Aid Assocs., Inc. v. GN Resound N. Am.*, 309 F. Supp.2d 694, 705 (E.D. Pa. 2004) (citing *Schmidt, Long & Assoc., Inc.*, 2001 WL 8856946, at *8); *Teva Pharms. USA, Inc.*, 291 F. Supp.3d at 680 (citing *Am. Hearing Aid Assocs., Inc.*, 309 F. Supp.2d at 705).

another's right of property in, or use or possession of, a chattel or other interference therewith, without the owner's consent and without lawful justification." *Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964).  Pennsylvania recognizes that claims for conversion may be founded on confidential business information, including trade secrets: "[o]ne who, for the purpose of advancing a rival business interest, *procures by improper means* information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information." *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1231 (Pa. Super. 1989) (emphasis added) (quoting Restatement (First) of Torts § 759 (Am. L. Inst. 1939)); *Pestco, Inc. v. Associated Prods., Inc.*, 880 A.2d 700, 708-09 (Pa. Super. 2005).  A properly pled claim of conversion therefore *must* include an allegation that a defendant acquired the information through misconduct; but the information need not have been acquired through a confidential relationship.  *See Kenset Corp. v. Illanjian*, 600 F. App'x 827, 832 (3d Cir. 2015) ("Under Pennsylvania law, an action for [] a conversion of business information lies where another acquires confidential business information (trade secrets or other non-public information) through misconduct. . . ."); *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, 2007 WL 4394447 (E.D. Pa. Dec. 13, 2007) (dismissing claim for conversion of business information for failing to plead that defendants acquired plaintiff's business information through improper means).  Misconduct can include misrepresentations.  *Kenset Corp.*, 600 F. App'x at 832; *Den-Tal-Ez, Inc.*, 566 A.2d at 1231.

The Amended Complaint includes allegations that Feldman obtained Houser's trade secrets by misrepresenting to Sharp, a student working for Houser, that he had Houser's permission to use them to Sharp.  It also alleges that Temple knew of Feldman's misdeed but nonetheless worked with him to file patents and monetize the Stolen Pig Materials, all the while

misrepresenting its involvement with Feldman and their use of the Stolen Pig Materials to Houser. This is sufficient to satisfy the elements for a claim for conversion of a trade secret under the appropriate test. Defendants' Motion to Dismiss this claim shall therefore be denied.

### e. **Unjust Enrichment**

Defendants both argue that Houser's claim for unjust enrichment must be dismissed because he fails to plead that "he conferred a benefit on anyone" in that he alleges that the "benefit was stolen from him and shared against his will." In sum, Defendants' argue that because Houser did not voluntarily share his trade secrets, Defendants were not unjustly enriched by their theft. To state a claim for unjust enrichment under Pennsylvania law, there must be: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and, (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1204 (Pa. Super. 1999). Nowhere in these elements is a requirement that the benefit be voluntarily conferred, as Defendants argue. Indeed, Defendants fail to cite a single case or legal authority to support of their reading of the requirements for a claim of unjust enrichment. While this alone merits denial of their Motions, *see* E.D. Pa. Local Civ. R. 7.1(c) (requiring that "(e)very motion . . . shall be accompanied by a brief containing a concise statement of the legal authorities relied upon in support of the motion"), this argument also flounders under case law, which permits unjust enrichment claims against parties who "wrongfully secured . . . a benefit." *Mitchell*, 729 A.2d at 1204 (quoting *Torchia ex rel. Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. 1985)). Defendants' Motion to Dismiss Houser's unjust enrichment claim shall therefore be denied.

####     f.   **Defamation Claim against Feldman**

Houser claims that Feldman defamed him by telling their colleagues that "Dr. Houser was under investigation by Harvard and the National Institutes of Health ('NIH')" some time "[a]fter Harvard's listing of retraction requests in October 2018. . . ."  Feldman argues that this claim must be dismissed because the statute of limitations had run by the time Houser brought this suit.  Feldman comes to this conclusion, though he concedes that "Dr. Houser [did] not identify a particular date on which these comments are purported to have been made" but nonetheless presses for dismissal, because Houser was "aware of [the comments], in or around October 2018", or in October 2019 when he "knew of and complained about [Feldman's] comments when the Wilmer Hale attorneys interviewed him. . . ."

As previously noted, a defense premised on the statute of limitations may be raised in a motion to dismiss when it is "apparent on the face of the complaint" that the claim lies outside of the limitations period.  *Wisniewski*, 857 F.3d at 157.  Under Pennsylvania law, the statute of limitations for defamation claims is one year from the date of publication.  *In re Phila. Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012) (citing 42 Pa. C.S. § 5523).  "The relevant triggering event for the statute of limitations in a defamation action under Pennsylvania law, however, is the *publication* of the defamatory communication by the defendant. . . ." *McClenaghan v. Turi*, 567 F. App'x 150, 153 (3d Cir. 2014) (emphasis in original) (citing *Dominiak v. Nat'l Enquirer*, 266 A.2d 626, 629 (Pa. 1970)).  Each publication constitutes "a separate, potentially-tortious act, governed by its own statute of limitations."  *Id.* (citing *Graham v. Today's Spirit*, 468 A.2d 454, 457 (Pa. 1983)).

Applied here, all the Amended Complaint reveals about the timing of the alleged defamation is that there were several statements which were made to more than one colleague,

and that they were made "[a]fter Harvard's listing of retraction requests in October 2018 were made public." The Amended Complaint does not specify the date on which Harvard's listing was made public, nor does it specify how many statements were made, or the dates on which they were made. All one can tell from the Amended Complaint is that at least some defamatory statements were made prior to October 10, 2019, the date of Houser's meeting with attorneys from Wilmer Hale LLP, because Houser professes to have informed the attorneys about "rumors [Dr. Daly and O'Connor] heard which were the same as those being disseminated by Dr. Feldman." It is evident from the face of the complaint that the one-year statute of limitations for the specific statements about which Houser complained in October 2019 had run by the time he filed this suit in February 2021.

But it is far from clear that the statute of limitations puts an end to Feldman defamation claim—as written the Amended Complaint can plausibly be read to suggest that there were more such statements made within the limitations period. Because it is not clear from "the face" of the Amended Complaint that all the statements which form Houser's defamation claim are time-barred, Feldman's motion to dismiss is granted with respect to those statements made to Dr. Daly and O'Connor which Houser disclosed to the Wilmer Hale attorneys and they shall be dismissed with prejudice. Feldman's motion shall be denied with respect to all other statements in that any such statements are not barred by the statute of limitations.

### g. Civil Conspiracy

Houser alleges that the Defendants conspired to deprive him "of his ownership and monetary rights to the [Stolen Pig Materials], so that Defendants could use the [Stolen Pig Materials] to earn significant monies (and thereby increase their own respective shares and prestige." Defendants' main arguments that Houser's claim for civil conspiracy must fail are

that: (1) the intra-corporate conspiracy precludes a cause of action premised on Temple conspiring with its employee, Feldman; and, (2) Houser has failed to allege that Defendants acted with malice.

Civil conspiracy in Pennsylvania requires the Plaintiff to allege "that *two or more persons combined* or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979) (emphasis added). Although corporations and other corporate entities like Temple are separate and legally distinct from the people they employ which they, nevertheless, can act only through their officers and employees. *Jagielski v. Package Mach. Co.*, 489 F. Supp. 232, 233-34 (E.D. Pa. 1980). Thus, the intra-corporate conspiracy doctrine treats allegations that a corporation and its employee conspired as really alleging that a "single, corporate entity" has conspired with itself. *Id*. Thus, allegations that an entity conspired with its employees fails to meet the first requirement of a civil conspiracy.

That is, of course, unless an exception applies. If the employee is alleged to have acted on his own behalf for his own personal benefit, then a claim for civil conspiracy may exist because there are now two conspirators—the corporate entity and its employee, whose actions are not made on behalf of the corporation but for his own benefit. *See Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003). To be sure, this exception "is poorly defined," and its viability is somewhat unsettled. *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp.3d 494, 514 (E.D. Pa. 2014). Pennsylvania appellate courts have reached conflicting conclusions about its existence, with unfortunately little explanation. *Compare Lilly v. Boots & Saddle Riding Club*, 2009 WL 9101459, at *6 (Pa. Commw. July 17, 2009) (opining that no exception to the intra-corporate conspiracy doctrine "is recognized by Pennsylvania state

courts") *with Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 489 A.2d 1364, 1372 (Pa. Super. 1985) (allowing a civil conspiracy claim against a hospital and its medical staff to proceed).  To date, the Pennsylvania Supreme Court has not addressed this issue.  *See Accurso*, 23 F. Supp.3d at 515 ("[T]he operative question is whether the Pennsylvania Supreme Court would recognize such an exception, and, based on the Court's research . . . the answer is unclear." (internal citation omitted)).

However, the Third Circuit, in analyzing the application of this exception in the context of attorney-client conspiracies under two federal laws pertaining to conspiracies to interfere with civil rights, has opined that a conspiracy between a corporation and its officer can exist "when the employees have acted for their sole personal benefit" because these actions would therefore be "outside the course and scope of their employment." *See Heffernan v. Hunter*, 189 F.3d 405, 412-13 (3d Cir. 1999).  The reasoning has parallels to (and roots in) the doctrine of *respondeat superior*.  Put simply, an employer cannot be subject to liability for the acts an employee takes "for their sole personal benefit", since the employee would have been acting outside the scope of his employment.  *Id.*  And because that employee was acting outside of his employment, he was not an "employee" with respect to his conspiratorial acts.  Rather, he was a free agent, able to conspire with his employer for his, not the employer's, ultimate benefit.  *Id.*  This reasoning is persuasive, and as other courts have noted, is "logically consistent with Pennsylvania law and common sense." *See Cannon v. City & Cnty. of Phila.*, 2014 WL 7399037, at *10 (E.D. Pa. Dec. 30, 2014) (Pratter, J.) (collecting cases).

For this reason, Houser's civil conspiracy claim against Temple and Feldman can proceed so long as the Amended Complaint sufficiently alleges that Feldman acted for his own benefit, not Temple's.  It easily clears this hurdle—Houser alleges that Feldman acted "for his

own personal benefit" to further his own research into BAG3 and monetized it by filing patents which relied upon the Stolen Pig Materials. This, in turn, helped Feldman's own company, Renovacor, obtain "significant private equity financing." In doing so, Feldman violated Temple's policies, specifically its Policy on Misconduct, and his violation could be punished by discipline, including his dismissal. Though Temple is co-listed on Feldman's patent applications, the pleadings sufficiently allege that Feldman's actions were not solely for Temple's benefit: they were driven for his own benefit, both monetary, professional and to further his own research.[11] This is more than enough to show that the exception to the intra-corporate doctrine applies. *See, e.g.*, *Accurso*, 23 F. Supp.3d at 516 (finding allegation that defendants acted in concert to deprive Plaintiff of his interest in the partnership and monies "for their mutual personal benefit" to be sufficient to survive a motion to dismiss).

Feldman further argues that the civil conspiracy claim must fail because Houser has failed to allege that either he or Temple acted with "malice." Rather, Feldman contends that "the Amended Complaint supports the facts that the Defendants were in pursuit of innovative scientific discovery." Malice for the purposes of a civil conspiracy claim is defined as "an intent to injure" which is "absent justification." *See Thompson Coal Co.*, 412 A.2d at 472. While acting "solely" to advance one's own "legitimate business interests" constitutes sufficient justification, acting "merely" to injure the plaintiff is never justified. *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp.3d 437, 454 n.4 (E.D. Pa. 2014).

Houser alleges that Feldman dislikes him, and intentionally made false statements to their colleagues for the purpose of defaming him and harming his reputation. He further alleges that

---

[11] In its Reply brief, Temple argues that Feldman acted on Temple's behalf because his 2015 publication which first relied upon the Stolen Pig Materials describes him to be a "member of the Temple University School of Medicine" and includes a Temple University email address. These common indicia of affiliation with one's employer do not warrant, by themselves, a conclusion that an employee's actions were taken for their employer's benefit.

Feldman misappropriated his Pig Materials to avoid sharing "credit (or potential financial gains)" with Houser.  Feldman's co-defendant, Temple, is alleged to have acted in "bad-faith" in launching its investigations into Houser, which are "pretext to malign, harass, threaten and intimidate" him into dropping his pursuit of his rights to the Stolen Pig Materials and financial renumeration stemming therefrom.  He further alleges that Temple means to intimidate and harass him for refusing to launch any investigations into Feldman based on his complaints about Feldman's conduct.  These allegations are more than enough to support a reading that the Defendants were driven, at least in part, not just by the "pursuit of innovative scientific discovery" as they claim, but by a desire to harm Plaintiff.    At this stage, these allegations suffice to allow Plaintiff's civil conspiracy claim to proceed.  *See Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp.3d 541, 558-59 (E.D. Pa. 2018); *Minehart v. McElhinny*, 2017 WL 5885730, at *3-4 (E.D. Pa. Nov. 28, 2017).[12]

Accordingly, Defendants' Motions to Dismiss Houser's claim for civil conspiracy shall be denied.

### h.  Specific Injunctive Relief and Constructive Trust

Houser also asserts "claims" against both Defendants for "specific injunctive relief" and a "constructive trust."  However, as Defendants both correctly maintain, these "claims" are not so much separate causes of action as they are a form of relief, or remedy, for the other wrongs Houser alleges.  *See, e.g.*, *Chruby v. Kowaleski*, 534 F. App'x 156, n.2 (3d Cir. 2013) ("[A]n injunction is a remedy rather than a cause of action. . . .") (citing *Birdman v. Off. of the*

---

[12] Defendant Temple also argues that Houser's civil conspiracy claim must be dismissed because Houser lacks a "viable underlying substantive claim."  It is true that a claim for civil conspiracy depends on pleading a "separate underlying intentional . . . act" that is tortious in nature.  *Accurso*, 23 F. Supp.3d at 512.  As explained above, Houser has several "viable underlying substantive claims" which meet this requirement.

*Governor*, 677 F.3d 167, 172 (3d Cir. 2012)); *In re Shop-Vac Mktg. & Sales Pracs. Litig.*, 964 F. Supp.2d 355, 365 (M.D. Pa. 2013) ("[I]njunctive relief is a remedy, not an independent cause of action."); *Herley Indus., Inc. v. R Cubed Eng'g, LLC*, 2021 WL 229322, at *5-6 (E.D. Pa. Jan. 22, 2021) ("[I]njunctions are a form of relief, not a claim to be pleaded as a separate count."); *Webster v. LLR, Inc.*, 2018 WL 10230741, at *12 (W.D. Pa. Aug. 20, 2018) (explaining that a constructive trust is "a remedy, not a claim" to a claim of unjust enrichment.).

For this reason, these claims shall be construed as ad damnum clauses rather than as claims.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss will be granted in part with respect to his claims for breach of contract, misappropriation of trade secrets under the PUTSA and defamation.  Houser's claims for a specific injunction and a constructive trust shall be construed as ad damnum clauses.  In all other respects the Motions shall be denied.

An appropriate order follows.

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**